REDACTED FOR PUBLIC FILING

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
UNITED STATES OF AMERICA,                                      :
                                                               :  ECF CASE
                         Plaintiff,                            :  12 Cr. 125 (JSR)
                                                               :
           vs.                                                 :
                                                               :
DOUG WHITMAN,                                                  :
                                                               :
                         Defendant.                            :
                                                               :
-------------------------------------------------------------- X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DOUGLAS F. WHITMAN'S MOTION IN LIMINE FOR A RULING AND JURY INSTRUCTION CONCERNING THE LEGALITY OF FINANCIAL "CHECKS"

David L. Anderson
(Admitted *pro hac vice*)
SIDLEY AUSTIN LLP
555 California Street
San Francisco, CA
(415) 772-1200
(415) 772-7400 (fax)

David M. Rody
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

Bradford A. Berenson
(Admitted *pro hac vice* )
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Douglas F. Whitman*

i

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

ARGUMENT ..........................................................................................................................2

CONCLUSION .....................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
   No. 04 Civ. 10014, 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009) ................................................8

*Dirks v. SEC*,
   463 U.S. 646 (1983) ...............................................................................................................1, 3, 4, 9

*Highland Capital Mgmt., L.P. v. Schneider*,
   551 F. Supp. 2d 173 (S.D.N.Y. 2008) .........................................................................................8

*SEC v. Monarch Fund*,
   608 F.2d 938 (2d Cir. 1979) ........................................................................................................2

*State Teachers Ret. Bd. v. Fluor Corp.*,
   576 F. Supp. 1116 (S.D.N.Y. 1983) ............................................................................................4

**OTHER AUTHORITIES**

17 C.F.R. Part 243 (2000) .....................................................................................................................6

Federal Rule of Evidence 404 ..........................................................................................................6, 7

Defendant Douglas F. Whitman respectfully moves that the Court hold, and instruct the jury, that there is nothing inherently improper about the common practice in the investment community of conducting financial "checks"—*i.e.*, verifying the financial information disseminated by a company by checking with the company's employees, its suppliers, its distributors, its resellers, its competitors, or others in the industry. These checks, in and of themselves, are entirely lawful and indeed valuable to the proper functioning of financial markets, as the Supreme Court has recognized, *see Dirks v. SEC*, 463 U.S. 646, 658-59 (1983). To be sure, financial checks – like potentially any conduct by market participants – can involve illegality, if the participants engage in acts that satisfy the elements of specified crimes such as securities fraud. In this case, however, there is a likelihood that, absent guidance from the court, the jury will be misled into thinking that such financial checks indicate unlawful intent, in and of themselves, because they often are conducted without the knowledge or approval of company management.

The government has provided notice that it may introduce tapes of numerous calls reflecting that such checks occurred. In order to properly assess the import of that evidence, the jury should be instructed that evidence of financial checks is not, without more, proof of securities fraud or unlawful intent. Given the apparent volume of likely evidence on this question, and in order to permit the parties to shape their presentation of evidence in conformance with the Court's resolution of this issue, we respectfully request that the Court provide a pretrial ruling on this issue, and instruct the jury accordingly. A proposed instruction is attached as Exhibit 1 to the Decl. of David L. Anderson ("Anderson Decl.") filed herewith.

## ARGUMENT

On February 8, 2012, a grand jury in the Southern District of New York returned an indictment against Mr. Whitman charging him with two counts of conspiracy to commit securities fraud and two counts of securities fraud. Indictment, No. 12 Cr. 125 (S.D.N.Y. filed Feb. 8, 2012), ¶¶ 9-10, 24-25, 29. The matter is currently scheduled for trial on July 30, 2012.

1. The government has given notice that, as part of its case in chief, it may seek to introduce evidence that Mr. Whitman conducted various financial "checks"—which, as a good financial analyst and investor, he did. *Cf. SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir. 1979) ("All reasonable investors seek to obtain as much information as they can before purchasing or selling a security."). It is both common and lawful for analysts to conduct such checks, and the markets would function less well without them. This is because the investment community does not—and should not—take statements made by corporate management at face value. Such statements are liable to be self-serving, so analysts instead are professional skeptics, treating management statements with the same healthy suspicion with which the press treats information provided by the government. Checks are so common, and so well-accepted, that published analyst reports routinely discuss such checks—including checks performed on the very companies at issue in this case.[1]

---

[1] *E.g.*, Thomas Weisel Partners, Polycom, Inc. Outperform at 1-3 (Dec. 21, 2005) ("[O]ur checks with half a dozen U.S. VARs and distributors as well as several international contacts suggest that Polycom is likely to hit revenue and EPS expectations.") (Anderson Decl. Ex. 2) filed herewith); Piper Jaffray, Market Share Momentum Has Shifted at 1 (Dec. 19, 2005); ("We touched base with several of Polycom's channel partners this quarter and the feedback regarding Q4 demand has been consistently upbeat.") (Anderson Decl. Ex. 3); Piper Jaffray, Polycom, Inc. Outperform: Takeaways from VON and Recent Management Meetings, at 1 (March 20, 2006) ("We met with Polycom's management during a recent field trip to the company's headquarters and touched base with a variety of industry contacts . . . and came away feeling increasingly more upbeat with respect to the near-term business fundamentals for PLCM.") (Anderson Decl. Ex. 4).

2

There are multiple types of "checks" that a financial professional interested in a particular company or its securities may perform. "Company checks" are directed to executives or employees at one specific company in order to learn information about that company, its products, and its business. In a "channel check," the query will be directed to customers, distributors, resellers, or suppliers of the company in question: By seeking information about, for instance, inventory levels, distributors', resellers', or retailers' attitudes toward a product, the success of marketing initiatives, pricing trends, or local orders or sales trends, the analyst may gain insight into company performance. "Competitor checks," as the name implies, are directed to a company's competitors in order to determine the potential effect of competition on the company, or information learned from business rivals in the course of competition. Finally, "industry checks" generally are directed broadly to an entire market segment.

It is clear from the Supreme Court's landmark decision in *Dirks v. SEC* that securities research analysts, or similarly situated research-driven investment managers on the buy side like Mr. Whitman, are neither required nor expected to accept information concerning a company's financial conditions from corporate spokespersons and officers. In *Dirks*, an analyst learned of material, nonpublic information—specifically, a possible fraud—from a company insider. 463 U.S. at 649. Mr. Dirks investigated the tip by, among other things, interviewing both officers and non-management employees at the company. *Id.* Whereas management denied the fraudulent conduct, employees confirmed the tip. *Id.* In evaluating this conduct, the Supreme Court recognized that seeking out information is a critical part of a securities analyst's job:

> The SEC expressly recognized that "[t]he value to the entire market of [analysts'] efforts cannot be gainsaid: market efficiency in pricing is significantly enhanced by [their] initiatives to ferret out and analyze information, and thus the analyst's work redounds to the benefit of all investors."

3

*Id.* at 658 n.17 (alterations in original) (quoting 21 S.E.C. Docket 1401, 1406 (1981)).  The way that analysts "ferret out and analyze information ... often is done by meeting with and questioning corporate officers and others who are insiders." *Id.* at 658.  Indeed, it was only by contacting lower-level employees that Mr. Dirks was able to corroborate the fraud. *Id.* at 649.

*Dirks* established "a guiding principle for those whose daily activities must be limited and instructed by the SEC's insider trading rules," 463 U.S. at 664, which clearly "extends beyond" the precise facts of *Dirks*, *id.* at 658 n.18; *see also State Teachers Ret. Bd. v. Fluor Corp.*, 576 F. Supp. 1116, 1118 (S.D.N.Y. 1983).  "[T]he role of market analysts … is necessary to the preservation of a healthy market." *Dirks*, 463 U.S. at 658.  That a company's management may not like contacts with company insiders is predictable, but does not render such checks, or similar checks with channel partners such as suppliers, resellers, and distributors, unlawful or improper; it simply reflects that corporate officers, often for self-serving reasons, prefer to maintain control over the company's financial information disseminated to the public.  Accordingly, the Supreme Court rejected the broad rule proposed by the SEC "that anyone who knowingly receives nonpublic material information from an insider has a fiduciary duty to disclose before trading," *id.* at 656, and in so doing recognized that such a rule "could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market." *Id.* at 658.  That is why the Court held that material, non-public information must be obtained in a corrupt manner from a company insider in order for there to be illegality.  *Id.* at 664.  Trading based on information obtained in breach of fiduciary duty for personal gain is what turns otherwise legitimate market research into illegal activity.

2.  Here, the government has indicated that it may introduce, principally through recorded conversations between Mr. Whitman and others, evidence of various financial checks performed

4

by Mr. Whitman and ▮▮▮▮ an employee at ▮▮▮▮  For the reasons just set forth, such checks are not, in and of themselves, improper. Indeed, much more than the mere fact of the checks – including, for example, the passing of MNPI, the payment of a benefit to an insider, and the defendant's knowledge of the benefit – would have to be proven for the checks to be found illegal. We summarize here just a few examples, to illustrate to the Court the significant likelihood of unfair prejudice if this information goes to the jury unaccompanied by an appropriate instruction.

Some of the conversations concern "company checks" conducted by Mr. Whitman. In one recording, Mr. Whitman describes to Mr. Motey a company check he performed with employees at Marvell:

> **Whitman**: This is my guy … [m]y limited who sells components. Sells the components that[] [are] used very quickly in drives. Obviously he's talking about June orders in May … I walked out of the meeting with … Marvell that sounded like they feel pretty comfortable … You know, I mean, I tried to do what ▮ told me to do and … they kept talk[ing] and he brought up the near term, right? Which is always a positive when you're not supposed to be talking about things in the quiet period and he brings stuff up in the quiet period.

May 14, 2009 Transcript at 2 (Anderson Decl. Ex. 5). The government would undoubtedly like to suggest, overtly or otherwise, that a passage of this sort reflects that Mr. Whitman has had both a conversation with a drive supplier and a contact with a Marvell "insider," and from those contacts has learned information about June orders and the "near term" prospects of Marvell during its quiet period. Yet this conversation reflects nothing improper at all: it reflects a channel check of the sort described above, and an authorized, company-sanctioned meeting between Mr. Whitman and ▮▮▮▮ which was attended by the company's ▮▮▮ ▮▮▮▮ To be sure, both sides will be able to argue to the jury their competing interpretations of this and other similar passages, but without some guidance from the court, the jury

5

will be less well equipped to decide among the competing interpretations. A jury accustomed to a colloquial understanding of "inside information," and acutely aware that retail investors cannot meet with a ▓ before investing, may, absent instruction from the court, easily conclude that there is something intrinsically wrong with what Mr. Whitman describes here when nothing could be further from the truth.[2]

Other conversations concern "channel checks." The government has given notice, for instance, that it may introduce evidence of a channel check on Marvell—specifically, Mr. Whitman's interactions with ▓ at ▓ a ▓ that supplied Marvell.[3] Mr. Whitman and other analysts sought to understand Marvell's performance by gathering information on the production of ▓ are made, by Marvell's suppliers. For example, in a taped conversation between Mr. Whitman and Mr. Motey, Mr. Whitman tells Mr. Motey:

> **Whitman**: [I]t's pretty clear from what's going on in the industry and the uh ... and what's going on at ▓ that uh ... it ... uh ... you know, that ... that [Marvell is] fine.

May 13, 2009 Transcript at 2 (conditional counter-designation) (Anderson Decl. Ex. 6). Inferring that Marvell is "fine" based upon "what's going on at ▓ is standard—indeed, high quality—equity research analysis through channel checking. Yet the government has cited Mr. Whitman's contacts with employees of ▓ as somehow indicative of wrongdoing. Later in

---

[2] Not only did Mr. Whitman not receive improper information during this interaction, in the many tapes that the government has designated for introduction at trial, there is *no* recording of any of the alleged tips supposedly giving rise to the trades at issue in the indictment. Moreover, under Regulation FD, 17 C.F.R. Part 243 (2000), Mr. Whitman could assume that whatever information he received from the CFO was either immaterial or also disseminated to other investors.

[3] For independent reasons, this evidence also is inadmissible, either as direct evidence or as "other acts" evidence under Federal Rule of Evidence 404(b), as set forth separately in Mr. Whitman's Motion to Exclude "Other Acts" Evidence. *See* Dkt. No. 48, 12-cr-125 (JSR).

6

the same passage, Mr. Whitman describes discussing the ▇ channel information directly with Marvell's ▇

> **Whitman**: ▇ goes, "Well, God it drives me crazy that ... that some people seem to get the orders at ▇ the day that we put them in." And I said, "Well I wasn't actually talking to ... about ... about you guys. I was talking about the industry in general." (Chuckles).
> ...
>
> **Whitman**: He's ma ... uh ... he said, you know, "I was ... a week into this, I started having our ▇ cut."
>
> **Motey**: Right.
>
> **Whitman**: "You know, I mean, so we were cutting orders before anybody else." And I said, "Well, yeah and everybody knew that." (Chuckles).
>
> **Motey**: Yeah. And did he ...?
>
> **Whitman**: He just starts laughing, so ...

*Id.* 2-3, 5 (Anderson Decl. Ex. 6).  Because Mr. Whitman was able to get information under circumstances that "dr[ove]" ▇ "crazy," the jury could easily accept the invitation to conclude that there was something wrongful about Mr. Whitman's conduct.  But the conversation itself confirms that the ▇ information was widely available ("everybody knew that") and that the ▇ frustrated though he may have been, fully understood the reality of channel checks in the securities industry, as he laughed off the situation.  Making these fine distinctions in a raft of telephone recordings will be a daunting and difficult task for the jury, yet it is absolutely essential to the rendering of an accurate verdict.  We submit that guidance from the court, designed to help the jury understand where the boundaries are between what is proper and what is illegal in this unfamiliar area, will be enormously useful in achieving that shared goal.

      Other tapes designated by the government for introduction at trial involve discussion of company "sources" or "moles."  As with the conversations in which Mr. Whitman discusses how

7

to use Skype or *67 to facilitate communications with lower-level employees,[4] there is a grave risk that the jury will equate such language or conduct with illegality or unlawful intent. Things are not nearly so simple. A "source" in this context is nothing more than a non-management employee. Again, and as noted above, corporate management predictably does not like that investors seek information from non-management sources at a company, and often attempt to limit this activity. Outside analysts and research-driven investors will commonly seek to avoid or circumvent the restrictions imposed by management. So, for instance, management often will monitor employee phone records and email accounts. But corporate preferences and policies are not law, and the fact that management has undertaken these measures does not make it illegal for lower-level employees, who typically do not know anything that would count as material non-public information under the securities laws in any event, to speak with analysts or investors. Such conduct does not itself reflect illegality or an intention to engage in it. Nonetheless, even if the government does not deliberately paint it that way, there is significant risk that the jury will so view it.

These are just a few examples of evidence that threatens to taint the trial and its outcome with unfair prejudice absent some meaningful guidance from the court. Terms like "mole," and efforts to evade management restrictions on conversations with company employees, are not, in and of themselves, proof of illegality or unlawful intent—and certainly do not deserve the heavy weight that an uninstructed jury is likely to give them. *Cf. Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, No. 04 Civ. 10014, 2009 WL 3111766, at *7 (S.D.N.Y. Sept. 28, 2009) (excluding pejorative terms like "tax haven" in a securities case); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (granting motion in limine

---

[4] We have addressed this topic separately in our motion to exclude certain evidence under Rule 404(b). Dkt. No. 48, 12-cr-125 (JSR), at 12-13.

precluding parties from "characteriz[ing] admissible evidence and testimony as 'securities fraud,' 'illegal,' 'insider trading,' 'inside information,' and 'market manipulation'"). The government's disclosures suggest that they consider this conduct to be evidence that Mr. Whitman improperly traded in Marvell, Polycom, and Google securities, and that is how we understand the government has portrayed "checks" in some other recent securities-fraud cases. That view, however, is squarely at odds with *Dirks* and the standard operating procedures of research analysts and research-driven investors everywhere. Because financial checks in and of themselves are lawful and appropriate conduct, and because there exists a very real danger that an uninstructed jury might misunderstand evidence of such legitimate conduct, the Court should instruct the jury that financial "checks" are not inherently improper, but rather rise to the level of illegality only when the elements of the charged offense are present.

## **CONCLUSION**

For the foregoing reasons, the motion should be granted and the Court should instruct the jury that financial checks are common corporate conduct that is not inherently illegal.

Dated:  July 16, 2012                                Respectfully submitted,

 /s David L. Anderson

David L. Anderson
(dlanderson@sidley.com)
(Admitted *pro hac vice*)
SIDLEY AUSTIN LLP
555 California Street
San Francisco, CA
(415) 772-1200
(415) 772-7400 (fax)

David M. Rody
(drody@sidley.com)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

Bradford A. Berenson
(bberenson@sidley.com)
(Admitted *pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Douglas F. Whitman*