UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   -v.-                                    :          12 Cr. 125 (JSR)

DOUG WHITMAN,                          :

              Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT DOUG WHITMAN'S MOTION TO VOID THE TOLLING
AGREEMENT AND DISMISS COUNT THREE AS TIME-BARRED**



PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
        of America.


CHRISTOPHER LAVIGNE
JILLIAN BERMAN
Assistant United States Attorneys
   - Of Counsel –

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                          :

   -v.-                                                        :          12 Cr. 125 (JSR)

DOUG WHITMAN,                                         :

             Defendant.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DOUG WHITMAN'S MOTION TO VOID THE TOLLING AGREEMENT AND DISMISS COUNT THREE AS TIME-BARRED

The Government respectfully submits this memorandum of law in opposition to Doug Whitman's ("Whitman" or the "defendant") Motion to Void the Tolling Agreement and Dismiss Count Three of the Indictment as Time Barred ("Whitman's Motion").

For the reasons set forth below, Whitman's Motion should be denied.

### BACKGROUND

Defendant Doug Whitman entered into a total of three agreements with the United States Attorney's Office for the Southern District of New York ("U.S. Attorney's Office") to toll the statute of limitations as to any and all possible violations of Titles 15 and 18 of the United States Code, including but not limited to violations relating to trading in the securities of Polycom, Google, and Marvell Technology Group Ltd. ("Marvell"), on the basis of material, non-public information. Whitman entered into the first tolling agreement on December 30, 2010 ("First Tolling Agreement"), shortly after Whitman had proffered with the U.S. Attorney's Office in an effort to cooperate, at which time Whitman was represented by Ira Sorkin, Esq. The First Proffer Agreement tolled the statute of limitations from January 1, 2011 through June 30, 2011. Anderson Decl. ¶ 2 & Exh. A.

Whitman entered into the second tolling agreement with the U.S. Attorney's Office on June 30, 2011, which tolled the statute of limitations from June 30, 2011 through December 31, 2011 ("Second Tolling Agreement"). Anderson Decl. ¶ 8 & Exh. D. When the Second Tolling Agreement was executed, the Government told Whitman that it did not intend to pursue Whitman's cooperation, Whitman had retained his current counsel, and Whitman's counsel and the Government had begun to explore a resolution to the Government's investigation. To that end, the Second Tolling Agreement – which is the subject of the instant motion – contained the terms set forth in a two-page document titled "Stipulation," (see Anderson Decl. Exh. D), as well as those set out in a June 29, 2011 email exchange (the "June 29th Email") between Whitman's counsel and a Special Assistant United States Attorney (the "SAUSA"). Anderson Decl. ¶¶ 6-7 & Exh. C. In that email exchange, Whitman's counsel wrote:

> The tolling agreement attached to your e-mail below is acceptable on the terms that you and I discussed. Specifically: You will make available all the taped calls you have on Doug. You will give me an opportunity to present to you in person before you make a charging decision. In the event that you decide that you are going to charge Doug, you will not arrest him but will allow him to voluntarily surrender.

The SAUSA "[c]onfirmed" these terms. *Id.*

During the period of the Second Tolling Agreement, the SAUSA made available to Whitman all audio recordings of which he was aware that captured Whitman's voice. Specifically, on July 18 and July 19, 2011, Whitman's counsel visited the U.S. Attorney's Office, at which time the SAUSA played more than a dozen audio recordings between Roomy Khan and Whitman, and Karl Motey and Whitman.[1]

---

[1]     As set forth in the Indictment, the Government alleges that Roomy Khan provided Whitman with material nonpublic information on Polycom and Google, and that Karl Motey provided Whitman with material nonpublic information on Marvell. Both Khan and Motey are cooperating witnesses with the Government.

Following this July visit, Whitman's counsel advised the SAUSA that there must be additional recordings capturing Whitman's voice. Anderson Decl. ¶ 11. While assuring defense counsel that he had been provided with all audio recordings with Whitman's voice, the SAUSA nonetheless agreed to double-check with the Federal Bureau of Investigation ("FBI"). *Id.* As of September 2011, the SAUSA had not learned of any additional recordings with Whitman, and advised Whitman's counsel of such. *Id.* at ¶ 12. However, upon continuing to inquire with the FBI, in November 2011, the SAUSA learned that in fact, there existed additional recordings with Whitman's voice.[2] The SAUSA obtained these recordings and produced them promptly to Whitman's counsel on November 4, November 17, and November 30, 2011[3] – within the period covered under the Second Tolling Agreement. Having uncovered and obtained these additional recordings with Whitman's voice in November 2011, the SAUSA asked the FBI at that time whether there were any additional recordings with Whitman, including consensual recordings between Wes Wang and Whitman.[4] The SAUSA was advised that there were no additional recordings with Whitman.

On or about January 4, 2012, after having more than a month to review even the latest of the Whitman recordings produced by the SAUSA, Whitman's counsel met with the Chief of the Securities and Commodities Fraud Unit of the U.S. Attorney's Office, the SAUSA, and several others, as agreed to in the Second Tolling Agreement, so that Whitman's counsel could attempt to persuade the U.S. Attorney's Office not to seek an indictment against

---

[2]     At that time, the SAUSA learned for the first time from the FBI that there were recorded conversations between ███████ and Doug Whitman that had been captured over a court-authorized wiretap. The SAUSA also learned at that time that a different Assistant United States Attorney working on a different matter possessed additional Motey recordings, which the SAUSA promptly obtained in November 2011 and produced to Whitman's counsel.

[3]     In addition to audio recordings capturing Whitman's voice, the November 30, 2011 production of audio recordings to Whitman's counsel included three audio files capturing consensual calls between a cooperating witness and an employee of Whitman's.

[4]     Wes Wang, who was approached by the FBI in January 2009, had conducted consensual calls at the direction of the FBI in early 2009.

Whitman. Anderson Decl. ¶23. At this meeting, Whitman's counsel presented arguments as to why Whitman should not be criminally charged, including arguments based on the recordings to which Whitman had been provided access. At no time did Whitman's counsel argue that the Second Tolling Agreement was not valid because of the production of recordings in November 2011.

On January 5, 2012, the U.S. Attorney's Office advised Whitman's counsel that after considering his arguments, it had nonetheless decided to seek an indictment against Whitman. Anderson Decl. ¶ 23. On January 9, 2012, Whitman entered into another tolling agreement with the U.S. Attorney's Office (the "Third Tolling Agreement"), which was effective through February 9, 2012. Anderson Decl. ¶ 24 & Exh. K. On February 8, 2012, a Grand Jury sitting in this district returned an indictment against Whitman, 12 Cr. 125 (JSR) ("the Indictment"), charging Whitman with: (1) participating in two separate conspiracies to commit securities fraud by engaging in insider trading (Counts One and Two); (2) committing substantive securities fraud by executing securities transactions of Polycom on the basis of material nonpublic information in or about January 2006; and (3) committing substantive securities fraud by executing securities transactions of Google on the basis of material nonpublic information on or about July 19 and 20, 2007.

On February 10, 2012, after being advised of the Indictment and the warrant for his arrest, and pursuant to the terms of the Second Tolling Agreement, Whitman self-surrendered to the FBI in New York, New York.

Following his Indictment, and after a trial date of July 30, 2012 was scheduled by this Court, the U.S. Attorney's Office produced discovery to Whitman pursuant to its obligations under Rule 16 of the Federal Rules of Evidence. In addition, the U.S. Attorney's Office began gathering materials it would need to produce to Whitman, prior to trial, pursuant to its obligations under Title 18, United States Code, Section 3500. To that end, the U.S.

4

Attorney's Office requested that the FBI provide it with, among other things, all consensual recordings in the FBI's possession of certain individuals whom the U.S. Attorney's Office was considering calling as trial witnesses, including Wesley Wang. In or about early June 2012, the U.S. Attorney's Office received discs containing numerous consensual calls recorded by Wes Wang. The U.S. Attorney's Office reviewed those calls and, during the course of doing so, discovered three consensual calls between Wang and Whitman.[5] The U.S. Attorney's Office promptly contacted Whitman's counsel by phone to alert defense counsel to their existence, and the U.S. Attorney's Office produced the calls to Whitman on June 13, 2012 (hereinafter "June 13th Recordings"), within days of identifying them.

## ARGUMENT

On July 6, 2012, three weeks after receiving the June 13th Recordings, and *more than seven months* after receiving all other recordings with Whitman, Whitman filed the instant motion. Whitman argues that the U.S. Attorney's Office breached the Second Tolling Agreement, not only by its late production of the June 13th Recordings, but also by its production of recordings in November 2011.

Whitman's motion should be denied. The U.S. Attorney's Office acted in good faith to comply with the terms of the Second Tolling Agreement. When the U.S. Attorney's Office learned – first in November 2011 and later in June 2012 – of additional recordings with Whitman that had not been produced, the U.S. Attorney's Office promptly provided these recordings to Whitman.

Moreover, Whitman has been afforded all of the benefits to which he was entitled under the Second Tolling Agreement, including from the production of the recordings in November 2011, and he has suffered no prejudice as a result of the production of recordings

---

[5]     Two of these calls are approximately one minute in length. The third is a voicemail that Wang leaves for Whitman.

in June 2012. Thus, assuming *arguendo* that the U.S. Attorney's Office did breach the

Second Tolling Agreement, there is no basis to rescind that agreement.

### I. To The Extent The Production of Recordings in November 2011 and June 2012 Constituted A Breach, Such Breach Was Neither Material Nor Willful, And Does Not Warrant Rescission

Assuming *arguendo* that the U.S. Attorney's Office breached the Second Tolling

Agreement by producing audio recordings of Whitman in November 2011 and June 2012,[6]

the remedy Whitman seeks – that of rescission of the contract – is unwarranted, would be

unjust, and is contrary to public policy interests.

Tolling agreements, like plea agreements and cooperation agreements, are interpreted

under traditional principles of contract law. *See United States* v. *Riera*, 298 F.3d 128, 133

(2d Cir. 2002); *United States* v. *Reeves*, 296 F.3d 113, 115-16 (2d Cir. 2002). "It is well-

settled under New York law that an immaterial breach cannot be a basis for rescission. As

the Second Circuit has put it, 'before rescission will be permitted the breach must be so

material and willful, or, if not willful, so substantial and fundamental as to strongly tend to

defeat the object of the parties in making the contract.'" *Times Mirror Magazines, Inc.* v.

*Field & Stream Licenses Company*, 103 F. Supp. 2d 711, 735 (S.D.N.Y. June 30, 2000)

(Chin, D.) (internal quotations marks omitted) (quoting *Septembertide Publ'g, B.V.* v. *Stein*

*and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989). "A breach is material if it defeats the object

of the parties in making the contract and 'deprive[s] the injured party of the benefit that it

---

[6]   It is notable that while Whitman's counsel asserts that as part of the Second Tolling
Agreement, the U.S. Attorney's Office was to produce all Whitman recordings in July 2011,
the June 29th Email does not specify that such recordings were to be provided in July 2011.
Indeed, the SAUSA recalls that the agreement between the U.S. Attorney's Office and
Whitman, in relevant part, was that the U.S. Attorney's Office would provide Whitman with
all recordings on which Whitman was captured during the period covered by the Second
Tolling Agreement, and importantly, in sufficient time so that Whitman could consider those
recordings in making a presentation to the U.S. Attorney's Office. The SAUSA further
recalls that discussions of a July 2011 date during a telephone communication on June 29,
2011, prior to the June 29th Email, pertained to when Whitman's counsel would come to the
U.S. Attorney's Office to listen to those recordings.

justifiably expected.'" *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp.2d 383, 392 (S.D.N.Y. 1999) (quoting Farnsworth, Contracts § 8.16 (3d ed.1999)).

"As an extraordinary remedy, rescission is appropriate only when a breach may be said to go to the root of the agreement between the parties." *Id.* at 735 (internal quotations and citations omitted). *See also ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp.2d 383, 392 (S.D.N.Y. 1999). Moreover, "[a] party cannot elect to continue with the contract, continue to receive benefits from it, and thereafter bring an action for rescission or total breach." *Office of Com'r of Baseball*, 76 F. Supp. 2d at 392 (internal quotations omitted). "In addition to the obvious uncertainty and concomitant unfairness that would result from allowing a party to treat its agreement as both broken and subsisting, there is a more fundamental problem when a party terminates after continuing the contract for a period of time: the party's legal justification for termination has disappeared." *Id.*

This Court has discretion to determine the appropriate remedy for a breach of contract. *See Santobello* v. *New York*, 404 U.S. 257, 262-63 (1971) (in case where the prosecution was deemed to have breached plea agreement by recommending the maximum sentence after agreement that it would not recommend any sentence, deferring to the state trial court to determine the appropriate relief); *Van Wagner Advertising Corp.* v. *S & M Enterprises*, 67 N.Y.2d 186, 191 (N.Y. 1986) (trial court had discretion to fashion remedy to breach of contract).

Here, to the extent there was a breach, it was not material and it was not willful. And most certainly, it was not "so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Times Mirror Magazines, Inc.*, 103 F. Supp. 2d at 735. Moreover, to the extent the production of recordings in November 2012 underlie the basis of Whitman's motion, Whitman continued to reap benefits from the Second Tolling Agreement well after that production.

7

### A. Any Breach Was Immaterial and Not Willful

A principal object of the Second Tolling Agreement was to allow Whitman – who by that time was aware that he was the target of a federal investigation and had unsuccessfully attempted to cooperate – to present mitigating facts and arguments to the U.S. Attorney's Office as to why he should not be charged. To facilitate Whitman's ability to do this in a meaningful way, the U.S. Attorney's Office took the extraordinary step of agreeing to make available to Whitman *all recordings* to which he was a party. This presented Whitman with tremendous benefits. First, this gave him access to key pieces of the Government's evidence against him *before* the Government's discovery obligations were triggered. Second – and again, before being charged – he was able to assess a substantial component of the Government's evidence, and endeavor to persuade the U.S. Attorney's Office why it was not reliable, trustworthy, or how it could be subject to different interpretations. Significantly, while Whitman did not have all recordings in the Government's possession at the time he presented his case to the U.S. Attorney's Office, he had been provided with every single recording on which he was captured except for two short one-minute conversations between him and Wes Wang. And more importantly, Whitman had been provided with every recording the U.S. Attorney's Office was considering in assessing the evidence against Whitman. Thus, the production of certain recordings in November 2011 and June 2012 was immaterial in that it did not impact Whitman's ability to present his case to the U.S. Attorney's Office and persuade the U.S. Attorney's Office as to why the evidence upon which it was relying did not support criminal charges.

A second object of the Second Tolling Agreement – to allow Whitman to consider a disposition of this matter short of indictment, by way of guilty plea to an Information – was also fulfilled. After being advised on January 5, 2012 that the U.S. Attorney's Office had decided to seek an indictment, Whitman had an opportunity to consider whether to plead

guilty to certain conduct. In doing so, again he had had ample opportunity to review every recording of him except two short calls (which the Government was not relying on). He does not allege that those two recordings, produced in June 2012, would have changed the decision he made or induced him to plead guilty. As such, it is clear that the alleged late production of certain recordings was not material.

Indeed, Whitman's own actions belie any argument that there was a material breach. Had Whitman truly believed that the U.S. Attorney's Office had materially breached the Second Tolling Agreement by producing certain recordings in November 2011, Whitman had every opportunity to argue as much in January 2012, when Whitman's counsel met with representatives of the U.S. Attorney's Office and presented arguments as to why he should not be indicted. Indeed, that meeting presented a perfect opportunity for Whitman to raise a defense that the Second Tolling Agreement had been breached and thus, certain alleged conduct was beyond the statute of limitations. Yet Whitman did not do so – undoubtedly because he did not view the Government's alleged conduct to amount to a material breach. Nor did Whitman raise this argument as to the November 2011 production of recordings at any time during the initial pretrial phase of his criminal case, despite filing another pretrial motion to dismiss the Indictment.

To the extent Whitman now cites to the production of recordings in June 2012 as amounting to a breach, that argument fails for the reasons above. Whitman has already obtained the benefits he bargained for under the Second Tolling Agreement, and he has not demonstrated, or attempted to demonstrate, that the two recordings produced in June 2012 would have influenced the course of his criminal prosecution.

Similarly, Whitman does not allege that the U.S. Attorney's Office acted in bad faith or engaged in willful misconduct. As explained above, the failure to produce these recordings was due to an honest oversight by the Government, one that was promptly

9

rectified upon discovery. Indeed, the principal purpose of the Second Tolling Agreement was to give Whitman an opportunity to present facts to the U.S. Attorney's Office to assist it in making a charging decision. No one is, or would be, served by not abiding by the terms of the agreement governing that arrangement, and there was no reason for the U.S. Attorney's Office to hold anything back.

Thus, given that the objects of the Second Tolling Agreement were not only not defeated but indeed, were fulfilled, and given the absence of bad faith and willful misconduct by the U.S. Attorney's Office, rescission – or voidance – of the Second Tolling Agreement, is simply not warranted.

The case upon which Whitman principally relies in support of his argument that the Second Tolling Agreement must be voided, *United States* v. *Spector*, 55 F. 3d 22 (1st Cir. 1995), does not compel a different conclusion. In that case – which is not controlling precedent – the First Circuit affirmed the district court's ruling that a tolling agreement was not valid because it had not been signed. There, the tolling agreement expressly provided that it was effective "upon execution by [certain parties] and their respective counsel and the United States by its counsel." *Id.* at 24. Yet the Government there neglected to sign the tolling agreement at all. Thus, while the First Circuit affirmed that dismissal of certain counts was appropriate because, absent the tolling agreement they were untimely, the First Circuit did not find that the tolling agreement had been breached. Rather, it found that there *had never been* an effective tolling agreement because the Government had failed to sign it. In contrast, in the instant case, the U.S. Attorney's Office had an effective tolling agreement, the terms of which were carried out virtually in full, if not in full.

B.  Whitman Benefitted From the Second Tolling Agreement And Suffered No Prejudice

As stated above, by virtue of the Second Tolling Agreement, Whitman was provided with dozens of recordings of himself well before he was entitled to them. By January 2012,

10

he had ample time to review all but two one-minute recordings of him, which allowed him to: (1) make a full and complete presentation to the U.S. Attorney's Office; and (2) subsequently, make an informed decision as to whether to consider a plea offer with the U.S. Attorney's Office. And, while he did not have two short recordings, he suffered no prejudice because, as stated above, the U.S. Attorney's Office was not considering these recordings in making a charging decision.

Whitman obtained additional significant benefits by virtue of the Second Tolling Agreement as well. In addition to be afforded the opportunity to be heard as to why he should not be charged, in February 2012, Whitman was allowed to self-surrender after the Government obtained an arrest warrant, thus avoiding the shame of being arrested and handcuffed in front of family members. Thus, even after Whitman claims there was a breach, he availed himself of contractual benefits for which he had bargained.

Whitman also obtained the benefit of access to discovery – to which he otherwise was not entitled – many months before he otherwise would have received it. Thus allowed Whitman additional time to investigate his case and prepare for trial. Thus, Whitman has received virtually everything he bargained for under the Second Tolling Agreement. Not only has he suffered no prejudice by the production of two recordings in June 2012, but Whitman would reap a windfall if the Second Tolling Agreement were voided.

    C.  Public Policy Interests Would Not Be Served By Voiding
           The Tolling Agreement

Finally, there are important public policy interests that are served by tolling agreements, and such interests would be undermined if the Court were to void the Second Tolling Agreement. Tolling agreements benefit both the Government and the defense. The Government benefits by such agreements because it is afforded additional time to investigate facts and resolve cases short of indictment. Putative defendants also benefit by being afforded an opportunity to investigate facts, review evidence, explain to prosecutors the

11

meaning of certain evidence or raise possible defenses, and resolve cases prior to indictment. This is particularly true in the white collar crime context, where individuals and entities are often notified that they are targets of a criminal investigation. Those individuals and entities then have an opportunity to conduct their own investigation, and commence a dialogue with prosecuting authorities, including an ability to present facts and defenses, and make arguments as to why charges would not be appropriate. Tolling agreements thus promote additional investigation, more accurate and thorough fact-gathering, and cooperative efforts to resolve cases short of indictment and trial. Courts within this Circuit have generally recognized the benefits of contracts that promote these goals. *See United States* v. *Velez*, 354 F.3d 190, 195-96 (2d Cir. 2004) ("invalidating a waiver provision [in a proffer agreement] would clearly interfere with plea bargaining and cooperation efforts—in direct contravention of the criminal justice system's legitimate goal of encouraging plea bargaining in appropriate circumstances"); *United States* v. *Gomez*, 210 F. Supp. 2d 465, 475 (S.D.N.Y. 2002)) ("Prosecutors will be reluctant to enter into cooperation agreements if they cannot obtain some assurance that the defendant will tell the truth.").

These benefits – additional investigation into facts, dialogue between prosecutors and putative defendants, and dialogue concerning resolution – would be thwarted if this Court were to void the Second Tolling Agreement based on what is, at most, a minor breach by the U.S. Attorney's Office, and one that not only did not prejudice Whitman but allowed him to secure numerous benefits.

12

## CONCLUSION

Accordingly, for the reasons set out above, Whitman's motion should be denied.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:   _____
      /s/
      Jillian Berman/Christopher LaVigne
      Assistant United States Attorneys
      Tel.: (212) 637-2197/2325