UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA          :

    - v -                                   :          12 Cr. 125 (JSR)

DOUG WHITMAN,                          :

        Defendant.               :

------------------------------------------------------------X

## GOVERNMENT'S MOTION *IN LIMINE*
## TO PRECLUDE CERTAIN EXPERT TESTIMONY

                        PREET BHARARA
                        United States Attorney
                        Southern District of New York
                        Attorney for the United States
                             of America

CHRISTOPHER LAVIGNE
JILLIAN BERMAN
MICAH SMITH
Assistant United States Attorneys

    - Of Counsel -

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA            :

        - v -                       :      12 Cr. 125 (JSR)

DOUG WHITMAN,                       :

                Defendant.          :

------------------------------------------------------------X
```

## GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE CERTAIN EXPERT TESTIMONY

The Government submits this motion *in limine* regarding the proposed expert testimony of two of defendant Doug Whitman's witnesses. In particular, the Government moves to preclude the experts from offering opinions that are not relevant, that do not require specialized knowledge, and that would usurp the Court's role in instructing the jury and confuse the jury about applicable legal standards.

### Background

In a letter dated July 16, 2012, Whitman notified the Government that he intends to call Michael G. Mayer, the vice president of a consulting firm, and George Kelly, the chief executive officer of a consulting firm, to testify as expert witnesses at trial. Whitman's letter described the qualifications of Mayer and Kelly, summarized the opinions and other testimony they are expected to offer, and provided a brief description of the bases for their expert opinions. *See* Exhibit 1. Whitman's letter also included the curriculum vitae for both Mayer and Kelly. *See id.*

Mayer's proposed testimony would focus principally on Whitman Capital's eleven years of portfolio and trading records, from 2000 to 2010. He is offered both as a summary witness

and an expert witness. As a summary witness, Mayer would "identify and particularize the six sets of trades the government has identified in the bill of particulars as allegedly having been made based upon MNPI [or material, non-public information]." *Id.* at 3. Mayer would also "identify circumstances in which the Whitman Capital trading records do not reflect trades corresponding to instances in which MNPI was allegedly passed to Mr. Whitman." *Id.* As an expert witness, Mayer would opine that "the six challenged trades ... are consistent with previously observed trades and patterns of trading" by Whitman Capital, and that certain trading patterns are "inconsistent with a hypothesis that [a trade] was based upon the receipt of MNPI." *Id.* at 3-4. He would also testify that some of Whitman Capital's trades in Marvell stock are "comparable [to] trades made in the securities of other issuers during the same period." *Id.* at 5.

Kelly's proposed testimony is characterized both as factual and expert. He would "explain what equity researchers do and how they do it, including the relationship between researchers and incumbent company management," and "he will define accepted industry usages and meanings of terms such as 'getting color,' 'having an edge,' and 'getting a read.'" *Id.* at 6. He would testify that "management sometimes attempts to frustrate analyst efforts to speak to lower-level company employees," and that "analysts also commonly employ techniques to initiate or maintain communications with such employees." *Id.* at 7. He would opine that "these techniques are not improper in themselves," and that "they do not necessarily suggest any intent to obtain material, non-public information." *Id.* He would further opine that if an analyst obtains material non-public information, "the consequences ... are simply that one may not trade," and that the "line between what a reasonable analyst would regard as actual information and more general, less specific, or less reliable views can be exceptionally unclear." *Id.* at 7-8. And he

2

would offer opinions "concerning the[] significance and connotations" of "passages of tape-recorded telephone calls introduced into evidence during the government's case-in-chief." *Id.* at 8.

## Argument

I.  **Applicable Law**

   A.  **Rule 702**

   Rule 702 of the Federal Rules of Evidence provides:

   > If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

   The party that proffers the testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987). Expert testimony is admissible only if the trial court determines that it is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see Kumho Tire Company, Inc. v. Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003). The District Court's exclusion of expert testimony will be affirmed unless it constituted an abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

In *Joiner*, the Supreme Court explained that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at 146. For example, in *Kumho Tire*, the Court upheld the exclusion of an expert's testimony that a defect caused a tire's tread to separate from the rest of the tire, because the expert's theories could not reliably determine the cause of the separation in the tire at issue. 526 U.S. at 154-55.

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts. *See Kumho Tire Co.*, 526 U.S. 137; *see also Amorgianos* v. *Romano Enterprises*, 303 F.3d 256, 267 (2d Cir. 2002). The Court "must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* (internal alterations, quotations, and citations omitted). The fact that an expert may generally possess "specialized knowledge" to qualify as an expert witness does not automatically render his opinions in the case reliable. *SEC* v. *Lipson*, 46 F. Supp. 2d 758, 761 (N.D. Ill. 1998).

Moreover, Rule 702 requires not only that an expert's opinion be reliable but that it "assist the trier of fact." Fed. R. Evid. 702. Expert opinions are inadmissible when they address "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." *Andrews* v. *Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

### B. Rule 703

Rule 703 of the Federal Rules of Evidence precludes an expert from disclosing to the jury "[f]acts or data that are otherwise inadmissible" unless the court determines that their probative value substantially outweighs their prejudicial effect, and the facts or data must be "of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject." Experts cannot be used as a substitute to calling witnesses to the events or facts at issue. For example, in *United States* v. *Zafar*, 291 Fed. Appx. 425, 427 (2d Cir. 2008), the Second Circuit affirmed the district court's exclusion of the defendant's proposed expert testimony about the use of stock-selection software found on the defendant's computer in a securities fraud case. There was no evidence that the defendant actually used that software for stock trading at the time of the charged offenses. *Id.* The Court affirmed the district court's decision, because the defense expert was not trying "to show the jury how the software worked but to insinuate what had happened with respect to the relevant stock trades, a subject on which [the expert] was not a competent witness." *Id.*

### C. Rule 704

Rule 704(b) of the Federal Rules of Evidence states that "[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are for the trier of fact alone." Moreover, a district court must exclude expert testimony that "expresses a legal conclusion." *Hygh* v. *Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). As the Second Circuit explained, "[e]ven if a jury were not misled into adopting a legal conclusion proffered by an

5

expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury." *Id.* at 364. Further, an expert "is not qualified to compete with the judge in the function of instructing the jury." *Id.*

In *United States* v. *Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987), the Second Circuit expressed discomfort with the "uncontrolled" use of expert testimony that might have the effect of providing "an additional summation by having the expert interpret the evidence." The Court stated that the district court must be vigilant to prevent an expert from coming "dangerously close to usurping the jury's function." *Id.*

### D. Rules 401-403

Rules 401 through 403 of the Federal Rules of Evidence state that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but it may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting authority omitted).

## II. Discussion

The Government moves to preclude Whitman's proposed expert witnesses from offering opinions that (A) are not relevant, (B) do not require specialized knowledge, and (c) describe and characterize legal standards and thus would confuse the jury about applicable law.

### A. Whitman's Experts Should Be Precluded From Offering Opinions That Are Not Relevant

Whitman should not be permitted to offer expert opinions that are not relevant. *See* Fed. R. Evid. 401-403, 702; *see also Daubert*, 509 U.S. at 589-90. When an expert's proposed opinions are irrelevant, they are properly excluded by motion *in limine* before trial. *See Island Intellectual Property LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) ("On a motion *in limine*, a Court may, *inter alia*, preclude testimony on the basis that it is irrelevant"). The proposed testimony of Mayer and Kelly is irrelevant in several respects.

First, Mayer intends to testify about "circumstances in which the Whitman Capital trading records do not reflect trades corresponding to instances in which MNPI was allegedly passed to Mr. Whitman." Exhibit 1, at 3. But it is irrelevant that Whitman Capital made some trades – even many trades – that the Government does not allege were based on inside information. The relevant question is whether the specific trades charged in the indictment and bill of particulars were based on inside information. The fact that Whitman Capital may have made lawful trades on other occasions would not help in answering that question.

Second, Mayer would testify that the challenged trades are "consistent with previously observed trades and patterns of trading" by Whitman Capital, *id.* at 3, and that Whitman Capital's challenged trades in Marvell stock were "comparable [to] trades made in the securities of other issuers during the same period," *id.* at 5. This is irrelevant. If the jury concludes that Whitman traded on inside information, their conclusion should not change merely because Whitman's unlawful trades may have resembled past trades that were not based on inside

7

information.

Third, Kelly would testify that "management sometimes attempts to frustrate analyst efforts to speak to lower-level company employees," and that "analysts also commonly employ techniques to initiate or maintain communications with such employees." Exhibit 1, at 7.

First of all, this testimony is not "expert," as it does not require scientific, technical, or other specialized knowledge. Thus, Kelly is only competent to testify about such conduct if he himself observed it. Even so, however, testimony about whether management "sometimes" attempts to frustrate analysts and whether analysts generally attempt to circumvent those management efforts is not relevant to this case. The question here is whether Whitman and others obtained inside information corruptly and deceptively, and through improper means. This turns on the specific facts regarding Whitman's conduct, and whether Whitman attempted to obtain confidential information from company insiders, directly or indirectly, corruptly, and in violation of those insiders' duties to their companies. The jury has no reason to consider whether, in general, analysts undertake efforts to circumvent company management and speak to lower-level employees.

### B.   Whitman's Experts Should Be Precluded From Offering Opinions That Do Not Require Specialized Knowledge

Whitman should not be permitted to offer expert opinion testimony regarding matters that do not require specialized knowledge. *See Andrews*, 882 F.2d at 708 (vacating jury verdict where district court allowed expert to testify "about matters that were neither scientific nor in any way beyond the jury's ken"). An expert's opinions are inadmissible if they do not result "from a process of reasoning which can be mastered only by specialists in the field." *United States v.*

*Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (citation and internal quotation marks omitted); *see also United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (the district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help"). Much of Mayer's and Kelly's proposed expert opinions fail this test.

For example, Mayer is prepared to offer the expert opinion that "the trading pattern observed in the challenged January 2006 Polycom trade is inconsistent with a hypothesis that it was based upon the receipt of MNPI [or material, non-public information]." Exhibit 1, at 4. He would further opine "the trading pattern observed in the challenged Marvell trades is inconsistent with their having been based on negative MNPI regarding Marvell." *Id.* at 5-6. And Kelly would offer expert opinions "concerning the[] significance and connotations" of "passages of tape-recorded telephone calls introduced into evidence during the government's case-in-chief." *Id.* at 8.

There is no need for expert testimony to opine on the significance of Whitman's trading and telephone call patterns. It does not require any specialized or scientific knowledge. The jury can consider the historical patterns and the timing of trades, and decide for themselves whether the challenged trades of Whitman and others were based on inside information. *See Taylor v. Evans*, No. 94 Civ. 8425 (CSH), 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) (excluding proposed expert testimony "presenting a narrative of the case which a lay juror is equally capable of constructing"). With respect to passages in tape-recorded calls and otherwise presented at trial, the passages to which Whitman refers – "getting color," "having an edge," and "getting a read" – are not technical or scientific terms, nor do they even remotely require

9

specialized knowledge such that an "expert" must interpret them. These are terms that are commonly used in the investment industry and in every day life, by people who are not in the investment community. Lay witnesses will testify at trial about these terms and put them in context, so the jurors will not need an expert to define or explain them. These conversations were between Whitman and his coconspirators. There is nothing technical or confusing about the language they use, and there is no more of a need for an expert to "interpret" these calls than there is a need for an expert to "interpret" the coconspirators' testimony. Similarly, "the use of Skype or *67 to facilitate incoming telephone calls," is not the sort of testimony that requires an expert opinion.

Indeed, Whitman has not even shown that Mayer and Kelly have any specialized knowledge about Whitman Capital's trading patterns and the significance of the telephone calls at issue in this case. Neither Mayer nor Kelly has ever worked at Whitman Capital. Neither of them has any unique knowledge about the firm. *See SEC v. Lipson*, 46 F. Supp. 2d 758, 761 (N.D. Ill. 1998) (fact that witness is a certified public accountant, generally possessing the "specialized knowledge" to qualify as an expert witness, does not automatically render his opinions reliable in a particular case). Neither were on the telephone calls at issue or – as far as we are aware – even knew the defendant or the Government's witnesses. Rather, their opinions appear to be little more than speculative assertions about what inferences to draw from the facts.

Allowing Whitman's experts to offer these opinions would merely permit the defense experts to "supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp.2d 531, 541 (S.D.N.Y. 2004); *see also United States v. Nersesian*, 824 F.2d at 1308 (disapproving the use of expert

10

testimony as an "additional summation by having the expert interpret the evidence"). It would also impermissibly allow the defense experts to opine or speculate about Whitman's and others' intent in making trading decisions and in holding telephone conversations. *See United States v. Abdel Rahman*, 189 F.3d 88, 136 (2d Cir. 1999) (affirming exclusion of expert testimony that "constituted an effort to tell the jury the defendant's intentions through the mouths of witnesses other than himself"). The proposed opinions should be excluded.

### C. Whitman's Experts Should Be Precluded From Offering Opinions That Would Usurp The Rule Of The Court And Confuse The Jury About Applicable Legal Standards

Finally, Whitman's proposed experts should not be allowed to offer opinions that risk supplanting the Court's role in instructing the jury and risk confusing the jury about applicable legal standards. *See Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) (expert may not "communicat[e] a legal standard – explicit or implicit – to the jury").

Whitman intends to offer Kelly's expert opinions that certain "techniques" used by analysts to obtain information from lower-level company employees "are not improper in themselves," and that "they do not necessarily suggest any intent to obtain material, non-public information." Exhibit 1, at 7. For example, "Kelly will offer the opinion" that "checks and contacts with lower-level employees of companies . . . channel checks with suppliers and distributors of those companies, competitor checks, and checks with other industry sources," are "standard practice in the industry" and "are openly acknowledged and accepted as such." *Id.* Kelly would also opine that if an analyst obtains inside information, "the consequences ... are simply that one may not trade," and that "the line between what a reasonable analyst would regard as actual information and more general, less specific, or less reliable views can be

11

exceptionally clear." *Id.* at 7-8.

This proposed testimony amounts to little more than Kelly's views on what the law is or should be. It is entirely improper, both because it would be inaccurate to state that all "checks and contacts with lower-level employees of companies" is "accepted," and because such testimony would improperly "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Blizerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see also Dallal v. New York Times Co.*, 352 F. App'x 508, 512 (2d Cir. 2009) (affirming exclusion of proffered expert testimony on "how industry participants interpreted applicable law" because it "would have intruded on [the district court's] own province and that of the jury").

It would also improperly suggest to the jury that Whitman did not have the requisite intent to be convicted of insider trading because if he was engaging in any "checks" of the sort Kelly describes, then Whitman could not have been violating the law. This is clearly an improper subject of testimony, as Kelly cannot speak to Whitman's intent or suggest to the jury that he lacked the necessary criminal intent. Given the "added aura of reliability that necessarily surrounds expert testimony," *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999), it is particularly important that Whitman be precluded from offering testimony that would confuse the jury about the content or proper application of the relevant legal standards, or suggest to the jury that Whitman lacked criminal intent with respect to the particular trades at issue. *See Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, (2d Cir. 1977) ("The danger is that the jury may think that the 'expert' in the particular branch of the law knows more than the judge – surely an inadmissible inference in our system of law.").

Finally, allowing an expert to testimony about "industry practice" is tantamount to an argument that Whitman should be found not guilty because "everyone else is doing it." That is nothing more than a thinly veiled attempt at jury nullification, which is improper for the reasons outlined in the Government's 7/16/12 Motion *in Limine*.

### Conclusion

For the foregoing reasons, the Government respectfully requests that the Court preclude the experts from offering certain opinions as described above.

Dated: New York, New York
       July 23, 2012

                                            Respectfully submitted,

                                            PREET BHARARA
                                            United States Attorney

By:       /s/
            CHRISTOPHER LAVIGNE
            JILLIAN BERMAN
            MICAH SMITH
            Assistant United States Attorneys
            Tel. (212) 637-2325/2197/2439