UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

   -v.-                                         :        12 Cr. 125 (JSR)

DOUG WHITMAN,                         :

            Defendant.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S SUPPLEMENTAL MEMORANDUM OF LAW ON THE DUTY OF CONFIDENTIALITY AND ON SPECIFIC INTENT


                                         PREET BHARARA
                                         United States Attorney for the
                                         Southern District of New York
                                         Attorney for the United States
                                             of America.

CHRISTOPHER LAVIGNE
JILLIAN BERMAN
MICAH SMITH
Assistant United States Attorneys
     - Of Counsel –

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA         :

    -v.-                         :        12 Cr. 125 (JSR)

DOUG WHITMAN,                    :

             Defendant.    :

------------------------------x

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM OF LAW ON THE DUTY OF CONFIDENTIALITY AND ON SPECIFIC INTENT**

The Government respectfully submits this supplemental memorandum of law in response to the Court's request for further briefing on the source of the fiduciary duty and on the intent requirement of Section 10(b) of the Securities Exchange Act. For the reasons set forth below, analogous provisions of the mail-fraud statute and related case law support the Government's positions that (1) the relevant duty for insider-trading purposes is not dependent upon state law, and (2) specific intent to cause harm is not a required element of a federal insider-trading charge under Section 10(b) and Rule 10b-5.

## ARGUMENT

**I.    THE MAIL-FRAUD STATUTE SUPPORTS THE GOVERNMENT'S POSITION THAT FEDERAL INSIDER TRADING LAW DUTIES ARE NOT DEPENDENT UPON STATE LAW**

Under Section 10(b) and Rule 10b-5, the duty to abstain from trading or disclose material non-public information arises when there is a "relationship of trust and confidence" between "the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *United States v. O'Hagan*, 521 U.S. 642, 652

(1997). The Government's prior submissions have demonstrated that a relationship of confidence and trust may exist as a matter of federal law, even if the laws of a particular state do not establish that relationship. (*See* Gov't Supplemental Memo. at 2-9.) This memorandum further demonstrates that the mail-fraud statute and related case law support the Government's position.

In the mail-fraud context, as in the insider trading context, state-law duties are not irrelevant. They can help to confirm that a relationship of confidence and trust exists in a given set of circumstances. *Compare United States v. Cassiere*, 4 F.3d 1006, 1023 (1st Cir. 1993) (agreeing that, in mail-fraud cases, "'[t]here may be circumstances in which a violation of a non-criminal standard such as the canons of ethics could conceivably be probative on the issue of whether or not there was [mail] fraud'") *with* Gov't Supplemental Memo. at 5 (noting that, in insider-trading cases, courts "'take [thei]r cues as to what *is* required to create the requisite relationship from the securities fraud precedents and the common law" (quoting *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (en banc))).

Whitman's argument is not, however, that state law is relevant; he argues that state law is dispositive. According to Whitman, the application of the federal insider trading laws is completely dependent upon the current scope of fiduciary and comparable duties under state law in the state in which the securities law violations took place. In his view, a relationship of confidence and trust will not give rise to an abstain-or-disclose duty unless that state's laws acknowledge the relationship as significant.[1]

---

[1] Whitman also misconstrues the state law at issue. He argues that in California, a contractual obligation is not comparable to a fiduciary duty of confidentiality unless it is "sufficiently solemn and specific to give rise to the sort of heightened obligations of trust and confidence that would render it equivalent to a fiduciary relationship." (Def. Memo. at 4.) Whitman cites no California case law – or any case law – in support of his assertion. There is

3

A similar argument – that state law should be the exclusive source of duties – has been raised in "honest services" mail-fraud cases. But most courts of appeals have rejected it. *See United States v. Weyhrauch*, 548 F.3d 1237, 1244 (9th Cir. 2008) ("The majority of circuits . . . have held that the meaning of 'honest services' is governed by a uniform federal standard"), *vacated by* 130 S. Ct. 2971 (2010). That is because, as the Solicitor General argued in

---

none. "It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing," which "requires that neither party do anything which will deprive the other of the benefits of the agreement." *See Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal. 3d 752 (Cal. 1984) (emphasis in original).

Indeed, although California law does not *generally* impose fiduciary duties on an employment-type relationship, *see O'Byrne v. Santa Monica-UCLA Med. Ctr.*, 94 Cal. App. 4th 797, 811-12 (Cal. Ct. App. 2001) (noting that "*[i]n general*, employment-type relationships are not fiduciary relationships" (emphasis added)), California law does adopt the *specific* Restatement rule that "'[a]n agent has a duty . . . not to use or communicate confidential information of the principal for the agent's own purposes or those of a third party,'" *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC*, 162 Cal. App. 4th 858, 888 n.8 (Cal. Ct. App. 2008) (quoting Rest. 3d Agency, § 8.05). The Restatement further provides that an agent's duty of confidentiality may be bolstered by an employment agreement, because "[a]n agent has a duty to act in accordance with the express and implied terms of any contract between the agent and the principle." Rest. 3d Agency, § 8.07. And of course, "[a]n employee is an agent" under California law. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 669 (Cal. 1988).

It is true that a relationship of confidence and trust cannot be created "'simply by the receipt of confidential information.'" (Def. Memo. at 4 (quoting *Michelson v. Hamada*, 36 Cal. Rptr. 2d 343, 348 (Cal. Ct. App. 1994).) But a person who enters into an employment agreement promising not to disclose or to use confidential information has entered into a relationship of confidence and trust *because of her agency relationship to the employer and her confidentiality agreement*, not simply because she later receives confidential information.

The district court's decision in *SEC v. Cuban*, 634 F. Supp.2d 713 (N.D. Tex. 2009), is not to the contrary. The defendant in that case was not an employee and did not sign a confidentiality and non-use agreement; he was a shareholder who orally promised to keep information confidential, but did not promise not to use it. And he complied with this limited promise by keeping the information confidential, even though he used the information himself to make trades. The insiders in this case, by contrast, signed employment agreements in which they promised *both* to keep material, non-public information confidential *and* not to use such information. (*See* Gov't Exh. 1511, para. 4 (Google insider promises "not to disclose to any person, firm, corporation or other entity and not to use, directly or indirectly, . . . any secret or confidential information or knowledge"); Gov't Exh. 1602 and 1611, at para. 2(a) (Marvell insiders promising not to disclose or use confidential information).) And they violated these contractual duties of confidentiality and non-use by conveying the information to others for others' use.

4

*Weyhrauch v. United States*, 130 S. Ct. 2971 (2010), *vacated in light of Skilling v. United States*, 130 S. Ct. 2896 (2010) (hereinafter "Brief of the United States"), both the text and drafting history of the honest services provision confirm that Congress did not intend to base nondisclosure honest-services fraud on violations of state law.

The text of the mail-fraud statute confirms this conclusion for at least two reasons. First, "[t]he provision's text does not refer to 'state law,' let alone suggest an intent to incorporate a state-law violation as an element of mail fraud." Brief of United States at 18. This is significant, the Solicitor General explained, because "'federal statutes are generally intended to have uniform nationwide application,'" and "'in the absence of a plain indication to the contrary,'" courts "normally assume[] that Congress does 'not mak[e] the application of [a] federal act dependent on state law.'" Brief of United States at 18-19 (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) (quoting *Jerome v. United States*, 318 U.S. 101, 104 (1943))). Second, "Congress has repeatedly used express text when it intends to depart from this background presumption and define federal offenses – including offenses involving the use of the mail – by reference to state law," *id.* (citing, *e.g.*, 18 U.S.C. 1952(a) and (b), which prohibit the use of mail in connection with offenses "in violation of the laws of the State in which they are committed"). Congress's use of explicit references to state law in other provisions confirms that it did not intend the honest-services provision to be dependent upon state law.

The drafting history of the honest-services provision also confirms that it is not dependent on state law. As the Solicitor General explained, "the courts of appeals that addressed the question before" the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), had "uniformly recognized that a mail fraud conviction need not be predicated on a violation of state law." Brief of United States at 28. "Although courts permitted the use of state

5

and local provisions governing official conduct as evidence that could tend to prove or disprove the defendant's intent to engage in a deceptive act, . . . they concluded that a violation of state law was not needed to establish honest-services fraud." *Id.* Congress would have been aware of this uniform judicial interpretation. And had it wished to depart from this established precedent, it would have spoken more clearly when it enacted 18 U.S.C. § 1346 after *McNally*. *See* Brief of United States at 31 ("When Congress enacted Section 1346 to overturn *McNally*, its action was intended to revitalize the pre-existing doctrine in the courts of appeals, which had consistently rejected the contention that a violation of an underlying state-law obligation was necessary to violate the mail fraud statute in public-sector honest-services cases.").

Accordingly, to the extent that the text and structure of the mail fraud statute is viewed as analogous to Section 10(b) and Rule 10b-5, it supports the Government's position that the insider-trading laws are not dependent upon state law. That is particularly so because the *reasons* for treating the mail-fraud statute as not dependent on state law apply with equal force to Section 10(b) and Rule 10b-5. First, the text of Section 10(b) and Rule 10b-5 makes no reference to state law, and thus should be presumed to create a uniform national standard. (*See* Gov't Supplemental Memo. at 6). Second, the legislative backdrop of the insider-trading laws – like the legislative backdrop of the honest-services mail-fraud provision – strongly suggests that Congress would not have wanted the laws to be dependent upon state law fiduciary duties. (*Id.* at 5-6).

To be sure, in the years after *McNally* and prior to the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), a few courts of appeals took the position that the honest-services fraud should be limited to cases in which an applicable state law was violated. But these courts reached this conclusion largely because of federalism concerns. For

6

instance, in *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997) (en banc), the Fifth Circuit reasoned that without a state-law limiting principle, the honest-services provision would "erode our federalist structure" by empowering prosecutors to "impose upon states a federal vision of appropriate services – to establish, in other words, an ethical regime for state employees," *id.* at 734. A state-law limiting principle was thus necessary to ensure that the "statute [would] serve federal interests without supplanting rights of core state governance," *id.*, and to relieve the "tension inherent in federal criminalization of conduct by state officials innocent under state law," *id.* at 735. *Cf. Printz v. United States*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers . . . to administer or enforce a federal regulatory program."). "To hold otherwise," the Fifth Circuit warned, "would offer § 1346 as an enforcer of federal preferences of 'good government' with attendant potential for large inroads into state maters and genuine difficulties of vagueness." *Brumley*, 116 F.3d at 735.

Even if these federalism concerns could justify a departure from the most natural reading of the honest-services provision, they have no bearing on the proper interpretation of the insider-trading laws. Allowing federal law to determine that a relationship is one of confidence and trust would not risk "supplanting rights of core state governance," *id.* at 734, or otherwise dictate the terms of state employment. No court has ever held – or even suggested – that allowing a uniform federal standard to determine whether a particular relationship constitutes one of confidence and trust would raise grave constitutional concerns. The insider-trading laws should therefore be given their most natural reading: an individual who has a relationship of confidence and trust must bear a duty to abstain or disclose, regardless of whether state laws acknowledge

7

the significance of the relationship. The mail-fraud cases confirm that this is indeed the most natural reading of the insider-trading laws.[2]

## II.   THE MAIL-FRAUD STATUTE SUPPORTS THE GOVERNMENT'S POSITION THAT FEDERAL INSIDER TRADING LAW DOES NOT REQUIRE A SHOWING OF SPECIFIC INTENT TO CAUSE HARM

The mail-fraud statute also supports the Government's position that there is no need to show specific intent to harm in a federal insider-trading case. Although courts have held that a mail-fraud violation generally requires a showing of specific intent to cause harm to the victim, *see, e.g., United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987), these cases involved situations in which "the victim's loss of money or property supplied the defendant's gain, with one of the mirror image of the other," *Skilling v. United States*, 130 S. Ct. 2896, 2926 (2010) (citing *Starr*, 816 F.2d at 101, as an example)). In such a case, a defendant can only be said to have intended to gain from a mail fraud if he also specifically intended to deprive the victim of the property that would constitute his gain.

But in honest-services mail-fraud cases, the rule is different. As the Supreme Court explained in *Skilling*, "the honest-services theory targeted corruption that lacked similar symmetry," because "[w]hile the offender profited, the betrayed party suffered no deprivation of money or property." 130 S. Ct. at 2926. "For example, if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length, the city (the betrayed party) would suffer no tangible loss." *Id.* In such a case, the defendant's desire to gain from a fraud does not necessarily imply a desire to harm the betrayed party. A specific intent to cause

---

[2] Because this is the most natural reading of the insider trading laws, and because no court has ever reached a different conclusion, it cannot credibly be argued that Whitman expected to be insulated from federal insider-trading charges so long as he operated his fraud out of a state with laws favorable to him.

harm might or might not be present, but it would not be a necessary implication of the offense: the willful acceptance of a bribe. *See United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc) (explaining that in an honest-services fraud case, "actual or intended economic or pecuniary harm to the victim need not be established.").

Insider-trading cases involving tippees are more analogous to the bribe-or-kickback honest-services cases than they are to other types of mail fraud. When an insider conveys material, non-public inside information to a tippee in breach of a duty of confidentiality, this breach might produce benefits to the insider that are wholly independent of any loss to the company or its shareholders. For instance, the tipper might merely be seeking to burnish her reputation, or earn the trust or future favor of the tippee. *See Dirks v. SEC*, 463 U.S. 646, 663-64 (1983). Accordingly, whether an insider intended to harm his company when he conveyed material, non-public information has no bearing on whether the information "has been made available to [the tippee] *improperly*." *Id.* at 660 (emphasis in original). And if the tippee knows that the information has been provided to him improperly, his insider-trading offense consists simply in trading on the information without first disclosing it, regardless of whether he specifically intends to cause harm in the course of reaping his gain. The honest-services mail-fraud cases support the conclusion that, under these circumstances, specific intent to cause harm should not be a required element of the offense.

Indeed, if a specific-intent-to-harm requirement were engrafted onto honest-services fraud or insider-trader cases, it would serve only as an arbitrary limit on the recipients of bribes and insider-trading defendants who can be held accountable for their criminal conduct. There can be no doubt that Congress sought to prohibit employees' receipt of bribes and kickbacks, *see Skilling*, 130 S. Ct. at 2930-31, just as there can be no doubt that Congress sought "to eliminate

9

the idea that the use of inside information for personal advantage was a normal emolument of corporate office," *In re Cady, Roberts & Co.*, 40 S.E.C. 907, 1961 WL 60638, at *4 n.15 (Nov. 8, 1961) (citing legislative history). In both types of cases, it would be improper to immunize a defendant who has willfully committed the act Congress sought to prohibit – accepting a bribe, or surreptitiously trading on inside information obtained improperly from an insider – merely because he did not *also* intend to cause an unrelated tangible loss to the victim. *Cf. SEC v. Stoker*, ---F. Supp.2d---, 2012 WL 2017736, at *6 (S.D.N.Y. June 6, 2012) (refusing, in a Section 17(a) case, to "allow a corporate employee who facilitated a fraud that netted his company millions of dollars to escape liability for the fraud by reading into the statute a narrowing requirement not found in the statutory language itself").

Notably, both the Second Circuit and this Court have recognized that "[t]o convict a defendant of securities fraud, the government . . . need not prove that the defendant intended to cause harm to the victim of the fraud." *United States v. Lincecum*, 225 F.3d 647 (2d Cir. 2000) (summary order) (citing *United States v. Dixon*, 536 F.2d 1388, 1396 (2d Cir. 1976) (Friendly, J.)); *Bennett v. United States*, No. 03 Civ. 1852 (PAC), 2006 WL 738162, at *11 (S.D.N.Y. Mar. 22, 2006) ("[I]ntent to harm is not an element of securities fraud at all." (quoting *United States v. Bennett*, 00-1330, at 4 (2d Cir. May 31, 2001) (summary order)). Indeed, Judge Friendly's opinion in *Dixon* confirms that under the securities laws, "an act is done willfully if done intentionally and deliberately and if it is not the result of innocent mistake, negligence or inadvertence." 536 F.2d at 1397 (alterations omitted). *See also United States v. Kaiser*, 609 F.3d 556, 568-70 (2d Cir. 2010) ("'[W]ilfully' simply requires the intentional doing of the wrongful acts'" (quoting *United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir. 1998)); *id.* ("[W]illfully' as it is used in § 78ff(a) means intentionally undertaking an act that one knows to

be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful'" (quoting *United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004))). No additional showing of a specific intent to harm should be required.

## CONCLUSION

For the reasons stated above, the mail-fraud statute supports the Government's position that (1) the duty of an insider to abstain from trading on material, non-public information, or to disclose that information before making a trade, is not dependent upon state law, and (2) an insider-trading violation does not require a showing of specific intent to harm.

Dated: New York, New York
August 6, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
Jillian Berman, Chris LaVigne, Micah Smith
Assistant United States Attorneys
212-637-2197/2325/2439