UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                            :

UNITED STATES OF AMERICA,        :
                            :   ECF CASE
                 Plaintiff,    :   12 Cr. 125 (JSR)
                            :
           vs.                :
                            :
DOUG WHITMAN,                :
                            :
              Defendant.   :
                            :
--------------------------------------------------------- X

**DECLARATION OF BRADFORD A. BERENSON IN SUPPORT OF DEFENDANT
DOUGLAS F. WHITMAN'S MOTION TO INTRODUCE PRIOR TESTIMONY OF
SUNIL BHALLA UNDER FEDERAL RULE OF EVIDENCE 804**

Bradford A. Berenson, pursuant to 28 U.S.C. § 1746, declares as follows:

1.       I am a partner at Sidley Austin LLP, attorneys for defendant Douglas F. Whitman,

and respectfully submit this declaration in support of Mr. Whitman's Motion to Introduce Prior

Testimony of Sunil Bhalla Under Federal Rule of Evidence 804 for the sole purpose of providing

the Court with true copies of documents relevant to the disposition of that motion.

2.       Attached as Exhibit A is a true copy of the Deposition of Sunil Bhalla taken by

the United States Securities Exchange Commission ("SEC") in 11-cv-170 (S.D.N.Y. July 8,

2011).

3.       Attached as Exhibit B is a true copy of an excerpt of the Deposition of Sunil

Bhalla taken by the SEC in 11-cv-170 (S.D.N.Y. July 8, 2011), including pages 129-134, 189,

and 211-212.

4.       Attached as Exhibit C is a true copy of a letter from Timothy P. Crudo to

Bradford A. Berenson, dated July 9, 2012.

5.      Attached as Exhibit D is a true copy of an e-mail from Bradford A. Berenson to Jillian Berman and Christopher LaVigne, dated July 18, 2012.

6.      Attached as Exhibit E is a true copy of an e-mail from Christopher LaVigne to Bradford A. Berenson and Jillian Berman, dated July 21, 2012.

7.      Attached as Exhibit F is a true copy of the SEC's Complaint in 11-cv-170.

8.      Attached as Exhibit G is a true copy of a press release from the United States Attorney's Office for the Southern District of New York, dated February 10, 2012.

9.      Attached as Exhibit H is a true copy a press release from the United States Securities Exchange Commission, dated February 10, 2012.


I declare under penalty of perjury that the foregoing is true and correct.


Dated:  August 13, 2012                                    /s/ Bradford A. Berenson
                                                                    _____

                                                                    Bradford A. Berenson
                                                                    (bberenson@sidley.com)
                                                                    (Admitted *pro hac vice*)
                                                                    SIDLEY AUSTIN LLP
                                                                    1501 K Street NW
                                                                    Washington, D.C. 20005
                                                                    (202) 736-8000
                                                                    (202) 736-8711 (fax)

                                                                    *Attorneys for Douglas F. Whitman*

# Exhibit A

**Exhibit A Omitted from Public Filing**

# Exhibit B

**Exhibit B Omitted from Public Filing**

# Exhibit C

**Timothy P. Crudo**
Direct Dial: 415-395-8084
Timothy.Crudo@LW.com

505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Moscow |
| Barcelona | Munich |
| Beijing | New Jersey |
| Boston | New York |
| Brussels | Orange County |
| Chicago | Paris |
| Doha | Riyadh |
| Dubai | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

July 9, 2012

## VIA ELECTRONIC AND U.S. MAIL

Bradford A. Berenson, Esq.
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C.  20005

Re:   *United States v. Whitman*, Case No. 12 CR 125 (JSR)

Dear Brad:

We are in receipt of the trial subpoena issued to Sunil Bhalla in *United States v. Whitman*, Case No. 12 CR 125 (JSR).  As I mentioned during our telephone discussion last week, in light of the position that the government has taken with respect to Mr. Bhalla in the particulars set out in its June 18, 2012, letter to you and in its Rule 404(b) notice to you dated June 25, 2012, if called as a witness in this matter Mr. Bhalla will have no choice but to assert his rights under the Fifth Amendment and decline to testify.

Please give me a call if you have any questions.  Thank you.

Sincerely,

Timothy P. Crudo
of LATHAM & WATKINS LLP

# Exhibit D

**Thompson, Nicolas**

---

| | |
|---|---|
| **From:** | Berenson, Bradford |
| **Sent:** | Wednesday, July 18, 2012 7:42 PM |
| **To:** | 'jillian.b.berman@usdoj.gov'; 'christopher.lavigne@usdoj.gov' |
| **Cc:** | Rody, David M.; Anderson, David |
| **Subject:** | Request for defense witness immunity |

Jillian and Chris,

On behalf of our client, Doug Whitman, we formally request that the government confer immunity on the following witnesses to permit them to give testimony at Mr. Whitman's upcoming trial:

Sunil Bhalla
Robert Feinblatt
Shammara Hussein
David Karson
Sangeeth Peruri

Each is currently under a defense subpoena.  We have good reason to believe that each of them, if called to testify, would have probative exculpatory evidence to furnish to the jury.  Yet we have been advised by counsel for each that, due to the allegations surrounding this case, they are at present unwilling to do so based on their Fifth Amendment privilege against compulsory self-incrimination.  Assuming the United States has no intention of bringing criminal charges against these individuals, the interests of justice would clearly favor granting them immunity so that they can give evidence.

Thank you for your consideration of this request.   To facilitate orderly trial preparation, we ask that you please let us know whether you are willing to seek such immunity no later than Monday, July 23rd.

Best regards,

Brad

**Bradford A. Berenson**
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8971
(202) 736-8711 (fax)
bberenson@sidley.com

# Exhibit E

**From**: LaVigne, Christopher (USANYS) [mailto:Christopher.LaVigne@usdoj.gov]
**Sent**: Saturday, July 21, 2012 06:26 PM
**To**: Berenson, Bradford; Berman, Jillian B. (USANYS) <Jillian.B.Berman@usdoj.gov>
**Cc**: Rody, David M.; Anderson, David
**Subject**: RE: A few quick questions

Brad,

Our understanding with respect to RTCs is the same as yours, that they are due Monday.  Regarding point 2, we do not consent to a deposition of Troy Jensen, as we do not believe his testimony is material (as has been defined in the Rule 15 context), nor is he unavailable.  On the former point, we are happy to get a proffer from you about what you expect he would say and take that into consideration before you submit this to the Court.  On point 3, we do not intend to see immunity for any of the witnesses you listed in your earlier e-mail to us.

Many thanks,

Chris

---

**From:** Berenson, Bradford [mailto:bberenson@sidley.com]
**Sent:** Saturday, July 21, 2012 5:03 PM
**To:** Berman, Jillian B. (USANYS); LaVigne, Christopher (USANYS)
**Cc:** Rody, David M.; Anderson, David
**Subject:** A few quick questions

Jillian and Chris,

Just a few quick questions:

1. We understand proposed jury instructions are due to be filed with the court on Monday.  Is that your understanding, too?

2. We have just learned that we will need to take a Rule 15 deposition this week of Troy Jensen.  He will be on vacation in Europe during the entire trial.  His counsel has indicated he can likely be available in New York on Thursday afternoon, although that is still being definitively confirmed.  We believe this will be short: 2 hours or less total.  Will that be all right with you?  We will need to get Judge Rakoff's approval asap and would plan to ask for that approval by telephone on Monday, subject to your views.  The deposition would be videotaped and would probably take place either at Sidley's office in mid-town or at the Ritz-Carlton in Battery Park City; if you had a preference, we could probably accommodate it.

3. Have you had a chance to consider our request for defense witness immunity yet?

Thanks,

Brad

--------------------------------------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such

taxpayer by the Internal Revenue Service.  In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

***********************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.


********************************************************************************************

# Exhibit F

George S. Canellos
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
(212) 336-1100

# 11 CV 0170

RECEIVED
JAN 10 2011
U.S.D.C. S.D. N.Y.
COMPLETED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                           Plaintiff,

     -against-

ROBERT FEINBLATT,
JEFFREY YOKUTY,
TRIVIUM CAPITAL MANAGEMENT LLC,
SUNIL BHALLA,
  and
SHAMMARA HUSSAIN,

                        Defendants.

---

**COMPLAINT**

ECF CASE

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint

against defendants Robert Feinblatt ("Feinblatt"), Jeffrey Yokuty ("Yokuty"), Trivium

Capital Management LLC ("Trivium"), Sunil Bhalla ("Bhalla"), and Shammara Hussain

("Hussain"), alleges as follows:

## SUMMARY

1.        This case involves the tipping of material nonpublic information ("inside information") by insiders, including Bhalla, a senior executive at Polycom, Inc. ("Polycom"), and Hussain, an employee at Market Street Partners, an investor relations consulting firm that did work for Google, Inc. ("Google"). The inside information was passed through an individual, Roomy Khan ("Khan"), to Trivium, its principal Feinblatt, its analyst Yokuty, and others, who then traded on the basis of this information. Khan also traded on and tipped others to inside information she learned from Bhalla, Hussain, and others.

2.        Bhalla tipped Khan to inside information about Polycom's fourth quarter 2005 ("Q4 2005") earnings. Khan traded on that information, and tipped Feinblatt and Yokuty, who traded on behalf of Trivium based on the inside information. Khan also tipped others, including Raj Rajaratnam ("Rajaratnam"), the founder of Galleon Management LP ("Galleon"), a New York-based hedge fund investment adviser. In addition, Khan traded on and tipped Rajaratnam to material nonpublic information she received from Bhalla about Polycom's first quarter 2006 ("Q1 2006") earnings. Rajaratnam, in turn, traded on behalf of Galleon based on the inside information he learned from Khan concerning Polycom's Q4 2005 and Q1 2006 earnings.

3.        Khan also traded on, and tipped Feinblatt and Yokuty to, inside information she received from Deep Shah ("Shah"), a Moody's rating agency analyst, about an impending takeover of Hilton by The Blackstone Group. Feinblatt and Yokuty traded on behalf of Trivium based on the information. Khan passed the Hilton tip to

2

Rajaratnam as well, and Rajaratnam traded on behalf of Galleon based on the information.

4.     Hussain tipped Khan to inside information about Google's second quarter 2007 ("Q2 2007") earnings. Khan traded on this inside information, and passed this inside information along to Feinblatt, Yokuty, and others, including Thomas Hardin, a former Managing Director at New York-based hedge fund investment adviser Lanexa Management, LLC ("Lanexa"). Feinblatt and Yokuty traded on behalf of Trivium based on the information, and Hardin traded on behalf of Lanexa based on the information, and also passed the tip to his friend Gautham Shankar ("Shankar"), a proprietary trader at New York-based broker-dealer Schottenfeld Group LLC ("Schottenfeld"), who traded on the tip. Khan also passed the Google tip to Rajaratnam, who traded on behalf of Galleon based on the information. In addition, Hussain passed the Google tip to hedge fund manager Choo-Beng Lee ("Lee") who, along with his business partner, Ali T. Far ("Far"), caused an entity they controlled, Far & Lee LLC ("Far & Lee"), to trade on the information. Lee also traded in his personal account based on the information.

5.     Finally, Khan traded on, and tipped Feinblatt, Yokuty, Hussain, and others to inside information about the impending acquisition of Kronos by Hellman & Friedman ("Hellman"), a private equity firm, that Khan had received from Shah, who first received the information from an insider. Feinblatt and Yokuty traded on behalf of Trivium based on the information. Hussain traded based on the information in an account held by her parents in which she regularly traded.

3

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6.      The Commission brings this action pursuant to the authority conferred

upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §

77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against each of the

defendants, enjoining them from engaging in the transactions, acts, practices, and courses

of business alleged in this Complaint, disgorgement of all trading profits or losses

avoided from the unlawful insider trading activity set forth in this Complaint, together

with prejudgment interest, and civil penalties pursuant to Section 20(d) of the Securities

Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)]. The Commission also brings this action pursuant to Section 21A of the

Exchange Act [15 U.S.C. § 78u-1] for civil penalties against defendants under the Insider

Trading and Securities Fraud Enforcement Act of 1988. In addition, pursuant to Section

20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act

[15 U.S.C. § 78u(d)(2)], the Commission seeks an order barring Bhalla from acting as an

officer or director of any issuer that has a class of securities registered pursuant to Section

12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to

Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]. The Commission seeks any

other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange

Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.     Venue lies in this Court pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York.  For example, Trivium was based in and had its offices in New York, New York, and Feinblatt and Yokuty worked in New York, New York during the time of the alleged insider trading.  Trades based on the insider tips alleged here were made by traders working out of and based in New York, New York.  In addition, many of the communications in furtherance of the insider trading alleged here were made from, to, or within New York, New York.

## DEFENDANTS

9.     **Feinblatt,** age 41, resides in New York, New York.  Feinblatt was a co-founder of and, during the relevant period, a principal at Trivium.  Feinblatt has held a Series 7 securities license.

10.     **Yokuty,** age 37, resides in New York, New York.  During the relevant period, Yokuty worked as an analyst at Trivium, where he reported to Feinblatt.  Yokuty has held Series 7 and 63 securities licenses.

11. **Trivium,** a Delaware limited liability company, was, during the relevant period, a New York-based hedge fund investment adviser. Trivium was registered with the Commission as an investment adviser until March 31, 2009. During the relevant period, Trivium had approximately $600 million under management in multiple hedge funds (the "Trivium Funds"). From approximately 2005 until the latter part of 2008, Trivium retained Khan as a consultant.

12. **Bhalla,** age 54, resides in Fremont, California. Bhalla joined Polycom in February 2000, and was a Senior Vice President and General Manager of the company's Voice Division during the relevant period.

13. **Hussain,** age 25, resides in Fremont, California. In mid-2007, Hussain worked at Market Street Partners, an investor relations consulting firm that did work for Google.

## RELEVANT INDIVIDUALS AND ENTITIES

14. **Far & Lee,** a Delaware limited liability company, was formed in July 2007 to operate as a trading entity that was used by Lee and Far before they formed the hedge fund investment adviser Spherix Capital LLC. Far & Lee is now defunct.

15. **Google** is a Delaware corporation headquartered in Mountain View, California. Google hosts one of the leading internet search engines. Google's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the Nasdaq under the symbol "GOOG."

16. **Hardin,** age 33, was a managing director at Lanexa through February 2009. He has held Series 7 and 55 securities licenses.

6

17.     **Hilton** is a Delaware corporation that is headquartered in Beverly Hills, California. Hilton is a leading international hotel chain. Hilton's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and, prior to October 24, 2007, its stock traded on the New York Stock Exchange ("NYSE") under the symbol "HLT." On October 24, 2007, Hilton was taken private by The Blackstone Group and its stock ceased trading on the NYSE pursuant to a merger agreement that was announced after the close of the market on July 3, 2007.

18.     **Khan,** age 52, resides in Fort Lauderdale, Florida. Khan is an individual investor.

19.     **Kronos** is a Massachusetts corporation headquartered in Chelmsford, Massachusetts. Kronos makes workforce management software for businesses. Kronos's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act. Until Kronos was acquired by private equity firm Hellman on June 11, 2007, its stock traded on the Nasdaq under the symbol "KRON."

20.     **Lanexa** (f/k/a Camber Global Management), a Delaware limited liability company, is an unregistered New York-based hedge fund investment adviser. As of January 2009, Lanexa claimed to have $55 million in assets under management.

21.     **Lee,** age 54, resides in San Jose, California. Lee was a Managing Partner, portfolio manager, and co-founder of Spherix Capital LLC, an unregistered hedge fund investment adviser. Lee was also a Managing Partner of Far & Lee.

22.     **Market Street Partners** is an investor relations consulting firm in San Francisco, California, which provided services to Google during the relevant period.

23.    **Polycom** is a Delaware corporation headquartered in Pleasanton, California. Polycom produces applications for voice, video, and data networking. Polycom's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the Nasdaq under the symbol "PLCM."

24.    **Rajaratnam,** age 52, resides in New York, New York. Rajaratnam is the founder and a Managing General Partner of Galleon, and, during the relevant period, served as the Portfolio Manager of the Technology Offshore Fund, Technology Partners Fund, Technology MAC Fund, and the Diversified Fund (collectively, the "Galleon Tech funds"). Prior to founding Galleon, Rajaratnam worked at Needham & Co., a registered broker-dealer, for 11 years, at which time he held Series 7 and Series 24 securities licenses. Rajaratnam obtained a degree from the University of Sussex, England, in 1980, and an MBA in Finance from the Wharton School of the University of Pennsylvania in 1983.

25.    **Galleon,** a Delaware limited partnership, is a registered investment adviser based in New York, New York. As of March 2009, Galleon had over $2.6 billion under management. Galleon was founded in 1997 and registered with the Commission as an investment adviser in January 2006. During the relevant period, Galleon served as the investment adviser for several hedge funds, including the Galleon Tech funds, the Captains funds and the Communications funds.

26.    **Shah,** age 27, resided in Jersey City, New Jersey during the relevant period, and, in 2007, was employed at Moody's as a lodging industry analyst. Shah left Moody's in late 2007 or early 2008. He is believed to currently reside in India.

8

27.    **Shankar**, age 36, resides in New Canaan, Connecticut. During the relevant period, Shankar was a registered representative and a proprietary trader at Schottenfeld. Shankar held Series 3, 7, 55, and 63 securities licenses.

28.    **Schottenfeld,** a New York limited liability company, is a registered broker-dealer based in New York, New York.

## FACTS

**A.    Insider Trading in Polycom Securities**

29.    During the relevant period, Bhalla was a senior Polycom executive with access to confidential information concerning Polycom's earnings.

30.    In or around 2003, Khan befriended Bhalla. Some time afterwards, Bhalla, believing that Khan was a successful investor, deposited money into an account and gave Khan authority to trade the account on Bhalla's behalf. Through unprofitable trading, Khan lost Bhalla's money.

31.    In late 2005 and 2006, Bhalla provided Khan with inside information concerning Polycom's quarterly earnings with the knowledge that Khan intended to use that inside information to trade in Polycom stock for profit, and with the expectation that Khan would share a portion of Khan's illegal trading profits with Bhalla.

**a.    Polycom's Q4 2005 Earnings Release – January 25, 2006**

32.    In late December 2005, Bhalla obtained inside information concerning Polycom's unit sales and revenues for Polycom's Q4 2005. On or before January 10, 2006, Bhalla provided Khan with material nonpublic Q4 2005 earnings information, including that Polycom's Q4 was strong, its revenues were up, and that its order backlog had increased.

33.   Following the close of the markets on January 25, 2006, Polycom released its Q4 2005 earnings, which included higher-than-expected revenues. The following day, Polycom's stock opened at $18.30 per share, up about 8% compared to the previous day's closing price of $16.98 per share.

34.   Khan traded on the basis of the information provided by Bhalla by purchasing Polycom securities in Khan's personal account. On January 10, 2006, Khan purchased 3,000 February $17.50 Polycom out-of-the-money call option contracts. On January 20, 2006, Khan purchased an additional 500 February $17.50 call option contracts. Following Polycom's earnings announcement, Khan sold her Polycom call options at varying prices, generating approximately $330,000 in illicit profits. Bhalla knew that Khan's trades in Polycom based on Bhalla's tips had been profitable, and Bhalla sought to be compensated for them.

35.   In addition to trading on the inside information obtained from Bhalla, Khan also passed the tip she received from Bhalla to Feinblatt, Yokuty, and others, including Rajaratnam.

36.   In 2005, Khan began working as a consultant for Trivium, providing research on the technology sector for a fee, which, at the time, was approximately $15,000 per month. On or before January 10, 2006, Khan informed Trivium's principal, Feinblatt, and Trivium's technology analyst, Yokuty, that Khan had an inside source at Polycom and that, based on information Khan had received from that source, the Trivium Funds should have a long position in Polycom going into the January 25, 2006 earnings release.

10

37.    From January 10 through January 25, 2006, Feinblatt, Yokuty, and Trivium, based on Khan's tip, caused the Trivium Funds to purchase approximately 325,000 shares of Polycom, which the Trivium Funds sold after the January 25, 2006 announcement for a profit of over $1.4 million. After the earnings announcement, Feinblatt thanked Khan for the tip.

38.    On or about January 10, 2006, Khan told Rajaratnam that Polycom's revenues for Q4 2005 would beat street estimates. Khan made it clear to Rajaratnam that Khan's information regarding Polycom was from an insider and was reliable. After obtaining this information from Khan, Rajaratnam began purchasing Polycom securities for the accounts of certain of the Galleon Tech funds on the basis of this inside information. All told, from January 10 through January 25, 2006, the date of the Polycom earnings release, Rajaratnam purchased 245,000 shares of Polycom and 500 Polycom call option contracts on behalf of the Galleon Tech funds. Following the earnings announcement, the Galleon Tech funds sold their Polycom holdings on different dates and at varying prices. Collectively, the Galleon Tech funds made approximately $600,000 in connection with their Polycom trades based on Khan's tip. On January 26, the day after the earnings release, Rajaratnam thanked Khan for the Polycom information.

b.    **Polycom's Q1 2006 Earnings Release – April 19, 2006**

39.    On or before April 10, 2006, Bhalla learned, through his position at Polycom, of Polycom's Q1 2006 financial results, including that Polycom's revenues for Q1 2006 would beat market expectations.

40.    On or about April 10, 2006, Bhalla communicated inside information about Polycom's Q1 2006 results to Khan. On or about April 13, 2006, Khan passed this

11

information on to Rajaratnam, making it clear that the information was from the same
source who had provided the inside information on Polycom's Q4 2005 earnings in
January 2006.

      41.     On April 17, 2006, Khan purchased 200 April $20 Polycom call option
contracts on the basis of the information Khan had received from Bhalla, and between
April 13 and 18, 2006, Rajaratnam purchased 250,000 Polycom shares on behalf of the
Galleon Tech funds based on the information he had received from Khan.

      42.     On April 19, 2006, Polycom's stock opened at $21.85 per share and began
to climb in advance of the after-hours earnings release, closing at $22.52 per share.
Following the market close on April 19, Polycom released its Q1 2006 earnings, which
included higher-than-expected revenues.  Later that day, Rajaratnam congratulated Khan
for the Polycom tip.  On April 20, 2006, Polycom opened at $22.72 per share.  The
Galleon Tech funds sold some of their Polycom shares in the stock price run-up prior to
the announcement on April 19, and then sold the rest following the announcement, for a
profit of over $165,000.  Khan sold her options on April 19 during the stock price run-up
prior to the announcement, making a profit of $22,000.

**B.**     **<u>Insider Trading in Hilton Securities</u>**

      43.     Khan obtained inside information in advance of a July 3, 2007 takeover
announcement that a private equity group would be buying Hilton for $47.50 per share, a
premium of $11.45 per share over the stock's July 3 closing price (the "Hilton
Transaction").  Khan obtained the nonpublic information from Shah, a friend and
roommate of Khan's cousin.  At the time, Shah was working as an analyst at Moody's, a
rating agency that was evaluating Hilton's debt in connection with the Hilton

Transaction. Because of his position at Moody's, Shah had access to inside information about Hilton.

44.    On or about July 2, 2007, Shah provided Khan with specific information concerning the upcoming Hilton Transaction. Shah told Khan that Hilton was going to be taken private in a deal to be announced the following day, at a price around the mid-$40s per share. Shah indicated that he had learned this information through a communication that representatives of Moody's had received from Hilton management.

45.    Immediately after receiving this information, Khan purchased 550 August $35 Hilton call option contracts. The following morning, Khan purchased 100 July $35 Hilton call option contracts.

46.    On the evening of July 3, the Hilton Transaction was announced at an $11.45 per share premium over that day's closing price of $36.05. On July 5, the first trading day after the July 4th holiday, the price of Hilton common stock shot up to $45.39 per share.

47.    On July 5, Khan sold all of the Hilton call option contracts that Khan had purchased on July 2 and 3 for a profit of over $630,000.

48.    On July 2, 2007, shortly after receiving the Hilton tip from Shah, Khan also passed the information Khan received from Shah about the Hilton Transaction to Feinblatt and Yokuty at Trivium, telling them that Khan's Moody's source – whom Khan, Feinblatt and Yokuty referred to as "the M guy" – had tipped her that Hilton was being taken private for a price in the mid-$40s per share and that the deal would be announced the following day. Going into July 2, the Trivium Funds had a short position in Hilton of over 280,000 shares, which they covered within minutes after Khan's

13

conversations with Shah and a subsequent call from Khan to Trivium's offices. Khan called Yokuty later that afternoon and then called Trivium's offices on the morning of July 3. Minutes after the July 3 call, the Trivium Funds built a substantial long position in Hilton on the basis of Khan's inside information, buying about 525,000 shares, or an amount equal to approximately 15% of Hilton's average daily trading volume for the prior three-month period, in a trading day that ended at 1 p.m. On July 3, 2007, Feinblatt told Khan that he would execute the Trivium Funds' Hilton trades through a brokerage firm that had just issued a research note about a possible private equity deal for Hilton to provide cover for his trading. Consistent with what Feinblatt told Khan, the Trivium Funds executed a portion of its July 3 Hilton purchases through Jefferies & Co. ("Jefferies"), which had recirculated in the early morning hours of July 3 an earlier positive analysis of Hilton. Based on Khan's Hilton tip, Feinblatt, Yokuty, and Trivium caused the Trivium Funds to sell their Hilton position for a profit of approximately $5.2 million, and they avoided trading losses of approximately $4.9 million by covering Trivium Funds' short position.

49.     Within minutes after the close of trading on July 3, 2007, Trivium emailed Khan notifying her that her annual consulting fee was being increased from $250,000 to $350,000.

50.     On or about July 2, 2007, Khan also passed Shah's Hilton tip to Rajaratnam, telling Rajaratnam that Hilton was going to be taken private at a price somewhere in the mid-$40s per share in a deal to be announced the following day. Khan described the Hilton Transaction to Rajaratnam as a sure thing, and told Rajaratnam that she had a very good source for the Hilton information. After receiving the tip from Khan,

on July 3, 2007, Rajaratnam and Galleon purchased 400,000 shares of Hilton for the Galleon Tech funds -- whose stated purpose was to make investments in the technology sector, rather than the lodging sector -- on the basis of this inside information. The Galleon Tech funds sold their Hilton shares after the July 3 announcement for a profit of over $4 million.

## C.  Insider Trading in Google Securities

51.  Within about a week of the Hilton tip, Hussain tipped Khan to inside information concerning Google's Q2 2007 results, which were scheduled to be announced after the close of the markets on July 19, 2007. At the time, Hussain worked for Market Street Partners, a consulting firm that performed investor relations work for Google. As a result, Hussain had access to inside information concerning Google's quarterly earnings announcements, including advance copies of such announcements.

52.  On or about July 10, 2007, Hussain told Khan that Google's earnings per share ("EPS") would be down about 25 cents, which was in sharp contrast to the market's expectation that Google's EPS would be strong. After receiving the Google tip from Hussain, Khan began purchasing put options on the basis of this inside information. Between July 12, 2007 and July 19, 2007, when Google publicly announced its financial results, Khan purchased a total of 566 August $530 Google put options.

53.  After the markets closed on July 19, 2007, Google announced its Q2 2007 earnings results, disclosing, among other things, that its EPS was 25 cents lower than for Q1 2007. Google's share price fell from over $548 per share to almost $520 per share.

54.  Khan sold all of Khan's put options the day after the July 19, 2007 Google announcement for a profit of over $500,000.

55.     After Hussain provided Khan with the above information, Hussain told Khan that unless Khan paid Hussain a fee of $100,000-$200,000 per quarter, Hussain would cease providing Khan with inside information. Khan declined to agree to this request, and Hussain stopped providing Khan with tips.

56.     Hussain also provided Lee with specific information about Google's Q2 2007 disappointing earnings in advance of the public release of that information on July 19, 2007. Hussain is a family friend of Lee, who knew that Hussain was employed at Google's investor relations firm. Lee shared the inside information from Hussain with Lee's business partner, Far, and the two traded based on this information in a joint account they held in the name of Far & Lee. On the morning of July 19, 2007, before the earnings announcement, Lee and Far caused Far & Lee to purchase 200 July $540 Google put option contracts, a position they closed out after Google's announcement for a profit of over $390,000. In addition, Lee purchased Google put options in his personal account for a profit of over $71,000.

57.     Shortly after receiving the Google tip from Hussain, Khan passed the inside information Khan received from Hussain about Google's Q2 2007 results to Feinblatt and Yokuty at Trivium. Khan explained to Feinblatt and Yokuty that the Google source was an employee of the investor relations firm retained by Google. Based on Khan's Google tip, Feinblatt and Yokuty bought Google put options for the Trivium Funds in the days leading up to the July 19 announcement. Following the July 19 announcement, Feinblatt and Yokuty closed out the Trivium Funds' Google position for profits exceeding $2.5 million.

58. In addition, Khan, shortly after receiving the Google tip from Hussain, passed the Google tip to Rajaratnam, telling him to short Google because earnings would fall below analysts' expectations. Khan told Rajaratnam that Khan's source for the tip was a consultant for Google who had pre-announcement access to earnings information. After receiving the tip from Khan, Rajaratnam began buying Google put options for the Galleon Tech funds and continued buying them through July 19 on the basis of this inside information. In addition, Rajaratnam communicated with Khan before the markets opened on July 17. Shortly afterwards, Rajaratnam communicated with the portfolio manager of the Galleon Captains funds. Beginning that same day and continuing through the day of Google's Q2 2007 earnings announcement, the Captains funds took aggressive short positions in Google on the basis of this inside information by purchasing Google put options, selling Google call options and selling short Google's stock. The Galleon Tech funds' profits from the Google tip were nearly $8 million, and the Galleon Captains funds made over $1.3 million. Thus, the combined profits generated by Rajaratnam and Galleon on behalf of the various Galleon funds from insider trading in Google on the basis of Khan's tip concerning Google's July 19, 2007 announcement exceeded $9 million.

59. On or about July 12, 2007, Khan also passed to Hardin the inside information about Google's Q2 2007 results that Khan received from Hussain. Khan told Hardin that Google would miss its quarter, explaining that the information came from Hussain, who worked at Google's investor relations firm and saw Google's quarterly earnings press release before it became public. Just before the market closed on the day of Google's post-close Q2 2007 earnings announcement, Hardin caused Lanexa to sell

short 5,900 Google shares based on this inside information, generating trading profits of approximately $150,000.

60.     On or before July 18, 2007, Hardin passed the inside information Hardin received from Khan about Google's Q2 2007 results to his friend, Shankar, a proprietary trader at Schottenfeld, telling Shankar that the information came from a source at Google's investor relations firm. Based on this information, before the announcement on July 19, 2007, Shankar sold short Google shares and purchased Google put option contracts, generating profits of more than $50,000.

**D.      Insider Trading in Kronos Securities**

61.     Khan also received inside information concerning the acquisition of software company Kronos by private equity firm Hellman in March 2007 (the "Kronos Transaction"). Khan traded on this information and passed it on to others. The Kronos Transaction was made public on March 23, 2007, at market open, when Kronos announced that it would be taken private by Hellman for $55 per share, a substantial premium to the previously prevailing market price of Kronos' stock.

62.     During mid-March 2007, Shah learned that Kronos was on the auction block and about to be acquired. Shah learned this information from a friend who worked at an investment bank involved in financing the acquisition (the "Kronos Source"). The Kronos Source and Shah communicated several times on March 14, 2007, and the Kronos Source relayed specific information to Shah concerning a bid to acquire Kronos. Shah and Khan also communicated several times on March 14, and Shah conveyed the material nonpublic information he had learned about the Kronos Transaction to Khan.

18

63.    On March 16, 2007, Khan purchased 35 April $40 Kronos call options at $3.00 per contract on the basis of the inside information Khan received from Shah.

64.    Following the March 23, 2007 announcement of the Kronos Transaction, Kronos's stock price increased nearly 14%, from $46.63 per share on March 22 to $53.11 per share at the market close on March 23.

65.    Khan traded profitably in Kronos based on the inside information she received from Shah, selling, after the announcement, all of the call options she bought on March 16 for a profit of approximately $37,000.

66.    Shah asked Khan to pay him $10,000 for the Kronos tip, and Khan, in turn, arranged for one of her tippees, Hardin, to make the payment to Shah.

67.    Khan tipped Feinblatt and Yokuty at Trivium to the Kronos Transaction, telling them that she received the information from her Moody's source – "the M guy" – and that the information had originally come from another source at a certain investment bank.

68.    Between March 16 and 22, 2007, on the basis of this inside information, Feinblatt and Yokuty caused the Trivium Funds to acquire a large long position in Kronos and, even after engaging in opportunistic profit-taking in the run up ahead of the announcement, held a position of 160,000 Kronos shares going into the announcement. The Trivium Funds sold off their Kronos position in the days following the announcement, making a profit of approximately $1.8 million.

69.    Khan also passed the Kronos tip to Hussain and told her that the information came from an inside source.  Khan and Hussain communicated multiple times on March 15 and 16, 2007.  On March 16, an account held jointly by Hussain's

parents, and in which Hussain regularly traded, began trading Kronos on the basis of this inside information. The account bought and sold Kronos shares ahead of the announcement, but maintained a 3,000 share position going into the announcement, generating a profit of approximately $21,000.

70.     On or about March 15, 2007, Khan told Hardin that Kronos would be acquired in about a week for a substantial premium, and also told Hardin what she knew about the source of the tip, and that Shah wanted to be paid $10,000 for the tip. Hardin caused Lanexa to trade in Kronos on the basis of the material nonpublic information that they received from Khan, generating profits of approximately $547,000. Hardin also personally paid Shah $10,000 in cash for the Kronos tip.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against all Defendants)

71.     The Commission realleges and incorporates by reference paragraphs 1 through 70, as though fully set forth herein.

72.     The information concerning (i) the Polycom January 25, 2006 earnings announcement, (ii) the Polycom April 19, 2006 earnings announcement, (iii) the Hilton Transaction, (iv) the Google July 19, 2007 earnings announcement, and (v) the Kronos Transaction, respectively, was, in each case, material and nonpublic. In addition, the information was, in each case, considered confidential by the companies that were the ultimate source of the information, and each of these companies had policies protecting confidential information.

73. Each of Bhalla, Shah, Hussain, and the Kronos Source learned during the course of his/her employment the inside information each conveyed, and each knew, recklessly disregarded, or should have known, that each, directly, indirectly or derivatively, owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

74. Each of Bhalla, Shah, Hussain, and the Kronos Source tipped inside information to their respective tippee(s) with the expectation of receiving a benefit.

75. Khan and Hardin, as tippees themselves, each tipped their respective tippees inside information, with the expectation of a benefit from doing so, and each knew, recklessly disregarded, or should have known, that the information was conveyed in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence. Each of the tippees named as defendants knew, recklessly disregarded, or should have known, that the inside information each received from their respective tippers was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

76. Feinblatt and Yokuty are liable for the trading occurring in the Trivium Funds because each effectuated the trades on behalf of the funds, controlled the funds, and/or unlawfully tipped the inside information to the funds.

77. The unlawful trading done by Feinblatt and Yokuty is attributable to Trivium.

78. By virtue of the foregoing, defendants Feinblatt, Yokuty, Trivium, Bhalla, and Hussain, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a

national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

79.     By virtue of the foregoing, defendants Feinblatt, Yokuty, Trivium, Bhalla and Hussain each, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### CLAIM II
### Violations of Section 17(a) of the Securities Act
### (Against Feinblatt, Yokuty, Trivium and Hussain)

80.     The Commission realleges and incorporates by reference paragraphs 1 through 79, as though fully set forth herein.

81.     By virtue of the foregoing, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, defendants Feinblatt, Yokuty, Trivium and Hussain: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

22

82.    By reason of the conduct described above, defendants Feinblatt, Yokuty,

Trivium and Hussain each, directly or indirectly, violated, and unless enjoined will again

violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a

Final Judgment:

### I.

Permanently restraining and enjoining defendants Feinblatt, Yokuty, Trivium,

Bhalla, Hussain, their officers, agents, servants, employees, and attorneys, and those

persons in active concert or participation with them who receive actual notice of the

injunction by personal service or otherwise, and each of them, from violating Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5];

### II.

Permanently restraining and enjoining defendants Feinblatt, Yokuty, Trivium,

Bhalla, Hussain, their officers, agents, servants, employees, and attorneys, and those

persons in active concert or participation with them who receive actual notice of the

injunction by personal service or otherwise, and each of them, from violating Section

17(a) of the Securities Act [15 U.S.C. §§ 77q(a)];

### III.

Ordering defendants Feinblatt, Yokuty, Trivium, Bhalla, and Hussain to disgorge,

with prejudgment interest, all illicit trading profits, other ill-gotten gains received, and/or

losses avoided as a result of the conduct alleged in this Complaint, including their own

illicit trading profits, other ill-gotten gains, and/or losses avoided, and the illicit trading profits, other ill-gotten gains, and/or losses avoided of their direct and downstream tippees;

## IV.

Ordering defendants Feinblatt, Yokuty, Trivium, Bhalla, and Hussain to pay civil monetary penalties pursuant to Section 21(d)(3) and/or Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1], and Section 20(d) of the Securities Act [5 U.S.C. § 77t(d)];

## V.

Barring defendant Bhalla pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

## VI.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
January 10, 2011

George S. Canellos
Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281-1022
(212) 336-1020

Of Counsel:

David Rosenfeld (RosenfeldD@sec.gov)
Sanjay Wadhwa (WadhwaS@sec.gov)
Valerie A. Szczepanik (SzczepanikV@sec.gov)
Kevin McGrath (McGrathK@sec.gov)
Jason E. Friedman (FriedmanJ@sec.gov)
John Henderson* (HendersonJ@sec.gov)
* not admitted in the S.D.N.Y.

# Exhibit G



## New York Field Office

Home • New York • Press Releases • 2012 • Manhattan U.S. Attorney and FBI Assistant Director in Charge Announce Insider Trading Charges Against California Hedge...

### Manhattan U.S. Attorney and FBI Assistant Director in Charge Announce Insider Trading Charges Against California Hedge Fund Portfolio Manager

*Defendant Allegedly Used Polycom and Google Inside Information to Net More Than $900,000 in Illegal Profits in One Scheme*

**U.S. Attorney's Office**
February 10, 2012

**Southern District of New York**
(212) 637-2600

Preet Bharara, the United States Attorney for the Southern District of New York, and Janice K. Fedarcyk, the Assistant Director in Charge of the New York Office of the Federal Bureau of Investigation ("FBI"), announced conspiracy and securities fraud charges against DOUG WHITMAN, the head portfolio manager at Whitman Capital, LLC, related to his alleged involvement in two insider trading schemes that earned his firm more than $900,000 in illegal profits. As part of the schemes, WHITMAN allegedly executed trades based on material, nonpublic ("Inside Information") related to three publicly traded companies: Marvell Technology Group, Ltd. ("Marvell"), Polycom, Inc. ("Polycom"), and Google, Inc. ("Google"). WHITMAN surrendered to the FBI this morning and will be presented in Magistrate Court later this afternoon.

Manhattan U.S. Attorney Preet Bharara said: "Inside tips, illegal shortcuts, and corrupt collaborations have no place in a trading strategy, and there is a high price to pay for those who think and act otherwise. With today's charges, Doug Whitman now joins the growing list of privileged professionals who mistakenly thought the rules did not apply to them."

FBI Assistant Director in Charge Janice K. Fedarcyk said: "Trading on inside information, whether it comes directly from industry insiders or is channeled through conduits, is illegal. Whitman recognized the value of the information he got, and paid cash for it in one case, and bartered his own inside information in the other. As today's charges show, our efforts to police the securities marketplace are unwavering."

The following allegations are based on the Indictment unsealed today in Manhattan federal court, as well as trial testimony from other court proceedings:

From about 2007 through about 2009, WHITMAN bought and sold Marvell stock and options at Whitman Capital based on Inside Information, including earnings, revenue, and/or other material financial and business information. The Inside Information was provided to WHITMAN by Karl Motey, an independent research consultant, who had obtained it from several Marvell employees. In exchange for the Inside Information, WHITMAN paid Motey through a soft dollar payment arrangement between Whitman Capital and Motey's consulting firm.

In another scheme, from about 2006 to about 2007, WHITMAN obtained Inside Information, including earnings information and/or material financial and business information, pertaining to Polycom and Google from Roomy Khan, who worked in the hedge fund industry. Khan obtained the Polycom Inside Information from an employee at the company, and she obtained the Google Inside Information from an employee of a firm that provided investor relations services to Google. WHITMAN used the Polycom and Google Inside Information to execute securities transactions that earned his firm more than $900,000 in illegal profits. In exchange for the Inside Information, WHITMAN provided Khan with information about other publicly traded technology companies.

* * *

WHITMAN, 54, of Atherton, California, has been charged with two counts of conspiracy to commit securities fraud and two counts of securities fraud. The conspiracy counts each carry a maximum penalty of five years in prison and a fine of $250,000, or twice the gross gain or loss from the offense. The securities fraud counts each carry a maximum penalty of 20 years in prison and a maximum fine of $5 million.

Mr. Bharara praised the investigative work of the FBI and thanked the U.S. Securities and Exchange Commission. He noted that the investigation is continuing.

Karl Motey and Roomy Khan both previously pled guilty to insider trading charges and are awaiting sentencing.

This case was brought in coordination with President Barack Obama's Financial Fraud Enforcement Task Force, on which Mr. Bharara serves as a Co-Chair of the Securities and Commodities Fraud Working Group. President Obama established the interagency Financial Fraud Enforcement Task Force to wage an aggressive, coordinated, and proactive effort to investigate and prosecute financial crimes. The task force includes representatives from a broad range of federal agencies, regulatory authorities, inspectors general, and state and local law enforcement who, working together, bring to bear a powerful array of criminal and civil enforcement resources. The task force is working to improve efforts across the federal executive branch, and with state and local partners, to investigate and prosecute significant financial crimes, ensure just and effective punishment for those who perpetrate financial crimes, combat discrimination in the lending and financial markets, and recover proceeds for victims of financial crimes.

This case is being handled by the Office's Securities and Commodities Fraud Task Force. Assistant U.S. Attorney David Leibowitz and Special Assistant U.S. Attorney Andrew Z. Michaelson are in charge of the prosecution.

The charges contained in the Indictment are merely accusations, and WHITMAN is presumed innocent unless and until proven guilty.

**New York Field Office Links**

**New York Field Office Home**

Contact Us
- Overview
- Territory/Jurisdiction

News and Outreach
- Press Room | Stories
- In Your Community

About Us
- Our People & Capabilities
- What We Investigate
- Our Partnerships
- New York History

**Wanted by the FBI - New York**

**FBI Jobs**

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice

Close

# Exhibit H



U.S. Securities and Exchange Commission

## SEC Charges California Hedge Fund Manager Connected to Galleon Insider Trading Case

**FOR IMMEDIATE RELEASE**
**2012-27**

*Washington, D.C., Feb. 10, 2012* — The Securities and Exchange Commission today charged a hedge fund manager and his Menlo Park, Calif.-based firm for their involvement in the insider trading ring connected to Raj Rajaratnam and hedge fund advisory firm Galleon Management.

---

**Additional Materials**

➤ SEC Complaint

---

The SEC alleges that Douglas F. Whitman and Whitman Capital illegally traded based on material nonpublic information obtained from Rajaratnam associate Roomy Khan, who was Whitman's friend and neighbor. Khan tipped Whitman with confidential details about Polycom Inc.'s fourth quarter 2005 earnings and Google Inc.'s second quarter 2007 earnings prior to the public announcements of those financial results by the companies. Whitman Capital reaped nearly $1 million in ill-gotten gains by trading on Khan's illegal tips.

"Whitman engaged in what even he termed 'slimeball' activity and together with Khan brought new illicit meaning to the maxim 'help thy neighbor,'" said George S. Canellos, Director of the SEC's New York Regional Office.

Sanjay Wadhwa, Associate Director of the SEC's New York Regional Office and Deputy Chief of the Market Abuse Unit, added, "This action should send a strong signal that the SEC will continue to pursue every angle of the Galleon investigation to hold accountable those who have undermined the integrity of our markets by engaging in illegal insider trading."

According to the SEC's complaint, filed in federal court in Manhattan, the inside information about Polycom and Google used by Whitman is the same information that the SEC has previously alleged Khan provided to many of her hedge fund contacts, including Rajaratnam as well as Robert Feinblatt and Jeffrey Yokuty at Trivium Capital.

The SEC alleges that Khan illegally tipped Whitman in January 2006 with information about Polycom's quarterly financial results, and she noted that these details were nonpublic and acquired from a source at Polycom. Whitman Capital accumulated 132,263 shares of Polycom stock in the next two weeks. When the company announced its results on January 25, Whitman Capital liquidated its entire Polycom position for a profit of more

than $360,000. On at least one later occasion, in September 2008, Whitman asked Khan to contact her Polycom source to obtain inside information about the company's upcoming earnings so the two could "short it." When Khan rebuffed Whitman citing a fear of getting caught, Whitman suggested that she use "Skype" to avoid detection. Whitman later stated that he would stop speaking to Khan if she wasn't going to be a "slimeball" anymore.

The SEC further alleges that Khan illegally tipped Whitman with inside information about Google's quarterly financial results shortly before the company's post market-close earnings announcement on July 19, 2007. At Whitman's insistence, Khan identified her Google source as an employee of an investor relations firm used by Google. Whitman Capital funds then purchased 2,761 Google put option contracts based on the tip from Khan. On July 20, Whitman Capital closed the put option positions and generated ill-gotten profits of more than $620,000. Afterwards, Whitman sent Khan a large floral arrangement to thank her for the tip.

The SEC's complaint charges Whitman and Whitman Capital with violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933. The complaint seeks a final judgment permanently enjoining the defendants from future violations of the above provisions of the federal securities laws, ordering them to disgorge their ill-gotten gains plus prejudgment interest, and ordering them to pay financial penalties.

The SEC has charged 30 defendants in its Galleon-related enforcement actions, which have exposed widespread and repeated insider trading at numerous hedge funds and by other traders, investment professionals, and corporate insiders located throughout the country. The insider trading occurred in the securities of more than 15 companies for illicit profits totaling more than $91 million.

The SEC's investigation, which is continuing, has been conducted by John Henderson and Joseph Sansone - members of the SEC's Market Abuse Unit in New York - and Diego Brucculeri and James D'Avino of the New York Regional Office. Kevin McGrath and Valerie Szczepanik will lead the SEC's litigation effort. The SEC thanks the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation for their ongoing assistance in the matter.

# # #

For more information about this enforcement action, contact:

George S. Canellos
Director, SEC's New York Regional Office
(212) 336-1020

Sanjay Wadhwa
Associate Director, SEC's New York Regional Office and Deputy Chief, Market Abuse Unit
(212) 336-0181

Joseph G. Sansone

Assistant Director, SEC's New York Regional Office and Market Abuse Unit
(212) 336-0517

*http://www.sec.gov/news/press/2012/2012-27.htm*

Home | Previous Page

Modified: 02/10/2012