UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X
                             :

UNITED STATES OF AMERICA,      :
                             :

        - v. -             :   ECF CASE
                             :   12 Cr. 125 (JSR)

DOUG WHITMAN,            :

                             :

                Defendant.    :

                             :

--------------------------------------------------------------- X

## **DEFENDANT'S SENTENCING MEMORANDUM**

David L. Anderson
(Admitted *pro hac vice*)
SIDLEY AUSTIN LLP
555 California Street
San Francisco, CA
(415) 772-1200
(415) 772-7400 (fax)

David M. Rody
Michael D. Mann
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Douglas F. Whitman*

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ........................................................................................1

II.    DOUG WHITMAN'S HISTORY AND CHARACTERISTICS, INCLUDING
       REPEATED ACTS OF CHARITY AND KINDNESS, WEIGH HEAVILY
       AGAINST A SENTENCE REQUIRING A TERM OF IMPRISONMENT......................3

       A.    Hard Work and a Helping Hand ............................................................................4

       B.    Charity, Compassion, and Kindness......................................................................6

       C.    Devotion to Family .............................................................................................12

       D.    Devastating Losses..............................................................................................17

III.   MR. WHITMAN DID NOT COMMIT PERJURY AND SHOULD NOT BE
       SUBJECT TO A SENTENCING ENHANCEMENT FOR OBSTRUCTION OF
       JUSTICE UNDER SECTION 3C1.1.................................................................................19

       A.    Legal Standard ....................................................................................................19

       B.    Mr. Whitman's Guidelines Range Should Not Be Enhanced as a Result of
             His Trial Testimony. ...........................................................................................21

IV.    THE ADVISORY GUIDELINES RANGE OVERSTATES THE SERIOUSNESS
       OF MR. WHITMAN'S OFFENSES AND FAILS TO CONSIDER FULLY THEIR
       NATURE AND CIRCUMSTANCES. ...............................................................................26

       A.    The Total Gain to Whitman Capital Overstates the Seriousness of Mr.
             Whitman's Offenses.............................................................................................27

             1.     The Gain Attributed to Mr. Whitman Ignores His Substantial Losses
                    on the Challenged Marvell Trades.............................................................28

             2.     Mr. Whitman's Personal Profit Was Only One-Third of the Total
                    Gain Attributed to Him. ............................................................................30

       B.    A Sentence Within the Recommended Guidelines Range Overstates the
             Seriousness of Mr. Whitman's Offenses Because It Fails to Consider the
             Derivative Nature of His Individual Conduct.......................................................31

V.     IMPOSING A GUIDELINES SENTENCE OF INCARCERATION WOULD
       CAUSE AN UNWARRANTED DISPARITY WITH SIMILARLY SITUATED
       DEFENDANTS. .................................................................................................................37

VI.   MR. WHITMAN HAS SUFFERED PUNISHMENT ENOUGH AND SHOULD
      RECEIVE A SENTENCE WITHIN ZONE A. ...............................................................42

CONCLUSION.........................................................................................................................44

# TABLE OF AUTHORITIES

Page(s)

Cases

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
 472 U.S. 299 (1985)........................................................................................................ 33, 41

*Carvajal-Montoya v. United States*,
 No. 12 Civ. 764, No. 07 Cr. 441 (LBS), 2012 WL 3713110 (S.D.N.Y. Aug. 27, 2012) ........21

*Dirks v. S.E.C.*,
 463 U.S. 646 (1983)...........................................................................................................33, 36

*United States v. Adelson*,
 441 F. Supp. 2d 506 (S.D.N.Y. 2006).................................................................................27, 32

*United States v. Araujo*,
 539 F.2d 287 (2d Cir. 1976).....................................................................................................39

*United States v. Ben-Shimon*,
 249 F.3d 98 (2d Cir. 2001).......................................................................................................20

*United States v. Canova*,
 412 F.3d 331 (2d Cir. 2005).....................................................................................................20

*United States v. Catano-Alzate*,
 62 F.3d 41 (2d Cir. 1995)....................................................................................................20, 23

*United States v. Cusimano*,
 123 F.3d 83 (2d Cir. 1997).......................................................................................................23

*United States v. Defreitas*,
 No. 98 Cr. 1004 (RWS), 2000 WL 763850 (S.D.N.Y. June 13, 2000) ..............................23, 24

*United States v. Dunnigan*,
 507 U.S. 87 (1993)........................................................................................................19, 20, 21

*United States v. Gupta*,
 No. 11 Cr. 907 (JSR), 2012 WL 5246919 (S.D.N.Y. Oct. 24, 2012)............................... *passim*

*United States v. Oakford Corp.*,
 No. 98 Cr. 144 (JSR), 1999 WL 1201725 (S.D.N.Y. Dec. 13, 1999) ......................................31

*United States v. Polanco*,
 37 F. Supp. 2d 262 (S.D.N.Y. 1999)........................................................................................20

*United States v. Rajaratnam*,
 No. 09 Cr. 1184 (RJH), 2012 WL 362031 (S.D.N.Y. Jan. 31, 2012)......................................31

*United States v. Savoca*,
   596 F.3d 154 (2d Cir. 2010)............................................................................................21

*United States v. Shonubi*,
   998 F.2d 84 (2d Cir. 1993)..............................................................................................20

*United States v. Simpson*,
   319 F.3d 81 (2d Cir. 2002)..............................................................................................30

*United States v. Stewart*,
   686 F.3d 156 (2d Cir. 2012)............................................................................................21

*United States v. Vegas*,
   27 F.3d 773 (2d Cir. 1994)..........................................................................................20, 21

*United States v. Weissman*,
   22 F. Supp. 2d 187 (S.D.N.Y. 1998)................................................................................24

*United States v. Zagari*,
   111 F.3d 307 (2d Cir. 1997)............................................................................................20

<u>Statutes and Rules</u>

18 U.S.C. § 3553............................................................................................................*passim*

U.S.S.G. § 2B1.1............................................................................................................*passim*

U.S.S.G. § 2B1.4............................................................................................................*passim*

U.S.S.G. § 3C1.1............................................................................................................*passim*

Defendant Douglas F. Whitman, through his counsel, hereby submits this Sentencing
Memorandum for the Court's consideration in connection with his sentencing, scheduled for
January 24, 2013.

I.    PRELIMINARY STATEMENT

On August 20, 2012, Mr. Whitman was convicted of two counts of conspiracy to commit
securities fraud and two counts of securities fraud. Count One alleged that Mr. Whitman, Karl
Motey, and others conspired to engage in trading in the securities of Marvell Technology Group,
Ltd. ("Marvell") on the basis of inside information from in or about 2007 through 2009. (*See
United States v. Whitman*, Indictment, No. 12 Cr. 125 (JSR) (filed Feb. 8, 2012) ("Indictment")
¶¶ 4-12). Count Two alleged that Mr. Whitman, Roomy Khan, and others conspired to engage in
trading in the securities of Polycom, Inc. ("Polycom") and Google, Inc. ("Google") on the basis
of inside information from in or about January 2006 through 2007. (Indictment ¶¶ 13-27).
Counts Three and Four contained substantive securities fraud charges based on the same factual
allegations underlying the conspiracy charged in Count Two: Count Three alleged that Mr.
Whitman's January 2006 trades in Polycom constituted insider trading, and Count Four alleged
that Mr. Whitman's July 2007 trades in Google amounted to insider trading. (Indictment ¶ 29).

According to the calculations of the United States Probation Office in the Presentence
Investigation Report ("PSR"), Mr. Whitman's total adjusted offense level is 22, with a Criminal
History Category of I, and a resulting advisory Sentencing Guidelines range of 41 to 51 months.
(PSR ¶¶ 35-46, 49, 92). In addition, the PSR indicates that the Government will seek a two-level
increase in Mr. Whitman's offense level pursuant to U.S.S.G. § 3C1.1 for "perjur[ing] himself at
trial." (PSR ¶ 33). In its addendum to the PSR, the Probation Office recommends that this Court
impose a sentence of 30 months of imprisonment, followed by one year of supervised release, a
$1 million fine, and a $400 special assessment. (PSR, at 26).

Without diminishing the seriousness of the crimes of which Mr. Whitman has been convicted, for the reasons set forth below, we respectfully submit that this Court should reject any enhancement pursuant to Section 3C1.1, and should impose a sentence within Zone A of the Sentencing Table, corresponding to a total offense level of no more than 8, that is, 0-6 months. Such a sentence would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in Section 3553(a) of Title 18, United States Code, for several reasons:

First, Mr. Whitman did not commit perjury during his trial testimony, nor did he engage in any other obstructive conduct worthy of an enhancement. Second, the Sentencing Guidelines range of 41-51 months calculated in the PSR vastly overstates the seriousness of Mr. Whitman's offenses. The Guidelines range not only fails to account for Mr. Whitman's net losses and relatively lower personal gains on the trades alleged by the Government to have been illegal, but also fails to consider the true nature and circumstances of Mr. Whitman's conduct, especially in light of the experiences of individuals who participated in the very same conduct as Mr. Whitman in this case. A sentence within the Guidelines range of 41-51 months would also create unwarranted disparities with similarly situated defendants. In addition, Mr. Whitman's history and characteristics, including his otherwise exemplary professional career, community engagement, and family life, merit a greatly reduced sentence.

Indeed, as its sentencing recommendation makes clear, even the Probation Office recognizes that a sentence within the advisory Guidelines range of 41-51 months is unwarranted here. Mr. Whitman has been punished enough. His life and the lives of his children and family will never be the same after the events of the past year. No good or useful purpose will be served by sentencing him to a lengthy term of imprisonment. Instead, for the reasons set forth below, we respectfully ask the Court to impose a sentence within Zone A.

2

II.    DOUG WHITMAN'S HISTORY AND CHARACTERISTICS, INCLUDING
       REPEATED ACTS OF CHARITY AND KINDNESS, WEIGH HEAVILY AGAINST A
       SENTENCE REQUIRING A TERM OF IMPRISONMENT.

       In order to "judge the man as a whole" on this most important of occasions, the Court

must consider a defendant's history and characteristics in imposing sentence. *United States v.*

*Gupta*, No. 11 Cr. 907 (JSR), 2012 WL 5246919, at *5 (S.D.N.Y. Oct. 24, 2012); *see also* 18

U.S.C. § 3553(a)(1). In the case of Doug Whitman, these factors argue strongly in favor of a

sentence within Zone A.

       Mr. Whitman is a good and decent person who has positively affected the lives of his

family members, friends, and even total strangers, through numerous acts of charity and

kindness, and by repeatedly placing other people's interests before his. He achieved success

through decades of diligence and hard work, but he never neglected to assist his colleagues along

the way, to enable them to achieve success as well. Even more importantly, Mr. Whitman's

many generous and compassionate acts – both large and small – have greatly benefitted other

people, especially disadvantaged children, and demonstrate Mr. Whitman's empathy,

selflessness, and commitment to a purpose much higher than merely making money.

       Mr. Whitman's highly admirable traits can be seen in part in the letters written on his

behalf by 80-some family members, friends, neighbors, and colleagues, which paint a more

complete, accurate, and human picture of Mr. Whitman than the two-dimensional figure

portrayed at trial by the Government's cooperating witnesses and in isolated snippets of audio

recordings. The descriptions of Mr. Whitman also make clear that the conduct that was the

subject of the trial does not come close to defining the man. The letters further show that Mr.

Whitman has already suffered grievously from his prosecution and conviction, including the loss

of his lifelong profession, the disintegration of his 20-year marriage, and the terrible effects of

his ordeal on his children. Taken together, Mr. Whitman's fine qualities, history of good works

3

and compassion for his fellow man, and acute suffering to date as a result of this case, form powerful grounds for this Court to impose a sentence carrying a minimal, if any, term of imprisonment.

## A. Hard Work and a Helping Hand

Mr. Whitman comes from an upper-middle class background in Philadelphia; his family was always financially secure, but not affluent. (PSR ¶ 56; Ex. 3, at 3). Mr. Whitman became successful later in life through reliance principally on one attribute he had in abundance: the capacity to work hard. Mr. Whitman's diligence and work ethic throughout his career plainly made an impression on his colleagues and business associates. (*E.g.,* Ex. 18 ("He was extremely hard working and conscientious . . . ."); Ex. 31 ("always struck me . . . how incredibly long and hard he has worked over the years"); Ex. 37 ("Doug was one of the hardest working people we have hired . . . ."); Ex. 51 ("enthusiastic and hardworking"; "worked tirelessly"); Ex. 57 ("Doug required excellence, commitment and diligence from himself and his employees"; "trained me to . . . work tirelessly"); Ex. 63 ("held in high esteem at my firm, was a hard worker and diligent researcher,"); Ex. 74 ("always was the hardest working guy I knew")). In short, Mr. Whitman's approach to his job was never one of cutting corners, avoiding tough or unpopular decisions, or taking the easiest route. (Ex. 5, at 2; Ex. 36; Ex. 38; Ex. 3, at 5; Ex. 51; Ex. 14; Ex. 68; Ex. 13, at 1; Ex. 79).

As his employment history makes clear, Mr. Whitman rose up through the ranks of his profession not spectacularly, but steadily – from part-time work during his college and graduate school days, to his many positions as an analyst and investor on the "sell-side" and the "buy-side," through his founding of Whitman Capital in 1994. (PSR ¶¶ 76-85). Mr. Whitman's launching of his namesake hedge fund was the fulfillment of his career-long goal, but the firm's success did not come easily. He started small, using his life savings and "a handful of small

4

investments from a handful of partners" (Ex. 3, at 5), and then made the fund a success through sheer determination – rising before dawn every day to track the stock market, staying at work each evening until well after the market had closed, and never taking a taking a true vacation away from his job (Ex. 40, at 1; Ex. 3, at 5, Ex. 13, at 1). The success of Whitman Capital[1] was a "great triumph" in Mr. Whitman's life, in which he took great pride. (Ex. 3, at 4).

Yet even as he worked hard to advance his own career in the highly competitive securities industry, Mr. Whitman never failed to give his time, attention, and respect to his co-workers, or to advise and assist them and others along their career paths. As one former colleague explains:

> Doug treated all his fellow employees with dignity and respect regardless of whether the person was [at] the lowest level or a top executive. In fact, he went out of his way to mentor and relate to the young trainees and associates.

(Ex. 34). The former colleague also recounts an instance when he personally benefitted from Mr. Whitman's "professionally gracious approach": Mr. Whitman was leaving the firm for another job, the colleague was tapped to replace him, and Mr. Whitman stayed on to train his colleague and to introduce him to Mr. Whitman's former clients:

> It would have been easy for Doug to depart with short notice. He had no incentive to stay longer and certainly had no incentive to help me. But he did help me and it made a huge difference in my ability to be successful in the job. . . . Doug made significant efforts to educate and promote me even though it delayed his personal plans because he thought it was the right thing to do. He was willing to put other people in front of his personal needs.

---

[1] Throughout trial, the Government referred to the fund for which Mr. Whitman served as portfolio manager as "Whitman Capital." In fact, Whitman Capital LLC is the management company for the fund, Whitman Partners. To maintain consistency with the trial record, this memorandum will refer to the fund as Whitman Capital.

(Ex. 34). What is remarkable is how many others who encountered Mr. Whitman at various points in his career echo these exact sentiments.[2] The time, care, and attention that Mr. Whitman gave to his co-workers, clients, and others made him a much-beloved, highly-regarded, and well-remembered colleague at every stop along his path. But even more importantly, these qualities make clear what Mr. Whitman valued most in the workplace: helping others to succeed and be the best they could be, even as he strove to achieve the same for himself.

### B. Charity, Compassion, and Kindness

Mr. Whitman has given extremely generously of himself in ways both large and small for many years. This includes giving his money, to be sure, but also much, much more. First, Mr. Whitman has donated several million dollars over the past decade to dozens and dozens of charities, including approximately $2 million in just the last few years. As the roster of recipients makes clear, Mr. Whitman's donations have focused on organizations that aid disadvantaged children, children with disabilities, and health and educational causes. (PSR ¶ 63;

---

[2] *See, e.g.*, Ex. 37 ("[H]e was very generous with his time helping new entrepreneurs set up and grow their companies. I was impressed by the many hours he spent with them in our offices and theirs helping with strategy and connections, even when there was no potential investment or a clear benefit for him personally to do so."); Ex. 54 ("Early in my career, Doug . . . took an interest in my work and me personally. I have always been appreciative of his generosity with his time and knowledge when I was getting started in the industry. He introduced me to larger brokerage firms, one of which was Alex Brown and Sons, who eventually hired me."); Ex. 57 ("Even after I left Whitman Capital . . . Doug remained one of my staunch[est] supporters and mentored me as I pursued more advanced professional opportunities. . . . He trained me to think analytically, work tirelessly and behave professionally in an enduringly aggressive, stressful and often hostile industry."); Ex. 18 ("Doug supported me in so many ways. He helped me with my business plan, he introduced me to potential investors and continuously supported me."); Ex. 68, at 2 ("Whether it was calling on me and asking for my help with a young adult trying to get into a college where I am an Alum, or in helping an entrepreneur that he has just met and has no economic association with, I have seen Doug help others in a very selfless and magnanimous ways."); Ex. 9 ("Doug kindly volunteered to be an advisor and mentor to me, something that I desperately needed. We spent many hours together and I was struck by how willing Doug was to invest his time, introduce me to other associate[s] who could be helpful, and share his financial and business wisdom – all without ever asking anything in return. I credit his mentorship and guidance as a key reason why I was able to ultimately turn the business around . . . .").

Ex. 3, at 5; Ex. 4, at 1; Ex. 8, at 1 ("Generally Doug's charities all have a common cause, helping under-privileged kids, educational interests and schools, and various medical or health causes.")).

For example, Mr. Whitman has given approximately $500,000 to the Children's Health Council ("CHC") in Palo Alto, California, a diagnostic treatment center and school for children and adolescents with learning disabilities and developmental and behavioral challenges. (PSR ¶ 63; Ex. 3, at 5; Ex. 7, at 1; Ex. 15). In addition to donating his own money to CHC, Mr. Whitman has also helped recruit many other donors to the cause by hosting annual fundraisers for the organization at his home. (Ex. 3, at 5; Ex. 46; Ex. 62). Participants at these events have "witnessed Doug's remarkable passion, dedication and sincerity in connection with his philanthropic endeavors to help children in need." (Ex. 42, at 1). Mr. Whitman has likewise been a "very generous donor" to the Boys and Girls Clubs of the Peninsula ("BGCP"), located in Menlo Park, California. (Ex. 6). According to the BGCP's Executive Director, Mr. Whitman has also been a "wonderfully generous supporter" of the organization in other ways as well, having: "volunteered to speak with our at-risk youth," "helped recruit new donors to BGCP," "followed the paths of some of our members and offered to help them when he could," including helping one member find a college scholarship and doing "everything he could" to support an employee who wanted to attend graduate school. (Ex. 6; *see also* Ex. 65 ("Doug's goal is to . . . eventually dedicate his working energy to the education and mentoring of these children.")).

Mr. Whitman has also been an "extremely generous" donor to his daughter's high school, and "incredibly supportive of the school in many ways." (Ex. 11). As the school's director felt "compelled to point out," Mr. Whitman's service to the school:

> is, for the most part, work done outside of the public eye; that is, one might even characterize it as "grunt work" that is rarely recognized outside of the relatively small

world of the Board of Trustees. This speaks volumes about Doug's character; he
volunteers his time without looking for recognition or glory; rather, he does it because he
is moved to support his daughter's school in any way he can.

(Ex. 11). Other parents of children at the school echo these sentiments, describing Mr. Whitman
as "a compassionate and generous man in spirit, time and resources," and noting that he "has
made his mark in a very quiet way. Never looking for accolades." (Ex. 49; *see also* Ex. 37 (Mr.
Whitman has been "very supportive of children less fortunate than his own enabling them to
attend high school and prepare for college.")).

Mr. Whitman has contributed to a broad range of other charities as well – the vast
majority of which have no personal connection to him or his family – including local soccer
leagues, the New York Police and Fire Widows' and Children's Benefit Fund, organizations
promoting Alzheimer's research, local family shelters, and the Children's Hospital at Stanford.[3]
(*See also* Ex. 40; Ex. 44; Ex. 20, at 1 ("Doug has been a consistent contributor to our cause [the
Foundation Fighting Blindness], writing checks on a nearly annual basis.")). And Mr.
Whitman's donations will continue into the future, because just over three years ago he
established the Whitman Family Trust, a charitable remainder trust that currently holds
approximately \$4.5 million in assets that will be distributed to charities in the years to come.
(PSR ¶ 86 n.8).

---

[3] In the past decade, Mr. Whitman has contributed to over 50 different not-for-profit and
charitable organizations in the Bay Area and elsewhere, including: Atherton Police Activities
League; Bay Oaks Soccer Club; Boys and Girls Club of the Peninsula; California Family
Foundation; Castilleja School; Charles Armstrong School; Child and Family Institute; Franklin
McKinley Education Foundation; Germantown Friends School; Girl Scouts Gift of Caring
Community Service Project; Guide Dogs for the Blind; Leukemia and Lymphoma Society -
Silicon Valley and Monterey Bay Area Chapter; Marin Breast Cancer Council; Morrissey-
Compton Educational Center; My New Red Shoes; Peninsula Bridge Program; Planned
Parenthood Federation of America; Rodin Museum – Stanford; San Francisco Symphony; San
Jose Family Shelter; Sesame Workshop; and Stanford Hospitals and Clinics.

8

Furthermore, and far more significant than his donations of money, Mr. Whitman has given his heart. Time and time again over the years, Mr. Whitman has reached out personally with kind and selfless gestures toward people in need or despair, that demonstrate best of all his compassion, empathy, and generosity of spirit. Nothing illustrates this core aspect of Mr. Whitman's character better than his organization and funding of a memorial service for his former home contractor's teenage son, who died of leukemia. As the boy's father describes it:

> Doug and Quin were right there for my family and me. They held a beautiful Memorial Service for my son at the Ritz Carlton in Half Moon Bay with over 300 people in attendance. I never knew what the cost of this event was, but I can imagine it was quite expensive. Doug and Quin took it upon themselves to do this for me as their friend.
>
> I will never forget the gracious support he shared with me during my time of need. I fully support Doug and I appreciate his friendship.

(PSR ¶ 63; Ex. 12).

Mr. Whitman's selfless acts have not stopped there. When one of his neighbors suddenly died four years ago, Mr. Whitman "rallied the neighbors to organize the entire funeral as well as contribute to the funding of it." (Ex. 65). Mr. Whitman also provided great comfort to the "emotionally beset and struggling" widow, who was left with three young children: "Typical of Doug, he jumped in and took care of and resolved everything, making a huge difference to the family during their very difficult moment of need." (Ex. 9, at 2; *see also* Ex. 13, at 2). Over the ensuing years, Mr. Whitman has continued to spend time with the deceased's children, attending one son's little league baseball games and the other son's football games, and has joined the family for numerous dinners. (Ex. 7, at 1). Similarly, another friend gratefully remarked that when her father died suddenly of a heart attack, "it was Doug who did everything he could for me as I was, to say the least, devastated." (Ex. 5, at 1 ("one of the most compassionate caring people I have ever met")). Likewise, when Mr. Whitman learned two years ago that a former

9

business associate from his New York days two decades earlier had passed away, he was "dutiful in letting her friends and co-workers know of her tragic death due to cancer." (Ex. 28 ("He was always there for his friends, always.")).

Mr. Whitman has been doing what he could to help people get through life's misfortunes throughout his entire adult life. In the 1980s, he "regularly spen[t] hours" at the hospital with a friend's father who suffered from Parkinson's disease, "doing his best to cheer him up, and make sure he was comfortable and well taken care of." (Ex. 4, at 1). Another friend whose husband suffers from Parkinson's disease writes:

Doug has been faithful in asking how he could help my husband or our family while respecting our privacy at all times. I know that other neighbors have experienced the same generous hearted support from Doug when faced with life's challenges.

(Ex. 24). Many other letter writers echoed these sentiments, explaining that Mr. Whitman "is one of those people who can always be trusted to be there when needed" for his family and friends. (Ex. 39; *see also, e.g.,* Ex. 41 ("He has always been willing to lend a hand when needed and has been a trustworthy friend."); Ex. 52 ("[H]e has many times shown interest and concern for myself and family, particularly when I had had serious health issues a number of years ago."); Ex. 58 ("To me, Doug is the kind of person who would 'give you the shirt off his back,' and was never too busy to volunteer his time or help whenever needed."); Ex. 9, at 2 ("Doug has been there for my family at our moment of need and has made a real difference to others without seeking anything in return. He regularly puts others before himself and has a kind heart and a caring soul."); Ex. 26, at 1 (When "financial challenges" forced a couple to rent out their primary

10

residence, "Doug graciously insisted" that they use his vacation home, rent free, for several months until they found alternate accommodations, which helped them "tremendously.")).[4]

In keeping with the focus of his charitable donations, Mr. Whitman has also repeatedly gone out of his way to help children in need. For example, Mr. Whitman was "instrumental" in helping a friend's daughter get into a special school for dyslexic children, "which ultimately was life changing for her." (Ex. 9, at 1). Mr. Whitman first arranged for the daughter to undergo a complete assessment and diagnosis, and then "reached out to the [Head] of the Armstrong School – the leading school on the West Coast working with children with Dyslexia, and arranged a special meeting." (Ex. 9, at 1). With Mr. Whitman's help, the girl was accepted at the Armstrong School, and is today a successful college student – a most unlikely outcome "had it not been for Doug's effort." (Ex. 9, at 2). Mr. Whitman did the same thing for another friend's son, who was diagnosed with severe dyslexia and ADHD: he arranged an interview for the son at the Armstrong School, where he was ultimately accepted. (Ex. 10, at 2). Mr. Whitman also offered to have the son live in his home during the school week so the family could avoid a 50-mile commute each way to the school. (Ex. 10, at 2). Writes the boy's father, "How many families would offer to take in an 11 year old boy with ADHD, during the school week, which already had two young children of their own?" (Ex. 10, at 2).[5]

---

[4] Mr. Whitman has also been generous to others in times of joy, hosting engagement parties and even weddings for friends at his home or club, and freely offering his home to friends for significant events or family vacations. (Exhibit 29; Exhibit 42; Exhibit 58).

[5] ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

C.    Devotion to Family

Mr. Whitman's family members, friends, and neighbors describe him as extraordinarily devoted to his family, especially his own children, but also including his extended stepfamily. This is perhaps not surprising given Mr. Whitman's own family experiences growing up. Mr. Whitman's mother was a Holocaust survivor from Hungary ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  Nevertheless, Mr. Whitman remained a devoted son through his parents' divorce a decade later, until their deaths from cancer. (*See*, *e.g.*, Ex. 48 ("His dedication and love for his Parents remained strong till the end of their lives, and he was very present, involved and caring during both of their illnesses which ultimately ended their lives. Much like his Parents, Doug always put his family first.")).

A wonderful thing happened to Mr. Whitman when his father remarried in 1992: in his mid-30s, Mr. Whitman gained an entire new stepfamily – including a mother, brother, sister, and a large extended family – with whom he and his brother have become as close over time as their own immediate family. (PSR ¶ 57; Ex. 47 ("Doug has been, and continues to be an essential part of our very close family. . . . [H]e and his brother have been more like brothers than Stepbrothers."); Ex. 53 ("such an important part of my life"); Ex. 60, at 1 ("instantly became part of our family"); Ex. 61, at 1 ("an integral part of our family")). For the past two decades, Mr. Whitman has regularly attended family functions and joined in holiday celebrations with his stepfamily, making a special effort to see them several times each year in the Philadelphia area, notwithstanding that he lives on the opposite coast. (Ex. 47; Ex. 60, at 1). Whether speaking

12

lovingly of his stepmother at her 80th birthday party (Ex. 60, at 2), or sitting in the hot sun to watch his stepsister "jog/walk" to finish a triathlon "almost last" (Ex. 61, at 3), Mr. Whitman has displayed great loyalty, kindness, and devotion toward his extended stepfamily.

Mr. Whitman has become especially close with, and devoted to, his stepmother. Thus, it was especially hard on Mr. Whitman when, shortly before his trial in this case, his stepmother suffered her second bout of cancer (and chemotherapy) within the past five years. (Ex. 3, at 7; Ex. 53). In his typical fashion, Mr. Whitman was "devoted and attentive" (Ex. 61, at 2) to his stepmother during the latest recurrence of her illness, giving "great support" and "great comfort" to her and her children (Ex. 47 ("Doug was there for her and for us.")). Thankfully, Mr. Whitman's stepmother recovered sufficiently to attend virtually every day of his trial last summer; indeed, she was joined in the courtroom on most days by her two children and their spouses – along with Mr. Whitman's brother, and other relatives and friends – a great testament to how much Mr. Whitman meant to all of them.

As good a brother and a son as Mr. Whitman has been, his childhood experiences have arguably made him an even better parent. Virtually every person who wrote to the Court on Mr. Whitman's behalf mentions what a good father he has been to his children and how incredibly devoted he is to them and their well-being. (*See, e.g.*, Ex. 15, Ex. 17, Ex. 18, Ex. 19, Ex. 21, Ex. 22, Ex. 8, Ex. 31, Ex. 33, Ex. 35, Ex. 45, Ex. 54, Ex. 4, Ex. 62, Ex. 63, Ex. 65, Ex. 69, Ex. 73, Ex. 13, Ex. 10, Ex. 77, Ex. 78). Beyond simply providing materially for his children, Mr. Whitman has been intimately involved in their lives, coaching their youth basketball teams; attending their school functions; taking them to sporting events; encouraging them to work hard in school; joining them for weekend outings; taking them to bike, golf, or ski; and helping them with their homework. (*E.g.*, Ex. 40, at 2; Ex. 42, at 1; Ex. 45; Ex. 65; Ex. 13, at 2; Ex. 10, at 1).

13

Mr. Whitman has also worked hard to mold his children's character, teaching them to respect and accept other people's differences, and instilling in them his own virtues of charity and compassion for those less fortunate than them. (*E.g.*, Ex. 24; Ex. 13, at 2; Ex. 10, at 1; Ex. 2, at 1). In addition, as his wife was not Jewish, Mr. Whitman "took full responsibility" to raise and educate his children in the Jewish faith, including seeing to it that his son had a Bar Mitzvah and his daughter a Bat Mitzvah – plainly bonding experiences for Mr. Whitman and his children. (Ex. 65; *see also* Ex. 18; Ex. 27; Ex. 8, at 2; Ex. 62; Ex. 63; Ex. 10, at 1; Ex. 77).

Despite the great demands that he placed upon himself at work, Mr. Whitman "always made it his first priority to spend time with and support" his children. (Ex. 15; *see also* Ex. 78 ("We were always impressed with Doug's ability to stay close to his children despite his busy schedule.")). Indeed, even in his darkest hours over the past year, as his life collapsed around him – through his investigation and prosecution, the dissolution of his marriage, the winding down of his fund, the grueling trial, and his conviction – Mr. Whitman has remained steadfastly focused on his children's physical and emotional welfare, doing everything he could to limit the stress and pain of his ordeal on them. (*E.g.*, Ex. 8, at 1; Ex. 10, at 1; Ex. 11 ("[H]e never appears to be angry nor to feel sorry for himself; he is simply going about his daily life in an attempt to maintain as much normalcy as possible for his kids. I truly admire this quality in Doug, and applaud his determination to put his children first under the most challenging of circumstances.")). This again reflects Mr. Whitman's values and perspective: regardless of his successes or failures, despite the vicissitudes of his personal life, he never loses sight of what is most important to him – the love and wellbeing of his children and family.

14





D.    Devastating Losses

By any measure of human experience, Mr. Whitman has suffered tremendously over the last year. He was indicted by the Government. He had to notify his limited partners of the charges and commence procedures to wind down his fund. He saw his children humiliated as their father's name and picture were splashed all over the financial press and in their community. Mere weeks after his indictment, his wife filed for legal separation; shortly thereafter, she tried to freeze Mr. Whitman's assets. From there, his 20-year marriage spiraled quickly downward.

████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████ Through it all, he dealt with another recurrence of cancer (and debilitating cancer treatments) for his 80-year old stepmother, with whom he is very close.

Mr. Whitman endured three excruciating weeks of trial, only to be found guilty in the end; and has spent the last five months with the threat of imprisonment hanging over his head.

███████████████████████████████████████████████

████████████████████████████████

In many ways, Mr. Whitman's focus on his children and family, and his history of charity and compassion, highlight how much he has lost and how far he has fallen as a result of this case. The man who has helped so many, and so often put the needs of others before his, is truly suffering now – as his family and friends well recognize in their pleas to the Court for leniency.

17

(*See, e.g.*, Ex. 17, at 2 ("I believe Doug feels that his life may just be over."); Ex. 5, at 2 ("I am worried that Doug may never regain his 'spirit' given the trial and his family situation. . . . It pains me greatly to think he could be punished 'beyond repair' meaning a long sentence could break him completely."); Ex. 8, at 1 ("Clearly this has been a tragic year for Doug and his family."); Ex. 44 ("Doug's world has been turned upside-down, his children have been ostracized, and he has been publicly humiliated. The punishment that he has already suffered is horrendous."); Ex. 3, at 2 ("Doug's life is in ruins, and he has paid very dearly already for his crimes."); Ex. 50 ("He has lost his reputation, his family, and many of his friends."); Ex. 65; Ex. 68, at 3; Ex. 73 ("This case has naturally taken its toll on Doug's family, and I am mortified by the fact that his wife . . . has chosen to leave him at his greatest time of need."); Ex. 13, at 2 ("I'm just overwhelmed to see the number of lives affected and the depth of mental anguish and damage this has done. You wonder – has he not been punished enough? There is no greater punishment th[a]n what he has already been through.")).

Mr. Whitman has lost his good name, his reputation, his means of a living in the only profession he has ever known, and the business that he built up from scratch and ran successfully for nearly two decades. Even more significantly, Mr. Whitman has lost the only thing he cares about more than his work – his family. In short, Mr. Whitman has lost everything that has ever been meaningful or important to him, or brought him joy or fulfillment in his life.

\* \* \* \* \*

Section 3553(a) requires the Court to consider not just the "nature and circumstances" of a defendant's offense, but also his "history and characteristics" – *i.e.*, the whole person. *E.g.*, *Gupta*, 2012 WL 5246919, at \*4-5. Here, the evidence adduced against Mr. Whitman at trial concerned only a small portion of his professional career, and revealed barely a glimpse of his

life outside of business, his character, his makeup. But Mr. Whitman is much more than the handful of securities trades and the dozen scattered phone conversations that were the subject of his trial. And he has meant much more – tangibly and physically, as well as emotionally – to many people, for a long time. The conduct for which Mr. Whitman has been convicted, then, should not and does not define him. Accordingly, Mr. Whitman's sentence must not reflect only that conduct, but must also be based on a consideration of the complete person – including his history and characteristics of hard work, good deeds, selflessness, kindness, and devotion to his children and his family.

## III. MR. WHITMAN DID NOT COMMIT PERJURY AND SHOULD NOT BE SUBJECT TO A SENTENCING ENHANCEMENT FOR OBSTRUCTION OF JUSTICE UNDER SECTION 3C1.1.

According to the PSR, the Government will contend that Mr. Whitman should receive a two-level enhancement pursuant to U.S.S.G. § 3C1.1 because he allegedly "perjured himself at trial." (PSR ¶ 33). Mr. Whitman did not commit perjury and no enhancement should be applied.

### A. Legal Standard

Section 3C1.1 directs a sentencing court to increase a defendant's offense level by two levels if the defendant "willfully obstructed or impeded the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." Where the basis for an obstruction enhancement is the defendant's alleged perjury at trial, a court must review the record and make independent findings that the testimony encompasses all the elements of perjury. *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). The Government must establish that the defendant gave "'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Id.* at 94. The Government must also establish that the alleged perjury was "part of

19

some greater design to interfere with judicial proceedings." *Id.* at 93; *United States v. Zagari*, 111 F.3d 307, 329 n.20 (2d Cir. 1997) (false testimony must have been given with "specific purpose of obstructing justice").

A perjury enhancement is improper where it treats the defendant's "denial of guilt under oath as tantamount to obstruction of justice, which is just what *Dunnigan* findings are intended to avoid." *United States v. Ben-Shimon*, 249 F.3d 98, 104 (2d Cir. 2001) (citing *United States v. Catano-Alzate*, 62 F.3d 41, 42 (2d Cir. 1995) ("*Dunnigan's* requirement of fact-finding insures that courts will not automatically enhance sentences whenever the accused takes the stand and is thereafter found guilty.")); *United States v. Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993) ("A proper determination by the district court ensures that defendants are not penalized merely for taking the stand, which otherwise would raise troubling constitutional issues.") (quotations omitted). Commentary to the Sentencing Guidelines makes clear that the enhancement is "not intended to punish a defendant for the exercise of a constitutional right" to testify. U.S.S.G. § 3C1.1, Commentary, Application Note 2; *United States v. Polanco*, 37 F. Supp. 2d 262, 264 (S.D.N.Y. 1999) (JSR) (rejecting a Section 3C1.1 enhancement and recognizing the "need not to chill a defendant's freedom to assert his constitutional rights").

The Supreme Court addressed the application of Section 3C1.1 to a defendant's purported perjury at trial in *Dunnigan*:

> Of course, not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury. . . . Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent.

507 U.S. at 95; *see also United States v. Canova*, 412 F.3d 331, 358 (2d Cir. 2005) (finding no error in district court's decision not to apply enhancement after defendant testified in own defense); *United States v. Vegas*, 27 F.3d 773, 782-83 (2d Cir. 1994) ("*Dunnigan* does not say

that every time a defendant is found guilty despite his exculpatory testimony, the court must hold a hearing to determine whether or not the defendant committed perjury."); *Carvajal-Montoya v. United States*, No. 12 Civ. 764, No. 07 Cr. 441 (LBS), 2012 WL 3713110, at *4 (S.D.N.Y. Aug. 27, 2012) ("a defendant's choice to challenge a prosecutor's assertion should not, on its own, open him or her up to an obstruction of justice enhancement."). Simply stated, the mere fact that the jury convicted Mr. Whitman after he testified is not enough to warrant an obstruction enhancement.

B.    Mr. Whitman's Guidelines Range Should Not Be Enhanced as a Result of His Trial Testimony.

In this case, the Government cannot meet its burden, and no enhancement for perjury under Section 3C1.1 should be applied. Mr. Whitman exercised his right to plead not guilty, to testify in his own defense at trial, and to offer the testimony of several other witnesses who supported Mr. Whitman's positions. The fact that the jury failed to credit that testimony in finding Mr. Whitman guilty does not mean that he committed perjury or obstructed justice.

Mr. Whitman did not invent facts, fabricate evidence, or weave fantastic tales. Nor did he make assertions as to dates, times, places, or events – such as securities transactions or telephone calls – that were contradicted by evidence such as brokerage or phone records. *See, e.g.*, *United States v. Stewart*, 686 F.3d 156, 176 (2d Cir. 2012) (quoting *United States v. Endo*, 635 F.2d 321, 323 (4th Cir. 1980) ("To be false, the statement must be with respect to a fact or facts and the statement must be such that the truth or falsity of it is susceptible of proof.") (internal quotations and alterations omitted)); *United States v. Savoca*, 596 F.3d 154 (2d Cir. 2010) (enhancement proper when defendant lied about the identity of another actor in the crime). Indeed, the Government cannot point to any allegedly perjurious testimony that relates to an independently verifiable fact or action. There was no evidence of any contemporaneous

21

statement ever made by Mr. Whitman evincing a criminal intent with respect to *his* challenged trading activity.[6] Here, instead, Mr. Whitman merely testified in his own defense at trial. He testified truthfully for three days (August 13, 14 and 15, 2012), answering every question posed to him to the best of his recollection.

And for the most part, what Mr. Whitman testified to was his state of mind when he engaged in the undisputed conduct – the securities trades, phone calls, and conversations – that formed the basis of the charges against him. Mr. Whitman never denied that he made the trades or had the conversations that the cooperators described. What Mr. Whitman did say, repeatedly and consistently, was that when he had those conversations and engaged in those acts, he never understood any of the information that he received from the cooperators (or anyone else), and upon which he based his trades, to be material, non-public information ("MNPI").

Right or wrong in fact as to whether the information *was* MNPI, Mr. Whitman never understood it to be MNPI, never believed it was MNPI, and never intended to trade on the basis of it if that were the case. Such statements of belief and intent amount only to denials of guilt in a case, such as this one, where the Government was required to prove the defendant's specific intent to commit the crime. Mr. Whitman did no more than that – deny his guilt by denying a culpable state of mind – throughout his testimony. And the Government offered no evidence to directly rebut Mr. Whitman's testimony on his state of mind or understanding of the law.

At trial, Mr. Whitman testified that he closely, lawfully, and legitimately followed Polycom, Google, and Marvell for as long as those companies were public, and made the challenged securities purchases and sales only after his own extensive research. For each

---

[6] Nor did Mr. Whitman – unlike at least one of the Government's cooperating witnesses, Roomy Khan – commit any of the other acts that often have been the basis for an obstruction of justice enhancement, such as destroying evidence, lying to federal agents, lying in prior sworn testimony, warning co-conspirators to flee, or continuing to engage in illegal conduct after arrest.

22

security, Mr. Whitman described that research, explained the factors that influenced his decisions to trade, and denied knowing that the information he received from Roomy Khan and/or Karl Motey on those stocks was MNPI. While the Government now claims that Mr. Whitman's denials of guilty knowledge were perjury (*see* Email from Christopher L. LaVigne to David M. Rody, January 9, 2013, attached hereto as Exhibit A), their legitimacy and good faith is borne out in the trial record.

To take just one example, Mr. Whitman denied having any belief or understanding that the information he received from Karl Motey regarding Marvell between 2007 and 2009 was MNPI. (*E.g.*, Tr. 2492-93). Yet Motey himself admitted at trial that he had "dumbed down," "watered [] down," and "softened" the information he gave to Mr. Whitman on Marvell, and furthermore had "delayed" the information until it came out in published research reports. (*See* Tr. 486-89, 510-22, 561-62). *See United States v. Cusimano*, 123 F.3d 83, 89 n.6 (2d Cir. 1997) (information can lose its non-public character when it is disseminated through press releases, SEC filings, trade publications, analyst reports, newspapers, magazines, rumors, word of mouth, or other sources). Indeed, Motey admitted that he could not recall a single specific piece of information that he had ever conveyed to Mr. Whitman regarding Marvell. (Tr. 658).

The trial record was therefore consistent with – and indeed affirmatively supported – Mr. Whitman's good faith explanations and denials of guilty knowledge. That the jury was not ultimately persuaded by this testimony does not mean that Mr. Whitman committed perjury with the intent to obstruct justice. *See, e.g.*. *Catano-Alzate*, 62 F.3d at 42-43 (2d Cir. 1995) (obstruction enhancement for perjury not necessarily warranted where defendant, convicted of knowingly transporting drugs, testified that she was unaware that drugs were in the vehicle); *United States v. Defreitas*, No. 98 Cr. 1004 (RWS), 2000 WL 763850, *3 (S.D.N.Y. June 13,

2000) (declining to apply enhancement when defendant testified repeatedly that he did not know the stuffed animals he imported were counterfeit); *United States v. Weissman*, 22 F. Supp. 2d 187, 190 (S.D.N.Y. 1998) (CSH) (perjury enhancement unwarranted when defendant's account was not "inherently implausible").

Further evidence that Mr. Whitman did not commit perjury during his trial testimony is that he made numerous admissions on material issues in the case that were harmful to his interests. By way of example, he admitted to: (a) speaking with Roomy Khan on multiple occasions in January 2006 about Polycom and Sunil Bhalla;[7] (b) speaking with Khan on more than one occasion in July 2007 about Google and her contact at an outside investor relations firm for Google;[8] (c) knowledge of Karl Motey's contacts at Marvell;[9] and (d) other admissions that

---

[7] *E.g.*, Tr. 2057 ("Q: And what, if anything, did Roomy Khan say to you in response to what you just described here as what you told her? A: She told me not to do anything until she talked to Sunil Bhalla."); Tr. 2424 ("Q: [In] January 2006 she sources information, right? A: Yes. Q: Says it [is] from Sunil Bhalla? A: Yes. Q: It's accurate, right? A: It turns out to be reasonably accurate, yes.").

[8] *E.g.*, Tr. 2202 ("Q: Did you speak with Ms. Khan about Google? A: Yes."); Tr. 2202 ("I think I had discussed Google with Roomy at various other times, but specifically around this time, I remember discussing it with her I believe in early July, but it could have been late June for the first time in this time frame."); Tr. 2387-88 ("Q: Both conversations were before Google announced its earnings on July 19, 2007, right? A: Yes, sir. Q: According to you, Roomy Khan told you the quarter would be light, correct? A: Yes . . . . Q: Now, you testified yesterday Roomy Khan indicated that information was coming from her contact at Google's IR firm, correct? A: Google's outside IR firm, yes. Q: And isn't it also true that Roomy Khan told you this contact was her friend, isn't that a fact? A: I believe she did.").

[9] *E.g.*, Tr. 2265 ("Q: Mr. Whitman, during the time that Mr. Motey was working as a consultant for you, what did you know about his various contacts? A: They were good contacts. Q: Did he ever refer to any of them by name? A: I believe he would say the drive guy, . . . but he would let you know he had talked to somebody in the drive division. He let you know he talked to somebody in the communications division, and I'm not sure exactly which part of that division. And he let you know that he talked to someone [who] worked on the Apple account at Marvell."); Tr. 2486 ("Q: Isn't it a fact that you knew [Karl Motey] had three contacts at Marvell? A: I knew he had more than three contacts at Marvell . . . I knew that he talked to a lot of people at Marvell.").

24

did not support his defense.[10] These admissions – all either directly or inferentially against Mr. Whitman's interests – hardly support the conclusion that he was intentionally obstructing justice in the trial of this matter. To the contrary, they demonstrate that he had nothing to hide and was testifying truthfully.

The Government will likely argue at sentencing, as it did in its closing at trial, that Mr. Whitman "had" to make these admissions "because of the evidence contained in the records, the trading records, the phone records." (Tr. 2813:23-25). But this simply is not so. Mr. Whitman first made most of these admissions during proffer sessions held 20 months *before* trial and well before the Government had provided him with a single piece of evidence in the case.

Over two consecutive days in December 2010, Mr. Whitman and prior counsel participated in proffer sessions at the United States Attorney's Office in a good faith effort to cooperate with the Government. During those two proffers, Mr. Whitman met with Assistant United States Attorneys and agents from the Federal Bureau of Investigation for hours at a time, answering every question earnestly and honestly in an attempt to assist in their investigation.

At trial, Mr. Whitman's testimony conformed to the evidence and to his prior proffer statements for the simple reason that he told the truth in the first instance when he proffered, and did so again when he testified about those same events 20 months later.[11] Notably, the

---

[10] *E.g.*, Tr. 2442 ("Q: Now you thought Ms. Khan was of value, right? . . . A: Roomy was very smart, so yes, I thought she was of value. Q: You thought she was valuable because of the people she knew, sources she had, right? A: That would be – that was a factor."); Tr. 2460-61 ("Q: And Sunil was more candid with Roomy than he was with you? A: Yes. Q: So you thought if Roomy talked to him, Roomy would get more color; is that fair to say? A: Yes. Q: Information about revenue? . . . A: I thought he – he would – she would get information about business, and that might include not the number of revenue but the – but there would be some information that would be relevant to revenue.").

[11] During the proffers, Mr. Whitman not only discussed his relationships with Roomy Khan and Karl Motey, but also admitted that he talked to Khan before trading Polycom securities in January 2006; admitted that Khan had referenced learning information from Sunil Bhalla; and

25

Government never called a federal agent to the stand in an attempt to contradict Mr. Whitman's testimony by introducing his proffer statements – which can itself be seen as a concession that Mr. Whitman did not commit perjury. That Mr. Whitman's proffer statements held up through and including trial, withstanding 20 months of intense Government scrutiny, confirms that a Section 3C1.1 enhancement is improper.

In sum, Mr. Whitman objects to the application of an enhancement pursuant to Section 3C1.1 and urges the Court to find that no such enhancement is warranted in this case.

## IV. THE ADVISORY GUIDELINES RANGE OVERSTATES THE SERIOUSNESS OF MR. WHITMAN'S OFFENSES AND FAILS TO CONSIDER FULLY THEIR NATURE AND CIRCUMSTANCES.

The advisory sentencing range recommended in the PSR of 41-51 months substantially overstates the seriousness of Mr. Whitman's insider trading offenses. This is true because: (a) Mr. Whitman suffered a net loss overall on the trades that the Government alleged were based on inside information, and personally obtained only a fraction of the total gain to Whitman Capital; and (b) the Guidelines Range fails to consider the remote, derivative nature of Mr. Whitman's conduct, especially in light of the circumstances surrounding individuals who participated in the very same conduct as Mr. Whitman in this case.

Accordingly, under both the Sentencing Guidelines and the factors enumerated in Section 3553(a) of Title 18, United States Code, Mr. Whitman should receive a downward departure from the Guidelines offense level or a non-Guidelines sentence. *See* U.S.S.G. § 2B1.1,

---

admitted that Khan had said that Polycom had a good quarter and a good outlook. (*See* Government's Motion to Introduce Whitman's Proffer Statements Should He or Counsel Make Arguments to the Contrary ("Proffer Motion"), at 2-3 (Dkt. No. 63) (filed on July 16, 2012)). Mr. Whitman also admitted that he spoke to Khan before trading in Google securities; admitted that Khan said she had a contact at Google outside of the investor relations department; and admitted that Khan said that Google's numbers for the upcoming quarter would be light. (Proffer Motion, at 2-3).

Commentary, Application Note 19(C) ("a downward departure may be warranted" where the offense level "substantially overstates the seriousness of the offense"); 18 U.S.C. § 3553(a) (requiring the court to consider, among other factors, the "nature and circumstances of the offense" in crafting a sentence "not greater than necessary"). The defense respectfully submits that an appropriate sentencing range would be one in Zone A, no greater than 0-6 months,[12] corresponding to an offense level no higher than 8.

A.    The Total Gain to Whitman Capital Overstates the Seriousness of Mr. Whitman's Offenses.

The "gain" of more than $900,000 attributed to Mr. Whitman under Sections 2B1.4 and 2B1.1 of the Sentencing Guidelines (PSR ¶¶ 31, 37-38) results in a total offense level that substantially – and arbitrarily – overstates the seriousness of Mr. Whitman's insider trading offenses and fails to account for critical characteristics of those offenses. From a base offense level of 8 for insider trading, *see* U.S.S.G. § 2B1.4(a), the $900,000 "gain" produces an enormous 14-level increase, nearly tripling Mr. Whitman's offense level to a total of 22, *see* U.S.S.G. § 2B1.4(b)(1) (cross-referencing the table in U.S.S.G. § 2B1.1). This overstates the seriousness of Mr. Whitman's offenses and is inconsistent with the "nature and circumstances" of them, 18 U.S.C. § 3553(a)(1), because, among other considerations, the "gain" calculation ignores the substantial losses he incurred on trades challenged by the Government as illegal, and fails to reflect the relatively small profit that Mr. Whitman personally earned. Given the "huge weight" that the Guidelines place on the "gain" calculation, *see United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (JSR), the Guidelines' failure to account for these essential

---

[12] Prior to his indictment in this case, the Government offered Mr. Whitman a guilty plea to a single conspiracy count carrying a Sentencing Guidelines range of 0-6 months. While the defense in no way suggests that Mr. Whitman should be entitled to benefit from a rejected plea offer, the offer extended to Mr. Whitman in this case gives some insight into the Government's view of the seriousness of Mr. Whitman's offenses.

considerations has the effect of substantially and improperly increasing the ultimate sentencing range.

      1.     The Gain Attributed to Mr. Whitman Ignores His Substantial Losses on the Challenged Marvell Trades.

The proposed "gain" calculation of over $900,000 accounts only for profits earned on the transactions charged in Counts Two through Four of the Indictment (*see* Indictment ¶¶ 13-29), while ignoring the substantial offsetting losses suffered by Whitman Capital – and Mr. Whitman personally – on the trades that were challenged by the Government as illegal in Count One. (*See* Indictment ¶¶ 1-12). Indeed, if the full range of Mr. Whitman's charged conduct were considered, the result would be no "gain" at all, but instead net losses of millions of dollars.

At trial, the Government challenged Whitman Capital's transactions in Marvell stock and options executed on "October 8, 2008, October 24-November 3, 2008, January 22, 2009, and March 5, 2009." (*See* Letter from Christopher L. LaVigne and Jillian B. Berman to David L. Anderson, David M. Rody, and Bradford A. Berenson, July 16, 2012, at 2; *see also* Tr. 1736, 1741, 1750). The Government alleged that those transactions were based on inside information, but was forced to concede that Whitman Capital achieved no net gain from those trades. Instead, Whitman Capital realized a total net loss from the challenged Marvell transactions of approximately $3,416,479. (*See* Letter of David M. Rody to Ross Kapitansky, Nov. 26, 2012, attached hereto as Exhibit B, at 3-4).

Taking this loss into account, the total "gain" realized by Whitman Capital as a result of all of the trades alleged in the Indictment is in fact a *loss* of $2,509,929 – that is, the $906,550 gain on Polycom and Google, minus the $3,416,479 loss on Marvell.[13] This conclusion remains

---

[13] If the entire period of the Marvell conspiracy alleged in the indictment is considered, rather than the just the challenged trades, the result is the same: from January 1, 2007 through March

28

true if Mr. Whitman's personal losses, rather than those of Whitman Capital, are considered. Mr. Whitman's share of the fund's $3,416,479 losses on the challenged Marvell trades was approximately $1,037,680. (Ex. B, at 5-6). When netted against Mr. Whitman's total personal gains from the Polycom and Google trades of $305,192 (discussed below), Mr. Whitman's total personal loss from all of the trades challenged by the Government as unlawful was $732,488. (Ex. B, at 5-6).

Focusing selectively on the gains to Whitman Capital from some of the charged trades allegedly based on inside information, while ignoring the losses suffered from some other charged trades, exaggerates Mr. Whitman's culpability and fails to consider the true "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). It may be true in the ordinary case that insider trading will be expected to result only in gains, but it is undisputed here that there were both realized gains and significant realized losses resulted from the charged trades. These circumstances are appropriately taken into consideration in measuring the nature of the offense, and at a minimum they support a downward departure or a sentence outside the recommended Guidelines range. *See* U.S.S.G. §§ 2B1.1, Commentary, Application Note 19(C), 5K2.0(a); 18 U.S.C. § 3553(a)(1).

Indeed, there is a serious question whether Guidelines Section 2B1.4 itself requires the use of net value in calculating the "gain" in an insider-trading case. The Guideline looks to the "gain resulting from the offense," U.S.S.G. § 2B1.4(b)(1), and the term "gain" is specifically defined as "the *total* increase in *value realized* through trading in securities," U.S.S.G. § 2B1.4, Commentary, Background (emphasis added); *see also* U.S.S.G. § 2B1.1, Commentary, Application Note 3(E) (Guideline governing fraud or deceit; losses must be offset by "the fair

31, 2009 (the last day before Karl Motey became a Government cooperator), Whitman Capital's total loss on its Marvell holdings was $12,804,036. (*See* Ex. B, at 4 & n.4).

29

market value" of services rendered, as well as "money returned"). Here, as noted above, the "value" actually "realized" by Whitman Capital through all of the challenged trades is actually a *loss* of over $2.5 million, not the $906,550 profit earned on a subset of the trades. Even if this provision were only ambiguous as to whether losses and gains should be netted, an ambiguity in the Guidelines must be resolved in favor of the defendant. *United States v. Simpson*, 319 F.3d 81, 86 (2d Cir. 2002) (applying rule of lenity to Guidelines). That being the case, Mr. Whitman's total offense level would be 8, rather than 22. *See* U.S.S.G. § 2B1.4(a).

## 2. Mr. Whitman's Personal Profit Was Only One-Third of the Total Gain Attributed to Him.

The "gain" amount of over $900,000 employed in the PSR's Guidelines calculation is purportedly based on Mr. Whitman's profits from the charged Polycom and Google trades. (*See* PSR ¶ 31). In fact, however, $900,000 was the approximate gain to *Whitman Capital* from the Polycom and Google trades, while Mr. Whitman's *personal* gain from those trades was only about one-third of that total. (*See* PSR ¶ 31 n.2; Ex. B, at 4-5). Accordingly, this "gain" calculation is a poor measure of Mr. Whitman's individual culpability – which should serve as the basis for any penalty, *see* 18 U.S.C. § 3553(a) – and overstates the seriousness of his offenses.

Whitman Capital's gain from the January 2006 Polycom transactions was $332,909, and the fund's gain from the July 2007 Google transactions was $573,641, for a total gain to Whitman Capital from both transactions of $906,550. (*See* Ex. B, at 2). As the manager of Whitman Capital, Mr. Whitman's personal compensation was derived through a formula common to the hedge fund industry: he earned a management fee of 1.5% of Whitman Capital's assets, as well as a performance fee of 20% of the fund's annual profits beyond specified profitability benchmarks. (*See* Tr. 1877-78; *see also* Ex. B, at 4-5). In addition, as an investor in

30

Whitman Capital, Mr. Whitman also profited according to his pro rata share of the fund, just as the other investors did. Applying this formula, Mr. Whitman's total fees and personal profits from the challenged Google and Polycom trades together amounted to approximately $305,192. (PSR ¶ 31 n.2; Ex. B, at 5).

For purposes of calculating a sentencing range, however, the Guidelines inflexibly attribute all of Whitman Capital's $906,550 in earnings to Mr. Whitman. The rough and incongruous application of the fund's total "gain" to Mr. Whitman personally, despite the fact that more than two-thirds of that total was never his, suggests that the Guidelines exaggerate the seriousness of his offenses and fail to gauge accurately to the nature of Mr. Whitman's conduct.[14] In such circumstances, a downward departure or non-Guidelines sentence is warranted. *See, e.g., United States v. Oakford Corp.*, No. 98 Cr. 144 (JSR), 1999 WL 1201725, at *10 (S.D.N.Y. Dec. 13, 1999) (finding that the Guidelines overstated the seriousness of a financial offense similar to insider trading where, among other factors, "each of the defendants personally realized only a small portion of the overall gains or profits").

B. A Sentence Within the Recommended Guidelines Range Overstates the Seriousness of Mr. Whitman's Offenses Because It Fails to Consider the Derivative Nature of His Individual Conduct.

The PSR's recommended sentencing range should also be reduced because it fails to account for important aspects of the individual insider trading offense at issue. The Guidelines treat *all* insider trading defendants as though the nature and circumstances of their offenses were the same: aside from Chapter Three adjustments, the sole factor distinguishing such defendants

---

[14] Although this Court's precedent indicates that the Guidelines permit the fund's total gains to be attributed to Mr. Whitman for the purpose of calculating a total offense level, *see Gupta*, 2012 WL 5246919, at *4; *see also United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2012 WL 362031, at *13-15 (S.D.N.Y. Jan. 31, 2012), such attribution – even if permissible – nonetheless overstates the seriousness of Mr. Whitman's offenses in this case by failing accurately to consider the nature of those offenses, including their true value to Mr. Whitman.

for purposes of calculating their offense level is the amount of "gain" attributed to them under the Guidelines, based on an arbitrary table. *See* U.S.S.G. §§ 2B1.4, 2B1.1(b)(1); *see Gupta*, 2012 WL 5246919, at *2 ("[T]he Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."); *see also Adelson*, 441 F. Supp. 2d at 509 (recognizing the problem with the Guidelines' "inordinate emphasis" on "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors").

The Guidelines scheme for insider trading thus fails to account for such critical aspects of any individual offense as, among other things, whether a defendant was a remote tippee or an insider; whether a defendant paid cold cash for stock tips or provided no benefits at all; or whether a defendant knew about any benefits flowing to an insider. Nevertheless, such factors are crucial considerations in assessing an individual defendant's culpability for an insider trading offense under Section 3553(a).

For example, there is no dispute that Mr. Whitman was a remote tippee who, according to the proof at trial, provided no benefits whatever to any insider. Nor did Mr. Whitman, as an outside research analyst and fund manager, induce from afar any insider to violate his or her fiduciary duties. Indeed, it is undisputed that Mr. Whitman had no contact with Marvell insiders Sam Miri and Bill Brennan, or Google insider Shammara Hussain. Although Mr. Whitman knew and spoke with Polycom insider Sunil Bhalla (*see* Tr. 2060), he never induced Bhalla to

32

breach any duties, and was not alleged to have received any information directly from Bhalla in connection with the charged Polycom trades.

Accordingly, Mr. Whitman cannot be viewed in the same light as an insider who assumed an important position of trust to a corporation's shareholders, and then "egregious[ly] breach[ed] [that] trust" for personal gain. *Gupta*, 2012 WL 5246919, at *3. "In the context of insider trading, we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313 (1985). Nevertheless, by potentially subjecting a remote tippee defendant like Mr. Whitman, whose liability is only derivative, *see Dirks v. S.E.C.*, 463 U.S. 646, 654-662 (1983), to the same sentence as a corporate insider who flagrantly abuses his or her position of trust, the Guidelines overstate the seriousness of the offenses in this case and fail to consider their relevant characteristics. *See Berner*, 472 U.S. at 313 (noting the "important distinctions between the relative culpabilities of tippers, securities professionals, and tippees in these circumstances").

This is especially so in light of the circumstances surrounding the Marvell, Polycom, and Google insiders in this very case, who allegedly breached their duties to their employers by providing inside information to Mr. Whitman through Roomy Khan and Karl Motey. Given the direct nature of their breach, these insiders would seem to be more culpable than the remote tippees like Mr. Whitman who allegedly traded on their information. *Id.* Yet neither Bill Brennan nor Sam Miri, the alleged Marvell insiders whom Motey testified were his sources of information to Mr. Whitman, has ever been charged either criminally or civilly. Sunil Bhalla and Shammara Hussain, whom Khan claimed were her inside sources for tips on Polycom and Google, respectively, were charged only by the SEC, and entered into settlements whereby they

33

paid financial penalties and suffered industry sanctions. (*See S.E.C. v. Feinblatt*, No. 11 Civ. 170 (JSR), Judgment (Dkt. No. 56) (filed June 8, 2011); Consent Judgment (Dkt. No. 92) (filed Sept. 19, 2011)). That persons arguably far more culpable than Mr. Whitman *in this very case* were subject to no criminal penalties, indicates that a sentence for Mr. Whitman within the Guidelines range overstates the seriousness of his offenses and fails to account fully for the nature and circumstances of his conduct.[15]

Further diminishing Mr. Whitman's relative culpability in comparison to the paradigmatic inside trader, the evidence at trial also demonstrated that Mr. Whitman paid no benefit of any kind – much less cash – to any insider, intermediate tippee, or anyone else to induce the alleged disclosures of information that were the subject of the challenged trades. Nor did Mr. Whitman know at the time he executed any of the challenged trades that any benefit – much less cash – was ever paid to the Marvell, Polycom, or Google insiders. (*See, e.g.,* Tr. 2773; Defense Exhibit S-1 (Roomy Khan told FBI agents that, *after* the July 2007 Google trade, she told Mr. Whitman "that the person who provided her with the Google tip wanted money for the tip")). Indeed, when Mr. Whitman learned – after his July 2007 Google trades – that Hussain wanted to be paid for information she provided to Khan, Mr. Whitman advised Khan not to make any such payment to Hussain because he considered it to be illegal. (Tr. 2216-18).

These circumstances stand in stark contrast to other remote tippees *in this case*, who allegedly received and traded on the very same inside information from the very same insiders, passed by the very same intermediate tippees, yet who paid large sums of money for the information. For example, Robert Feinblatt and Jeffrey Yokuty, both employees of Trivium Capital Management LLC, allegedly traded on "inside information" regarding "Polycom's fourth

---

[15] Likewise, Wesley Wang, a Government cooperator who testified against Mr. Whitman at trial, was sentenced by this Court to two years of probation. (PSR ¶ 9).

quarter 2005 earnings" and "Google's second quarter 2007 earnings" passed to them by Khan, who allegedly obtained the information from, respectively, Bhalla and Hussain. (*See S.E.C. v. Feinblatt*, No. 11 Civ. 170 (JSR), Complaint (Dkt. No. 1) (filed Jan. 10, 2011) ¶¶ 1, 2, 4, 29-38, 51-60). Moreover, it is clear from the Complaint that Feinblatt and Yokuty: (i) made substantially *more* money than Whitman Capital did by allegedly trading on the same Polycom and Google information (*see Feinblatt*, No. 11 Civ. 170 (JSR), Complaint ¶¶ 37, 57 (profits on Polycom "of over $1.4 million" and profits on Google "exceeding $2.5 million")); and (ii) paid Khan an ever-increasing "consulting fee" for the information (*see Feinblatt*, No. 11 Civ. 170 (JSR), Complaint ¶¶ 11, 36, 49)). As set forth above, Mr. Whitman made a fraction of those sums from his Polycom and Google trades, and indisputably never paid Khan in order to obtain any information. (*E.g.*, Tr. 1052, 2773).[16] Neither Feinblatt nor Yokuty was ever charged criminally; both settled with the SEC and agreed to pay disgorgement and civil penalties. (*See Feinblatt*, No. 11 Civ. 170 (JSR), Judgment (Dkt. Nos. 66 and 68) (filed July 11 and 18, 2011)).

Likewise, Karl Motey testified that he provided the same inside information he allegedly gave to Mr. Whitman about Marvell to remote tippees such as Timothy and Todd McSweeney of Loch Capital, and to fund managers at Diamondback Capital Management, in return for a salary from each fund of $100,000 per year, twice what Mr. Whitman paid Motey as a consultant. (*See* Tr. 478-79, 518-19, 600-01). There is no record of any charges – criminal or civil – against the McSweeneys; and although a portfolio manager at Diamondback Capital, Todd Newman, was recently convicted for *other* insider trading conduct, he was not charged criminally for trading on the basis of information about Marvell, or any information that he received from Motey. (*See*

---

[16] In addition, Feinblatt and Yokuty raised Khan's "annual consulting fee" by $100,000 after trading successfully on her inside information regarding the Hilton and Kronos acquisitions (*see Feinblatt*, No. 11 Civ. 170, Complaint ¶¶ 3, 5, 48-49, 67-68), while Mr. Whitman indisputably did not trade on that information (*see* Tr. 2230-32).

*United States v. Newman,* No. 12 Cr. 121 (RJS), Indictment (Dkt. No. 26) (filed Feb. 7, 2012)). Given that many of the other remote tippees who allegedly traded on the very same information as Mr. Whitman *in this case* were not subject to criminal prosecution, any sentence above Zone A for Mr. Whitman – let alone a Guidelines sentence – would greatly overstate the seriousness of Mr. Whitman's offenses and fail to consider fully the nature and circumstances of his conduct.

The derivative, remote nature of Mr. Whitman's conduct and his lack of knowledge of any personal benefit to insiders, are critical considerations in evaluating the seriousness of Mr. Whitman's offenses. At the heart of insider trading – and what ultimately makes it criminal – is a deceptive breach of trust, *see Dirks,* 463 U.S. at 654; yet Mr. Whitman's conduct was not connected in any direct way to such a breach. Furthermore, because personal benefit and knowledge of personal benefit, especially in a remote tippee case like this, serve to define insider trading as a species of corruption and distinguish it from legitimate information-gathering activity, *id.* at 658-59; (*Whitman,* No. 12 Cr. 125 (JSR), Opinion, at 15-17 (Dkt. No. 114) (filed Nov. 14, 2012)), a crucial aspect of the nature and circumstances of Mr. Whitman's offense is the paucity of evidence directly connecting these elements to him.

A Guidelines sentence that fails to account for the indirect, derivative nature of Mr. Whitman's offenses, and treats them no differently than direct, more egregious conduct – such as an insider's cash-for-tips scheme – thus overstates the seriousness of the offenses and fails to consider their true nature and circumstances. In such a situation, a downward departure or a non-Guidelines sentence is warranted.

\* \* \* \* \*

Given that Mr. Whitman in fact suffered large net losses from the challenged trades as a whole, that he personally received only a fraction of the profit to his firm from the positive

36

trades, and that he was a remote tippee far removed from any breach of duty by, or payment to, any insiders, a sentence within Zone A of the Sentencing Table, corresponding to an offense level of no more than 8, would reflect appropriate consideration of the nature, circumstances, and seriousness of Mr. Whitman's offenses.

## V.    IMPOSING A GUIDELINES SENTENCE OF INCARCERATION WOULD CAUSE AN UNWARRANTED DISPARITY WITH SIMILARLY SITUATED DEFENDANTS.

In determining the appropriate sentence for Mr. Whitman, this Court must also consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Avoiding such disparities is a key aspect of this Court's duty to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes outlined in Section 3553(a).

The recent sentences of other "tippee" defendants – although less similar to Mr. Whitman than the other remote tippees in his own case who were not charged criminally at all[17] – suggest that a sentence of no more than probation or home confinement would avoid unwarranted sentencing disparities in this case. If any prison sentence is imposed, these arguably relevant, but admittedly less similar comparators demonstrate that a minimal term is appropriate. Indeed, several finance professionals who were convicted of insider trading as tippees in amounts similar to the range attributed to Mr. Whitman have been sentenced well below the relevant Guidelines range.

Ken Okada, for instance, was a former broker at Bear Stearns who derived more than $300,000 in profits through trades based on inside information. Okada obtained the information

---

[17] It is difficult to imagine defendants with records and conduct more similar to Mr. Whitman than Feinblatt, Yokuty, and the McSweeneys, who traded on the same tips from Khan and Motey and profited in amounts relatively similar to Mr. Whitman. Given that none of these individuals faced even criminal prosecution – much less a lengthy prison sentence – the most appropriate way to avoid unwarranted sentencing disparities would be to impose no term of imprisonment.

by observing his client's trading in a Bear Stearns account, which he knew was based on MNPI regarding UBS analyst recommendations that had not been released to the public. (*United States v. Okada*, No. 07 Cr. 144 (DC), Indictment, at ¶¶ 25-29 (Dkt. No. 1) (filed Feb. 26, 2007)). Okada was also charged with trading on merger and acquisitions activity and with making false statements to the FBI during its investigation. (*Okada*, No. 07 Cr. 144, Indictment at ¶¶10-18, 32). Although Okada faced a Guidelines range of 30-37 months, Judge Chin imposed a sentence of probation, for reasons including that others closer to the source of the leaks received probation. (*Okada*, No. 07 Cr. 144, Sentencing Tr. at 19 (May 6, 2008)). Judge Chin also placed considerable weight on the fact that Okada – like Mr. Whitman in this case –made a good faith attempt to cooperate by proffering to the Government, notwithstanding that the Government did not write Okada a "5K" letter. (*Okada*, No. 07 Cr. 144, Sentencing Tr. at 23-25) (May 6, 2008).

The sentences of other defendants further support the propriety of a sentence within Zone A in Mr. Whitman's case. Eric Holzer, for instance, traded on tips he received concerning impending corporate mergers and acquisitions – information that is typically far more certain to affect a company's stock price than the quarterly earnings projections at issue in Mr. Whitman's case. (*See United States v. Holzer*, No. 09 Cr. 470 (VM), Information (Dkt. No. 14) (filed May 7, 2009)). His Guidelines range was 12-18 months, but Judge Marrero sentenced him to a term of 5 years of probation, including 270 days at a residential reentry center. (*See Holzer*, No. 09 Cr. 470, Judgment (Dkt. No. 24) (filed Oct. 1, 2009)).

Similarly, over a several-year period Michael Koulouroudis traded on tips he received from a friend in the mergers and acquisitions department at UBS concerning impending corporate takeovers – again information more certain to affect stock prices than that received by Mr. Whitman. (*See United States v. Koulouroudis*, No. 09 Cr. 440 (PGG), Indictment (Dkt. No.

9) (filed Apr. 30, 2009)). Koulouroudis's guilty plea resulted in a Guidelines range of 18-24 months, but Judge Gardephe imposed a non-Guidelines sentence of 3 months in prison, followed by 3 months of home confinement. *(See Koulouroudis*, No. 09 Cr. 440, Judgment (Dkt. No. 33) (filed May 4, 2010)).

Comparators like Okada, Holzer and Koulouroudis demonstrate that a sentence of probation or home confinement is appropriate in this case. While it is true that these individuals chose to plead guilty, they did not cooperate with the Government, and the fact that Mr. Whitman chose to vindicate his constitutional right to a trial by jury should not prohibit him from receiving a non-Guidelines sentence for comparable conduct. *See, e.g., United States v. Araujo*, 539 F.2d 287, 292 (2d Cir. 1976) (recognizing that the "[a]ugmentation of sentence" based a defendant's decision to "stand on [his] right to put the Government to its proof rather than plead guilty" is improper); *(United States v. Jiau*, No. 11 Cr. 161 (JSR), Sentencing Tr., at 58 (Sept. 21, 2011 ) ("[I]t will never be the policy of this Court to make a huge difference in sentence between those who exercised their right to go to trial and those who plead guilty, because at that point I think it becomes no longer a recognition of the credit that should justly be given for acceptance of responsibility, it becomes a veiled price of going to trial. There should be no price on going to trial.")).

If a prison term is imposed, however, an examination of the sentences of other insider trading tippees indicates that a non-Guidelines term is necessary to avoid unwarranted disparities. Drew Brownstein, for example, purchased stock in an energy company after learning from a friend whose father sat on the company's board that the company would soon be acquired for a premium. *(See United States v. Brownstein*, No. 11 Cr. 904 (RPP), Information (Dkt. No. 6) (filed Oct. 21, 2011)). Brownstein's trading on the basis of this tip, which was more certain

and direct than the kind of information Mr. Whitman received, resulted in approximately $2.4 million in illicit profits. Although Brownstein's gain was well more than twice that of Mr. Whitman, Brownstein was sentenced in January 2012 to one year and one day in prison, more than two-thirds below the advisory Guidelines range of 37-46 months. (*See Brownstein*, No. 11 Cr. 904, Order of Forfeiture (Dkt. No. 14) (filed Jan. 17, 2012) and Judgment (Dkt. No. 15) (filed Jan. 18, 2012)).

A comparator in the neighboring District of New Jersey, James Turner II, was the chief investment officer of hedge fund Clay Capital Management. Turner pled guilty to receiving tips from his brother-in-law and a college friend on mergers and acquisition activity, through which Turner made more than $2.5 million in illicit profits – again, far more than was alleged against Mr. Whitman. (*United States v. Turner*, No. 11 Cr. 868 (D.N.J.) (DMC), Plea Agreement (Dkt. No. 5) (filed Dec. 19, 2011). Turner faced a Guidelines range of 57-71 months, but was sentenced to 12 months in prison, with three years of supervised release. (*Turner*, No. 11 Cr. 868, Judgment (Dkt. No. 10) (filed Apr. 16, 2012)).[18]

In addition to the tippee defendants described above, several *tippers* have also recently been sentenced to terms of imprisonment well below their respective Guidelines ranges. These examples also weigh in favor of a non-Guidelines sentence in this case, because a tipper who directly breaches their fiduciary duties to a company and its shareholders is roundly understood

---

[18] There are other examples of tippees who received sentences well below the recommended Guidelines range in the Southern District of New York. Jennifer Xujia Wang, for example, a former employee of Morgan Stanley & Co., and her husband, Ruben Chen, a former employee of ING Investment Management Services LLC, used non-public merger and acquisition information from Morgan Stanley to make more than $600,000 by trading before the public announcement of five impending acquisitions. (*United States v. Wang*, No. 07 Cr. 740 (CM), Information (Dkt. No. 27) (filed Aug. 7, 2007)). The two pled guilty and were each sentenced by Judge McMahon to 18 months in prison, well below the Guideline range of 30-37 months. (*Wang*, No. 07 Cr. 740, Judgment, No. 07 Cr. 740 (Dkt. No. 34 and 35)).

to be more culpable than a tippee, and especially a remote tippee like Mr. Whitman. *Berner*, 472 U.S. at 313 (person whose liability is solely derivative cannot "be said to be as culpable as one whose breach of duty gave rise to that liability in the first place"); *Gupta*, 2012 WL 5246919, at *3 ("The heart of Mr. Gupta's offenses here, it bears repeating, is his egregious breach of trust.").

For example, James Gansman, a former partner at accounting firm Ernst & Young LLP, was convicted after a jury trial on six securities fraud counts. (*United States v. Gansman*, No. 08 Cr. 471 (MGC), Judgment (Dkt. No. 42) (filed Feb. 25, 2010)). The Government alleged that, over at least a two-year period, Gansman tipped a woman with whom he was having an affair about potential mergers and acquisitions involving Ernst & Young's clients. (*Gansman*, No. 08 Cr. 471, Indictment (Dkt. No. 1) (filed May 27, 2008)). The woman made approximately $390,000 on the illegal tips, which was attributed to Gansman. Although the resulting Guidelines range was 33-41 months, Judge Cedarbaum imposed a non-Guidelines sentence of one year and one day, plus six months of supervised release. (*Gansman*, No. 08 Cr. 471, Judgment (Dkt. No. 42) (filed Feb. 25, 2010)).

Of course, this Court recently sentenced Rajat Gupta to 24 months of imprisonment for providing tips on Goldman Sachs to Raj Rajaratnam, who made millions of dollars trading on the information. The gain amount attributed to Gupta was over $5 million, far above that of Mr. Whitman, and Gupta's Guidelines range was 78-97 months' imprisonment. *Gupta*, 2012 WL 5246919, at *4. Moreover, although Gupta plainly had a compelling personal history and character, the Court just as plainly found his criminal conduct extremely troubling. *Id.* at *5 (inside tip to Raj Rajaratnam regarding impending infusion of $5 billion to Goldman Sachs when company was "in turmoil but on the verge of being rescued from possible ruin" was "the

functional equivalent of stabbing Goldman in the back"). That this Court sentenced a preeminent corporate insider like Gupta – who "egregious[ly]" breached his duty of trust, *id.* at *3 – to 24 months, far below the recommended Guideline range in this case, indicates that an appropriate sentence for Mr. Whitman would be far lower still.

The absence of criminal charges against remote tippees *in this case* like Feinblatt, Yokuty, and the McSweeney brothers, who allegedly traded on the same information as Mr. Whitman did, yet often in greater amounts, as well as the terms of imprisonment imposed on other tippees and tippers comparable to Mr. Whitman, weigh strongly against a Guidelines sentence here. Indeed, a sentence far below the Guidelines range is necessary in this case to achieve a sentence that is "sufficient, but not greater than necessary" and to avoid "unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6). Again, we respectfully suggest that the appropriate such sentence in this case is one within Zone A of the Sentencing Table.

VI.    MR. WHITMAN HAS SUFFERED PUNISHMENT ENOUGH AND SHOULD RECEIVE A SENTENCE WITHIN ZONE A.

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing set forth in the statute. In Mr. Whitman's case, given how greatly he has already been punished, that dictate counsels in favor of a sentence in Zone A, corresponding to a total offense level no higher than 8 (0-6 months), and requiring no term of imprisonment.

Mr. Whitman will never work again in the securities industry, he will never get his marriage back, he will never be looked at the same by his friends, neighbors, former colleagues, and business associates. Worse yet, his children and family have suffered greatly along with him. And Mr. Whitman's suffering will only continue. While he has already lost a great deal of

42

money due to the dissolution of his marriage, the closing of his fund, and his legal fees, Mr. Whitman will undoubtedly lose still more in the near future through forfeiture and fines.

In these circumstances, there can be no useful purpose served by sentencing Mr. Whitman to a term of imprisonment above Zone A – any such term would be "greater than necessary" to fulfill the purposes of the sentencing statute. No more is needed at this point to punish Mr. Whitman and uphold society's and the Government's interests than a sentence of probation or perhaps home or community confinement, and monetary penalties. Mr. Whitman has been punished enough. No other good can come from sending Doug Whitman to prison for months or years. We humbly and respectfully ask this Court not to do so.

## CONCLUSION

For all of the foregoing reasons, the defense respectfully requests that the Court impose upon Doug Whitman a sentence within Zone A of the Sentencing Table.

Dated: January 17, 2013
      New York, New York

Respectfully submitted,

David L. Anderson
(dlanderson@sidley.com)
(Admitted *pro hac vice*)
SIDLEY AUSTIN LLP
555 California Street
San Francisco, CA
(415) 772-1200
(415) 772-7400 (fax)

David M. Rody
(drody@sidley.com)
Michael D. Mann
(mdmann@sidley.com)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Douglas F. Whitman*

# EXHIBIT A

| From: | LaVigne, Christopher (USANYS) |
| To: | Rody, David M.; Berman, Jillian B. (USANYS) |
| Cc: | Mann, Michael D. |
| Subject: | RE: U.S. v. Whitman, 12 Cr. 125 (JSR) |
| Date: | Wednesday, January 09, 2013 10:05:28 AM |

Dave, in response to your request, we do intend to seek an obstruction enhancement based on what we believe was your client's intentionally false testimony at trial relating to the trades at issue in this case, as well as other evidence we introduced in this case

By way of example we believe your client's testimony regarding the basis for his trades in Polycom (in January 2006) and Google (in July 2007) was materially false, in that he denied his trades were at all based on material non-public information (MNPI) he received from Roomy Khan Similarly, we believe your client gave false testimony when he denied intending to have Roomy Khan get MNPI from Sunil Bhalla during various consensually recorded phone calls between your client and Khan in 2008, and when he denied intending to have Motey provide him with MNPI during various consensually recorded phone calls beween your client and Motey in 2009 Likewise we believe your c ent s testimony regarding his knowledge of Motey s contacts at Marvell was false. Specific examples of this test mony are as follows (from the trial transcript). 2059-60 (lines 23-3); 2145 (lines 11-14). 2148-49 (lines 12-2) 2203-04 ( nes 22-7) 2209 (lines 20-23); 2215 (15-17); 2224 (lines 14-19). 2264 (lines 17-22); 2383-84 (lines 20-4): 2396 (lines 13-15) 2423 (l nes 3 – 11) 2425 (lines 8-12), 2431 (lines 8-11): 2447 (lines 12-22); 2475 (lines 6-8): 2492-93 (lines 24 14): and 2494-95 (lines 21-7)

Please be advised that this is not intended to be a complete list of all instances in which we believe your cl ent gave false and/or misleading testimony, and it in no way should be read to limit what we may seek to rely on in seeking an obstruction enhancement Rather, these instances are illustrative of our current position, and are intended to help streamline the various issues that will be presented to the Court when sentencing submissions are due on Jan 17.

Chr s

**From: Rody, David M. [mailto:drody@Sidley.com]**
**Sent:** Wednesday, January 02, 2013 3:07 PM
**To:** Berman, Jillian B. (USANYS); LaVigne, Christopher (USANYS)
**Cc:** Mann, Michael D.
**Subject:** U.S. v. Whitman, 12 Cr. 125 (JSR)

Hi Jillian and Chris,

As I discussed on the phone today with Chris, in order for the defense to prepare our sentencing submission to the Court, we request that you particularize for us the specific statements that Mr Whitman made during his testimony at trial that you claim constituted perjury. The PSR gives no specifics whatsoever, stating only: "The government indicated that Whitman perjured h mself at trial." (PSR ¶ 33). So that we may have sufficient time to incorporate the information you provide into our sentencing submission, we request that you provide us with these particulars as soon as possible, and in any event no later than January 7, 2013, ten days prior to the date on which our sentencing submission is due to the Court.

Thanks very much,
Dave

**David M. Rody** | Sidley Austin LLP
787 Seventh Avenue | New York, New York 10019
I (212) 839-5951 | F (212) 839-5599
drody@sidley.com | www.sidley.com

-----------------------------------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such

taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

# EXHIBIT B



SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
(212) 839 5300
(212) 839 6599 FAX

drody@sidley com
(212) 839 5951

| BEIJING | LOS ANGELES |
|---|---|
| BRUSSELS | NEW YORK |
| CHICAGO | PALO ALTO |
| DALLAS | SAN FRANCISCO |
| FRANKFURT | SHANGHAI |
| GENEVA | SINGAPORE |
| HONG KONG | SYDNEY |
| HOUSTON | TOKYO |
| LONDON | WASHINGTON D C |

FOUNDED 1866

November 26, 2012

**By Mail and Email**

Ross Kapitansky
United States Probation Office
Southern District of New York
500 Pearl Street, 8th Floor
New York, NY 10007

Re: *United States v. Doug Whitman*, 12 Cr. 125 (JSR)

Dear Mr. Kapitansky:

As we discussed during your interview with Mr. Whitman on October 23, 2012, I am writing to provide the defense's calculations of the gains and losses associated with each of the four counts of the Indictment – as well as each of the individual challenged trades within those counts – on which Mr. Whitman was convicted at trial in the above-captioned case. I begin with the straightforward analysis for Counts Two through Four of the Indictment, and then proceed to the slightly more complex analysis for Count One.

## Counts Two Through Four

Mr. Whitman was charged in Count Two of the Indictment with conspiracy to commit securities fraud by trading in the securities of Polycom, Inc. ("Polycom") and Google, Inc. ("Google") on the basis of inside information. (*See* Indictment ¶¶ 13-27). Counts Three and Four charged Mr. Whitman with substantive securities fraud based on the same conduct underlying Count Two; specifically, Count Three charged that Mr. Whitman engaged in insider trading in Polycom securities in January 2006, and Count Four charged that he committed insider trading in Google securities in July 2007. (*See* Indictment ¶ 29).

The Government confirmed in its bill of particulars and at trial that the Polycom trades at issue in Counts Two and Three are the same: The relevant transactions are Whitman Capital's purchases and sales of Polycom stock between "January 12-30, 2006." (*See* Letter from Christopher L. LaVigne and Jillian B. Berman to David L. Anderson, David M. Rody, and

Sidley Austin (NY) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships



Bradford A. Berenson, June 18, 2012 ("Bill of Particulars"), at 4).[1] The Government likewise confirmed that the July 19-20, 2007 transactions in Google securities at issue in Counts Two and Four are the same for both counts. (*See, e.g.*, Bill of Particulars, at 4 ("Whitman executed securities transactions based in whole or in part on the Google MNPI on July 19 and 20, 2007.")).

Whitman Capital's total gain on the Polycom transactions charged in Counts Two and Three is $332,909.[2] Whitman Capital purchased Polycom shares on January 12, 13, 17, 19, 20, 23, and 24, and then sold Polycom shares on January 26 and 30, after Polycom announced its quarterly earnings on January 25, 2006. The $332,909 figure reflects the difference between the proceeds from the January 26-30 stock sales and the costs of the January 12-24 stock purchases. The Government, through FBI Special Agent Michael Brown, estimated at trial that gains from the January 2006 Polycom transactions amounted to $344,254. (*See* Trial Transcript ("Tr.") at 1757; Government Exhibit ("GX") 49). The prosecution's total is $11,345 greater than the defense's total because Special Agent Brown admittedly did not account for transaction costs in his calculations. (*See* Tr. at 1740). Transaction costs, such as brokerage and exchange fees, are costs that Whitman Capital necessarily incurred in executing the trades at issue and that reduced the amount of profit realized by Whitman Capital.

Whitman Capital's total gain on the Google transactions charged in Counts Two and Four is $573,641. Whitman Capital purchased put options contracts on July 19, 2007, at strike prices ranging from $490 to $530, and closed out those contracts on July 20, 2007. The $573,641 total is the difference between the proceeds Whitman Capital realized by selling the put options contracts and the costs that the fund incurred to close out the contracts. The Government, through Special Agent Brown, estimated at trial a total gain of $591,052 from the Google transactions. (*See* Tr. 1763; GX 54). The difference of $17,411 is again attributable to Brown's failure to account for transaction costs.

In sum, based on the foregoing calculations, the total gain realized by Whitman Capital from the challenged Polycom and Google trades in Counts Two through Four was $906,550. As indicated above, this figure is consistent with the gain alleged by the Government at trial for these transactions, less transaction costs.

---

[1] The Bill of Particulars also listed trades in Polycom on July 11 and 12, 2007, but the prosecution stated at trial that it would present no proof of any illicit activity by Mr. Whitman in connection with those transactions.

[2] All figures used herein are approximate due to rounding and certain assumptions described in this letter. I am happy to provide you with additional details regarding these calculations at your request.


SIDLEY AUSTIN LLP

Ross Kapitansky
November 26, 2012
Page 3

Count One

In Count One of the Indictment, Mr. Whitman was charged with conspiracy to commit
securities fraud by trading in the securities of Marvell Technology Group, Ltd. ("Marvell") on
the basis of inside information "from in or about 2007 through in or about 2009." (*See*
Indictment ¶ 4). The Government identified several specific "challenged trades" in the 2007-
2009 time period that it alleged to be based on inside information. Specifically, the Government
pointed to trades by Whitman Capital in Marvell securities on "October 8, 2008, October 24-
November 3, 2008, January 22, 2009, and March 5, 2009." (*See* Letter from Christopher L.
LaVigne and Jillian B. Berman to David L. Anderson, David M. Rody, and Bradford A.
Berenson, July 16, 2012 ("Supplemental Bill of Particulars"), at 2). Special Agent Brown
testified about these trades at trial. (*See* Tr. at 1736, 1741, 1750; GX 59, 60, 62, 63, 65, 66).

The Marvell trades identified and challenged by the prosecution include both sales of
stock and sales of options by Whitman Capital. The challenged stock sales occurred on October
8, 2008, October 24-29, 2008, and January 22, 2009. The challenged options trades were
executed on October 24, 2008, November 3, 2008, January 22, 2009, and March 5, 2009. The
challenged options sales were of two types: the options sales on October 24, 2008, November 3,
2008, and January 22, 2009 involved the sale of so-called "covered call" options, while the
March 5, 2009 transaction involved the sale of put options.

As the Government conceded at trial, Whitman Capital achieved no net gain from the
challenged Marvell trades. Indeed, Whitman Capital's net loss from all of the challenged
Marvell trades taken together is $3,416,479. This total encompasses the net losses from both the
options sales and the stock sales.[3] With respect to the options sales, Whitman Capital lost a total
of $186,590 on those trades. Specifically, although Whitman Capital gained $27,267 from the

---

[3] The loss calculations for the Marvell stock sales are less precise than the gain calculations set forth above for
Polycom and Google, for two reasons. First, because of Whitman Capital's multi-year net-long position in Marvell
shares and the volume of Marvell shares purchased and sold by the fund, it is difficult to identify the purchase price
of individual Marvell shares that were sold. For the small number of Marvell shares where a purchase price could
be identified with certainty, that price was used in calculating the loss reported herein. For the vast majority of
shares, whose purchase price could not be identified, the purchase price used in the loss calculation is the share price
on December 29, 2006 – *i.e.*, the last price prior to the first day of the conspiracy alleged in Count One. Second,
although the portion of the total loss figure attributable to options trades includes transaction costs, the portion
attributable to stock sales includes the transaction costs associated only with the *sale* of the stock, but not those
associated with the *purchase* of the stock. Again, that is because of the difficulty of identifying the purchase price
of individual Marvell shares. If the transactions costs of all of the stock purchases were included, the calculated loss
would be greater than the figure stated.



sale of 484 call options on October 24 and November 3, 2008, along with $122,588 from the March 5, 2009 sale of 1392 put options, the fund lost $336,444 on the January 22, 2009 sale of 1590 call options. For each of these options sales, the total gain or loss is calculated as the difference between the amount for which the options contracts were sold and the costs that the fund incurred to close out the positions. With respect to the challenged Marvell stock sales, Whitman Capital lost a total of $3,229,888 from those trades.

If the entire period of the conspiracy alleged in the indictment is considered – from January 1, 2007 to March 31, 2009[4] – rather than just the challenged trades, Whitman Capital's total loss on all Marvell holdings during that period is $12,804,036. This calculation includes the net gains and losses from all of the options positions that Whitman Capital opened during the period of January 1, 2007 to March 31, 2009, as well the total loss in the value of the fund's Marvell stock holdings during that same period.[5]

The Government did not provide an estimate in its Bills of Particulars or at trial for the total gains or losses associated with Count One. At trial, Special Agent Brown testified that Whitman Capital realized a gain of $11,105 on option sales between October 24-29, 2008 (see Tr. 1739; GX 60); a loss of $323,322 on option sales on January 22, 2009 (see Tr. At 1743-44; GX 63); and a gain of $127,117 on the March 5, 2009 option sales (see Tr. At 1751; GX 66). These calculations reflect a net loss of $185,100, consistent with the figure we report above, but presumably not including transaction costs. Special Agent Brown did not testify regarding the total loss that Whitman Capital incurred from the Marvell stock sales.

\* \* \*

Finally, I note that the gains to Mr. Whitman himself from any of the above-described transactions are not equivalent to the gains to Whitman Capital. Mr. Whitman's personal gains were, in reality, a fraction of the profit realized by Whitman Capital. As the fund manager at Whitman Capital, Mr. Whitman's management profits came in essentially two forms. The first

---

[4] Cooperating witness Karl Motey, through whom Mr. Whitman allegedly received all of his inside information on Marvell, began cooperating with the Government on April 1, 2009 (see, e.g., Tr. 58, 139); so the charged conspiracy necessarily ended at that time.

[5] The net stock loss is calculated as the difference between the value of Marvell shares held by Whitman Capital at the close of the market on December 29, 2006, and the sum of (i) the amount for which Whitman Capital sold Marvell shares between January 1, 2007 and March 31, 2009 and (ii) the value of Marvell shares held by Whitman Capital at the close of the market on March 31, 2009.

 **SIDLEY AUSTIN LLP**
# SIDLEY

Ross Kapitansky
November 26, 2012
Page 5

was a management fee of 1.5% of the net asset value ("NAV") of the fund in each quarter. The second was a performance fee of 20% of any annual profits beyond the fund's prior "high watermark" – that is, the fund's highest historic NAV. If Whitman Capital was unprofitable in a given year, or, if the fund's profits were insufficient to increase the fund's NAV beyond the prior high, Mr. Whitman did not receive the 20%. In years where the fund was profitable and above the high watermark, however, Mr. Whitman earned 21.5% of the profits. During the period of the Indictment, the fund was profitable only in 2006 and 2009. The fund lost money in 2007 and 2008, and therefore Mr. Whitman did not receive the 20% in those years. In addition to his profits as fund manager, Mr. Whitman also profited from the fund as an investor, according to his pro rata share of any yearly fund profits, just like other investors. Mr. Whitman's ownership share in the fund was never greater than one-third during the period relevant to the Indictment.

Following these principles, Mr. Whitman's personal gain from the January 2006 Polycom trades was $132,727, and his personal gain from the July 2007 Google trades was $172,465, for a total personal gain to Mr. Whitman of $305,192. Moreover, Mr. Whitman's total personal loss from the challenged Marvell trades in 2008 and 2009 was $1,037,680. Accordingly, as a result of all of the trades challenged by the Government in all three securities, Mr. Whitman suffered a total personal loss of $732,488.

To understand how these totals were derived, consider first the figures for the January 2006 Polycom and July 2007 Google transactions. In 2006, Mr. Whitman's ownership share in the fund was 23.4%, the fund was profitable that year, and the fund's NAV exceeded the prior high. Accordingly, Mr. Whitman's personal profit from the Polycom trades was the sum of 21.5% of the fund's $332,909 gains, *i.e.*, Mr. Whitman's management profits, and 23.4% of the remaining gains from the transactions, *i.e.*, Mr. Whitman's share of the gains as an investor, for a total profit of $132,727. In 2007, Whitman Capital was not profitable, and Mr. Whitman's ownership share in the fund was 29.0%. Mr. Whitman's personal gain from the Google transactions was therefore the sum of 1.5% of the fund's $573,640 gains from the transactions, *i.e.*, Mr. Whitman's management fee in unprofitable years, and 29.0% of the remaining gains from the transactions, *i.e.*, Mr. Whitman's gains as an investor, for a total profit of $172,465. Again, in sum, Mr. Whitman's personal, pre-tax gain from the challenged Polycom and Google transactions was $305,192.

Next, consider Mr. Whitman's personal loss from the challenged Marvell trades. In 2008, the loss to Whitman Capital from the challenged Marvell options and stock sales was $2,487,458. Because Mr. Whitman's ownership share in the fund that year was 30.4%, his



personal loss can be calculated as 30.4% of the fund's loss, or $756,187.[6] In 2009, Mr. Whitman's ownership share of the fund was 30.3%, and Whitman Capital's loss on the challenged Marvell stock and options sales was $929,019, resulting in a personal loss to Mr. Whitman of $281,493. Taking the two years together, Mr. Whitman's total personal loss from the challenged Marvell trades was $1,037,680. When added against Mr. Whitman's total personal gains from the Polycom and Google trades of $305,192, Mr. Whitman's total personal loss from all of the trades challenged by the Government as unlawful was $732,488.

If the entire period of the Marvell conspiracy alleged in the Indictment is considered, instead of just the challenged Marvell transactions, Mr. Whitman's personal loss from Whitman Capital's Marvell holdings from January 1, 2007 to March 31, 2009 is $3,815,125. This represents Mr. Whitman's share – based on his ownership percentage in each of the relevant years – of Whitman Capital's total gains and losses on its Marvell stock and options positions in 2007, 2008, and the relevant portion of 2009.[7] When added against Mr. Whitman's total personal gains from the Polycom and Google trades of $305,192, Mr. Whitman's total personal loss from all of the conduct alleged in the Indictment was $3,509,933.

Please let me know if you have questions about any of these calculations, or would like additional details or supporting materials.

Very truly yours,

David M. Rody

---

[6] Mr. Whitman's annual 1.5% management fee should not be counted against his losses on the challenged Marvell trades in either 2008 or 2009. Again, the management fee was calculated as 1.5% of the fund's NAV. Because the Marvell losses decreased the fund's NAV, those losses decreased the management fee that Mr. Whitman received – *i.e.*, he received 1.5% of a smaller number, which, if anything, *increased* Mr. Whitman's personal loss. The same applies to the 20% performance fee that Mr. Whitman earned in 2009. Although the fund was profitable that year (albeit after April 1, 2009, when the charged conspiracy necessarily ended), the loss on the challenged Marvell transactions in 2009 decreased the profitability of the fund, thereby decreasing Mr. Whitman's personal gain – *i.e.*, he received 20% of a smaller number – beyond the conservative estimates provided above.

[7] Again, in calculating Mr. Whitman's personal loss for the entire period of the Marvell conspiracy, neither the 1.5% management fee nor the 20% performance fee were counted against Mr. Whitman's losses – for the same reasons described above in footnote 6.