UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                                                 :
UNITED STATES OF AMERICA,                                        :
                                                                 :
                        - v. -                                   :  ECF CASE
                                                                 :  12 Cr. 125 (JSR)
DOUG WHITMAN,                                                    :
                                                                 :
                                Defendant.                       :
                                                                 :
---------------------------------------------------------------- X


# DEFENDANT'S RESPONSE TO THE GOVERNMENT'S SENTENCING MEMORANDUM

David L. Anderson
(Admitted *pro hac vice*)
SIDLEY AUSTIN LLP
555 California Street
San Francisco, California 94104
(415) 772-1200
(415) 772-7400 (fax)

David M. Rody
Michael D. Mann
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Douglas F. Whitman*

Defendant Douglas F. Whitman, through his counsel, respectfully submits this memorandum in response to the Government's Sentencing Memorandum, filed January 17, 2013 ("Gov't Mem."). Mr. Whitman's sentencing hearing is scheduled for Thursday, January 24, 2013 at 3:00 p.m.

I.   PRELIMINARY STATEMENT

In its Sentencing Memorandum, the Government seeks a sentence for Mr. Whitman of between 51 and 63 months of imprisonment – potentially doubling the 30-month term recommended by the Probation Office. The Government suggests that "a significant term of imprisonment is necessary to reflect the seriousness of Whitman's crimes and to deter others from engaging in a crime that has become far too common." (Gov't Mem. at 1). Yet while marching through its trial evidence in an apparent attempt to re-prove Mr. Whitman's guilt, the Government relies on "facts" that are not supported by the record[1] and asks this Court to impose a punishment that would be grossly disproportionate to the conduct on which Mr. Whitman's conviction was based.

The Government's Sentencing Memorandum gives no meaningful consideration to the Section 3553(a) factors, or whether a sentence of 51 to 63 months of imprisonment is greater than necessary to satisfy the purposes of sentencing set forth in the statute. Instead, the

---

[1] In its zeal, the Government has overstated and misstated the evidence against Mr. Whitman. For example, the Government contends that Khan's testimony regarding Google was corroborated by a "wealth of other evidence," including "telephone records reflecting 18 telephone communications between Khan and Whitman between July 2 and July 17, 2007." (Gov't Mem at 5-6). This is factually wrong; there are no such records. The Government points to Government Exhibit ("GX") 52, which reflects 18 calls between Khan and *Shammara Hussain*, not Mr. Whitman. The Government also cites testimony which, it says, shows that Mr. Whitman perjured himself by denying that Karl Motey had contacts "in the finance department at Marvell." (Gov't Mem. at 19 (citing Tr. 2264-65)). But Motey never testified that he had contacts in the finance department at Marvell. (*See* Tr. 172-77; Tr. 194 (In identifying his Marvell contacts to Mr. Whitman, Motey identified "Bill Brennan as my drive guy, Sam Miri as my communication guy, and Christian Olsson as my Apple guy.")).

1

Government relies on sweeping generalizations about insider trading cases without acknowledging, much less distinguishing, the critical facts that must be part of an individualized assessment of the seriousness of Mr. Whitman's offenses – which just twelve months ago warranted a plea offer from the Government of 0-6 months. Somehow, in the Government's eyes, the appropriate Guideline range for Mr. Whitman's offenses has now skyrocketed to 51 to 63 months. The Government's suggested range is based solely on Guideline arithmetic, rather than an appropriate consideration of the nature, circumstances, and seriousness of Mr. Whitman's offenses.

For the reasons set forth below, and those set forth in Defendant's Sentencing Memorandum ("Def. Mem."), we respectfully submit that, in light of the factors set forth in Section 3553(a) and "an individualized assessment" of Mr. Whitman and the facts of his case, *Gall v. United States*, 552 U.S. 38, 49-50 (2007), an appropriate sentence for Mr. Whitman is one within Zone A of the Sentencing Table.

## II. MR. WHITMAN DID NOT COMMIT PERJURY AND SHOULD NOT BE SUBJECT TO A SENTENCING ENHANCEMENT.

The majority of the Government's Sentencing Memorandum is devoted to arguing that Mr. Whitman should receive a sentencing enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. As explained in Mr. Whitman's initial Sentencing Memorandum (at 19–25), no such enhancement is warranted. Without repeating the arguments made previously, Mr. Whitman respectfully responds to several points in the Government's submission.

According to the Government, Mr. Whitman's allegedly perjurious testimony falls into two overlapping groups: (a) testimony in which Mr. Whitman denied the charged conduct of trading on the basis of material, non-public information ("MNPI") ("Starting with Whitman's January 2006 Polycom trades, Whitman repeatedly denied executing those trades on the basis of

MNPI;" "Whitman also unequivocally denied executing trades in Google in July 2007 on the basis of MNPI he received from Khan" (Gov't Mem. at 14-15)); and (b) testimony Mr. Whitman gave concerning his understanding and interpretation of conversations he had with the Government's cooperators ("To bolster his false testimony about his January 2006 Polycom and July 2007 Google trades, Whitman attempted to explain away various statements he made to Roomy Khan in the summer and fall of 2008 during various consensually recorded calls" (Gov't Mem. at 16)). Neither category forms the basis for an obstruction enhancement. Mr. Whitman did no more than deny his guilt by denying a culpable state of mind. Given that the Government offered no evidence to directly rebut Mr. Whitman's testimony on his state of mind or understanding of the law, such denials cannot support an enhancement for perjury.

A. Testimony Concerning the January 2006 Polycom Trades

The Government first asserts that Mr. Whitman "lied regarding his basis for trades in Polycom in January 2006." (Gov't Mem. at 14-15).[2] Mr. Whitman testified that he did not believe that he was coming into possession of MNPI regarding Polycom when he spoke to Khan in January 2006, because she merely repeated back to him what he had previously said to her about his own views on the stock. (Tr. 2059-60). In particular, Mr. Whitman testified that he "didn't really care" what Khan said about Polycom at that time because he and his research analyst, Dave Karson, had "already made our . . . investment decisions." (Tr. 2057). Indeed, the evidence showed that Whitman Capital began building its position in Polycom with a purchase of 8,200 shares on January 3, 2006 (GX 48; Defense Exhibit ("DX") 48R; Tr. 1884-86), eight

---

[2] The Government cites the following examples: Tr. 2149-50 (Q: In January 2006 did you buy Polycom stock in any way on anything that Roomy Khan had said? A: No, sir."); Tr. 2148-49; Tr. 2059-60; Tr. 2384 ("Q: And when you traded Polycom in January 2006, Roomy Khan's information played no role? A: That's correct."); Tr. 2425 ("Q: According to you, the information Roomy Khan gave to you played no factor in your trade? A: We are talking about January 2006? Q: Yes. A: Yes, that's correct, sir.").

3

days before the Government alleged that Khan "tipped" Mr. Whitman about the stock (*see* GX 47).

The Government now contends that this testimony was false, and specifically that it was contradicted by, among other things, various consensual recordings between Mr. Whitman and Khan, as well as Mr. Whitman's phone and trading records. The consensual calls occurred in mid to late 2008, more than 18 months *after* Mr. Whitman's challenged January 2006 Polycom trades. The Government argues that these calls referred back to January 2006; but there is no reference in any of these calls to that period or to Khan's or Mr. Whitman's Polycom trades at that time. In that respect, the recordings in no way constitute an admission of guilt by Mr. Whitman about what occurred in January 2006 or contradict his testimony about the events of that period. Nor do the recordings show the nature of the information Mr. Whitman received from Khan at that time. In short, the 2008 recordings have nothing to do with Mr. Whitman's state of mind in January 2006, and thus cannot and do not show that Mr. Whitman perjured himself when he testified that he did not rely on Khan's information to make the January 2006 trades.

The Government makes much of the September 2008 consensual call between Mr. Whitman and Khan, in which Mr. Whitman urged Khan to call Sunil Bhalla and "get[] a good call on Polycom" so Mr. Whitman could "short it." (Gov't Mem. at 16-17; GX22T-E-2). The Government insists that, in this call, Mr. Whitman must have been seeking MNPI from Khan. Mr. Whitman testified, however, that he was looking for "color" from Bhalla in this call, not MNPI. (Tr. 2149; Tr. 2225). Mr. Whitman testified repeatedly that he understood getting "color" to be perfectly legal (Tr. 2027-28; Tr. 2119; Tr. 2149; Tr. 2458-59), and a number of witnesses described "color" as something securities analysts sought and received every day in

4

the course of their work. (Tr. 863 (J. Horne); Tr. 1132 (R. Khan)). For example, Laura Durr, Polycom's corporate representative, explained to the jury that giving "color" meant simply "giving a little bit more detailed information or flavor about the specific numbers" for the company. (Tr. 1674-75).

Contrary to the Government's claim, therefore, it is not at all "implausible" that Mr. Whitman was looking for "color" during the September 2008 call with Khan, not MNPI. Mr. Whitman testified that he had spoken to Bhalla on many occasions and never considered his discussions with Bhalla about Polycom's performance to be improper. (Tr. 2241; *see also* Tr. 2637 (J. Ader) ("[i]n the course of covering [Polycom] and meeting with company management, I had the opportunity to meet with Mr. Bhalla several times.")). It was also undisputed at trial that executives at Polycom, including Bhalla, talked regularly with analysts and investors for legitimate business purposes. (*See* Tr. 1643-48 (noting Bhalla's participation on conference calls with investors and analysts, and quotations from Bhalla in more than 20 company press releases). They did so because they wanted investors like Mr. Whitman to purchase their stock and analysts to follow their company. The Government argues that the only reasonable interpretation of the calls between Mr. Whitman and Khan was that Mr. Whitman was asking her to obtain MNPI from Bhalla. But that is far from the only reasonable interpretation of the calls – much less a "clear-cut example" of Mr. Whitman committing perjury, as the Government now contends.[3]

---

[3] The Government also alleges that Mr. Whitman spoke with Khan shortly before the Q3 2008 Polycom earnings announcement and said it is "easy to go long" if you have a "pretty good idea" they are going to report positive (Gov't Mem. at 19). Mr. Whitman's explanation that he got that "pretty good idea" from color, direction, estimates, and other analysis regularly performed by Whitman Capital is in no way "implausible." Such information is not necessarily MNPI, and there is no evidence from the calls or otherwise to suggest that Mr. Whitman expected to obtain actual revenue numbers or other specific information from the company. (Tr. 2467).

5

Mr. Whitman also was not lying when he testified that he wanted information to "short" Polycom during the fall of 2008; indeed, he did short the stock then. (*See* DX 4228). The Government suggests that Mr. Whitman's response to Khan's recorded statement that she could "go to jail" for calling Bhalla (Gov't Mem. at 18) is of some import. It is not. Not only did *Khan* make the statement, as opposed to Mr. Whitman, but Mr. Whitman immediately responded, "[y]ou would not" go to prison. (GX 22T-E-2; Tr. 1324). This is evidence that Mr. Whitman did not believe that he was asking Khan to do something illegal. It is bolstered by Mr. Whitman's suggestion that Khan obtain a Skype number to contact Bhalla (Gov't Mem. at 18), as it is clear that Mr. Whitman assumed she was concerned about getting Bhalla in trouble with Polycom management, not with avoiding jail. (*See* Tr. 2227 (D. Whitman) ("I am talking about investor relations.")). Mr. Whitman himself explained that he was sensitive to insiders' need to avoid getting into trouble with their investor relations department or management. (Tr. 2372).

Securities analysts call company insiders each and every day, and it is a perfectly legal practice. *See Dirks v. S.E.C.*, 463 U.S. 646, 658-59 (1983) ("It is commonplace for analysts to 'ferret out and analyze information,' . . . and this often is done by meeting with and questioning corporate officers and others who are insiders."). Jason Ader testified that he would "talk to anybody else at the company that would talk to me." (Tr. 2632). Regardless of what Khan thought she was trying to get Mr. Whitman to say during these calls in the fall of 2008, what he did say provided no evidence that he wanted her to engage in illegal conduct. Indeed, if Mr. Whitman was asking Khan to obtain true MNPI from Bhalla – that is, "the number" – he had no reason not to say as much on the call. Moreover, as stated above, the 2008 calls do not prove Mr. Whitman's state of mind in January 2006, and therefore cannot serve to demonstrate that Mr. Whitman's testimony about the Polycom trades in January 2006 was false.

6

Finally, the Government suggests that, because Mr. Whitman continued to talk to Khan after he knew or suspected that she possessed MNPI on Polycom in April 2006, on Kronos in March 2007, and on Hilton in July 2007 (Gov't Mem. at 18), he must have been seeking MNPI from Khan during the 2008 calls with her. If anything, however, the examples listed above only support the conclusion that Mr. Whitman never knew or believed that Khan possessed MNPI on Polycom in January 2006 or on Google in July 2007. These examples show that, when Mr. Whitman came into possession of what he understood to be MNPI, he did not trade on it. And, such examples of times when Mr. Whitman did *not* trade on MNPI in 2006 and 2007 certainly do not support the contention that Mr. Whitman was seeking to obtain MNPI from Khan in 2008. Indeed, if Mr. Whitman were in fact as "brazen" as the Government contends (Gov't Mem. at 22), then surely he would have traded on Polycom in April 2006 and on Kronos and Hilton in 2007. (Tr. 1211 (R. Khan); Tr. 2230-32 (D. Whitman)). He did not, and none of the evidence that the Government cites on Polycom supports its claim that Mr. Whitman perjured himself in his testimony regarding that stock.

### B. Testimony Concerning July 2007 Google Trades

The Government next contends that Mr. Whitman lied when he denied trading in Google in July 2007 based on MNPI received from Khan. Mr. Whitman testified that he did not believe he received MNPI regarding Google from Khan in July 2007, but instead thought that she was "topping" him and "making the story up" about having a contact at Google's outside investor relations firm. (Tr. 2203-05). Mr. Whitman further explained that his decision to short Google stock at that time was based on his own research and hard work. (Tr. 2205). The undisputed evidence at trial was that Mr. Whitman did not learn that Khan's contact at the outside investor relations firm had requested payment in return for information on Google until *after* Mr. Whitman made the trades. (Tr. 2216-18, 2773; Stipulation S-1). Moreover, contemporaneous

7

emails showed Mr. Whitman referencing his "hard work . . . on Google market data and financial analysis" to individuals with whom he testified he had consulted prior to his Google trades. (Tr. 2536-37; DX 3201).

The Government points to a December 4, 2008 wiretap call with Wesley Wang nearly a year and a half after the July 2007 Google trades as proof that Mr. Whitman lied at trial. (Gov't Mem. at 16; GX 32T). Yet the call in no way constitutes evidence that Mr. Whitman's testimony about the Google trade was perjurious, nor an admission by Mr. Whitman that he *did* trade Google on the basis of MNPI from Khan. Mr. Whitman testified that Khan's name came up during the December 2008 call with Wang because she was the subject of several news stories as a result of a lawsuit filed against Khan by her maid, which resulted in media coverage of protests outside of her home. (Tr. 2235). Thus, at the time, Khan was a subject of discussion between Mr. Whitman and Wang. Accordingly, it was not implausible that Mr. Whitman would connect Khan to a discussion about Google, given Mr. Whitman's testimony that the Google episode stood out to him because it was the first time that he ever heard of anyone asking for money for information (a fact it is undisputed he learned only after the trade), which shocked him. (Tr. 2235).

More importantly, later in that very same wiretap call – a fact omitted by the Government in its memorandum – Mr. Whitman discussed some of the insight he received about Google from Ali Jenab, of Source Forge, and how that influenced Mr. Whitman's trades in Google. (DX 2753). This again supports Mr. Whitman's testimony that he did not make the Google trade on the basis of MNPI, but did so on the basis of his own research, in consultation with others, about the merits of the trade. (Tr. 2207-09).

8

The Government next points to Mr. Whitman's email to Khan after the Google trade (Gov't Mem. 16) as further evidence that the two traded on MNPI. But the email establishes no such thing. There was no contention at trial that Mr. Whitman did not know that Khan had made a trade in the same direction – indeed, Mr. Whitman testified that he thought Khan was "topping" him. (Tr. 2210). Thus, it is reasonable that Mr. Whitman would email Khan to discuss the market reaction on Google's reporting when he saw an analyst make a positive call on the stock even after the negative earnings announcement. That is not evidence that Mr. Whitman traded on MNPI, but simply evidence that Mr. Whitman knew he and Khan had a similar position in Google. On the other hand, notably absent from the Government's Sentencing Memorandum is any reference to the contemporaneous emails Mr. Whitman sent on the day of the trades (but before the announcement by Google) openly acknowledging to another trader that he was shorting the stock. (DX 3199; Tr. 2211-13). The Government also makes no mention of the emails Mr. Whitman sent shortly after the trade that supported his claim that his decision to trade was based on his own hard work and research. (DX 3201; Tr. 2536-37).

  C. <u>Testimony Concerning Marvell Insiders</u>

The Government's final contention is that Mr. Whitman "lied about his contacts with Motey." (Gov't Mem. at 19). This allegation is surprising given Motey's own testimony that he had "dumbed down," "watered [] down," and "softened" the information he gave to Mr. Whitman on Marvell, and had "delayed" the information until it came out in published research reports. (*See* Tr. 510-22; Tr. 561-62). Indeed, notwithstanding Motey's well-rehearsed testimony that he received MNPI from people at Marvell, and "passed that information along to my clients, including Doug Whitman," (Tr. 140; *see also* Tr. 160; Tr. 198-99; Tr. 205; Tr. 243; Tr. 261; Tr. 271; Tr. 275 (repeating the same line)), Motey conceded that he could not recall "a

9

single specific piece of information" that he had ever conveyed to Mr. Whitman regarding Marvell. (Tr. 658).

Most oddly, the Government now contends that Mr. Whitman perjured himself by denying that he knew that Motey had contacts in the finance department at Marvell. (Gov't Mem. at 19; Tr. 2265). Yet the evidence at trial established that neither Sam Miri nor Bill Brennan were in the Marvell finance department. Motey testified that he identified "Bill Brennan as my drive guy, Sam Miri as my communication guy, and Christian Olsson as my Apple guy." (Tr. 194; *see also* Tr. 172-77). Motey never mentioned a "finance guy." And there was no evidence that Mr. Whitman knew anything more about Motey's contacts than the way Motey referred to them. This simply cannot be a basis for perjury.

The Government tries to corroborate other parts of Motey's testimony with his notebook, which purportedly contained contemporaneous notes of his calls with insiders at various companies. (Gov't Mem. at 7). The notebook, however, cannot serve as a tool to impeach Mr. Whitman regarding the information he believed he received from Motey. First, there is no dispute that Mr. Whitman never saw the notebook. More importantly, Motey admitted that he "didn't cite verbatim the notes" from the notebook to Mr. Whitman. (Tr. 635). Motey also testified that he "dumbed down," "watered [] down," "softened," and "delayed" the information he allegedly passed to Mr. Whitman from insiders. (Tr. 518). Thus, even Motey admitted that he could not say what he told Mr. Whitman about Marvell. (Tr. 518, 658). Accordingly, even if the notebook corroborates Motey's testimony that he actually received MNPI from Brennan and Miri, it does not at all show what Motey told Mr. Whitman about Marvell, much less prove that Mr. Whitman lied when he said that he never believed he was receiving MNPI from Motey. If anything, Motey's testimony actually supports Mr. Whitman's testimony about what he

10

understood of the information he received from Motey. *See, e.g.*, *United States v. Cusimano*, 123 F.3d 83, 89 n.6 (2d Cir. 1997) (noting that information can lose its non-public character when it is disseminated through press releases, SEC filings, trade publications, analyst reports, newspapers, magazines, rumors, word of mouth, or other sources).

Finally, the Government points to an instant message communication between Mr. Whitman and his analyst, Dave Karson, in which Mr. Karson stated that, "Karl yesterday had drinks with MRVL friend, he is saying between $790 and $795." (Gov't Mem. at 20-21 (citing GX 561-R-1). The Government asserts that it was "outrageous" that Mr. Whitman refused to admit that he believed that the numbers communicated in the instant message came from a Marvell insider. The Government's fit of pique stems entirely from its view that the "he" in the text must inexorably refer to the "MRVL friend." But it is equally possible from the content and context of the communication that "he" refers to Motey. That is, Motey was communicating that he had spoken with his Marvell friend, and based on that conversation, *Motey* thought that Marvell would report 790-795 (a range that in fact turned out to be incorrect). That is how Mr. Whitman testified that he understood the message. (Tr. 2493 ("But I thought Karl was giving us his estimate.")). Given the utterly ambiguous language of the communication, this is no basis for perjury. No other witness testified about the communication and Mr. Whitman's testimony was a reasonable interpretation.

        D.      <u>A Guilty Verdict Does Not Mean Mr. Whitman Committed Perjury</u>

The Government concludes that "[i]n finding Whitman guilty beyond a reasonable doubt . . . the jury rejected Whitman's version of events." (Gov't Mem. 15). As an initial matter, this sweeping rule would mean that very nearly every defendant who testifies in his or her own defense and is subsequently convicted is guilty of perjury. That assuredly is not the law. And, the assertion is incorrect here in any event. As demonstrated by the examples above, the trial

11

record was consistent with Mr. Whitman's good faith explanations and denials of guilty knowledge. That the jury was not ultimately persuaded by this testimony does not mean that Mr. Whitman committed perjury with the intent to obstruct justice. *See, e.g., United States v. Catano-Alzate*, 62 F.3d 41, 42-43 (2d Cir. 1995) (obstruction enhancement for perjury not necessarily warranted where defendant, convicted of knowingly transporting drugs, testified that she was unaware that drugs were in the vehicle); *United States v. Defreitas*, No. 98 Cr. 1004 (RWS), 2000 WL 763850, at *3 (S.D.N.Y. June 13, 2000) (declining to apply enhancement when defendant testified repeatedly that he did not know the stuffed animals he imported were counterfeit); *United States v. Weissman*, 22 F. Supp. 2d 187, 190 (S.D.N.Y. 1998) (CSH) (perjury enhancement unwarranted when defendant's account was not "inherently implausible").

That is particularly true here because the Court instructed the jury, at the Government's urging, on willful blindness. (Tr. 2953). Thus, the jury was told by the Court that it could find the intent element of insider trading, and thereby find Mr. Whitman guilty, without finding that he had the specific intent to commit the crime. Accordingly, the jury could have concluded that Mr. Whitman was telling the truth when he testified that he did not know that the information he received on a given stock was MNPI, but that he had "consciously avoided" knowing the truth about the nature of the information. As in *United States v. Dunnigan*, 507 U.S. 87, 95 (1993), a defendant's "testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent." For all these reasons, Mr. Whitman respectfully contends an enhancement for perjury is unwarranted.

III.  THE GOVERNMENT'S RECOMMENDED SENTENCE FAILS TO CONSIDER THE SECTION 3553 FACTORS.

The Government spends most of its Sentencing Memorandum rehashing the evidence at trial and pointing to evidence of supposed perjury, yet undertakes no meaningful consideration of the Section 3553(a) factors or the circumstance of Mr. Whitman's case.

A. A Sentence within Zone A Would Provide Adequate Deterrence

The sentence proposed by the Government of 51 to 63 months of imprisonment is not remotely necessary to accomplish specific and general deterrence.  The Government points to recent cases within this district in which the sentencing courts have noted the need for the sentence to afford adequate deterrence.  The most striking thing about the cases cited, however, is that in almost every one the sentence actually imposed was less than the Guidelines range at issue in that case, and far below what the Government claims is necessary to achieve sufficient deterrence in this case.  *See, e.g.*, *United States v. Jiau*, 11 Cr. 161 (JSR) (faced Guidelines range of 78 to 97 months; sentenced to 48 months); *United States v. Naseem*, 07 Cr. 610 (RPP) (faced Guidelines range of 97 to 120 months; sentenced to 60 months); *United States v. Fleishman*, 11 Cr. 32 (JSR) (faced Guidelines range of 37 to 46 months; sentenced to 30 months); *United States v. Koulouroudis*, 09 Cr. 440 (PGG) (faced Guidelines range of 18 to 24 months; sentenced to 3 months).  Even *United States v. Heffernan*, 43 F.3d 1144, 1150 (7th Cir. 1994), a criminal antitrust case that the Government cites for Judge Posner's statements on the need for general deterrence, vacated a 24-month sentence for the defendant and remanded with instructions to resentence him at a lower offense level.

Without factual or empirical support, the Government makes the generalized claim that Mr. Whitman's "prominence in the business community as founder and principal of a hedge fund" has the potential for greater deterrent impact than a similar sentence in the "average" case.

13

Yet it is unclear in what way Mr. Whitman is more prominent than the many other defendants the Government cites in its sentencing papers. General deterrence will be satisfied by any sentence the Court imposes – a significant or lengthy sentence is not necessary to further general deterrence principles. Indeed, "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004), for the proposition "that the Sentencing Guidelines were written, in part, to 'ensure a short but definite period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence'").[4]

  B. <u>Nature and Circumstances of the Offense and the History and Characteristics of the Defendant</u>

The Government's memorandum makes no meaningful attempt to consider the nature and circumstances of the offense, and instead relies on pure arithmetic to arrive at its recommended sentencing range of 51 to 63 months. *See United States v. Gupta*, No. 11 Cr. 907 (JSR), 2012 WL 5246919, at *2 (S.D.N.Y. Oct. 24, 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be

---

[4] The Government does not suggest that a lengthy sentence is needed for specific deterrence for good reason. Mr. Whitman is no longer in a position to commit a similar crime. He has lost his reputation and, with it, will likely be barred from the securities industry. Further, Mr. Whitman is a 55-year old first time offender. (PSR at 2; PSR ¶¶ 47-48). Both the age of an offender and his first offender status are powerful predictors of the low likelihood of recidivism. *United States v. Sanchez*, No. 99 Cr. 338-12 (RWS), 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) ("With regard to the necessity to protect society from future crimes of the defendant, this Court and others have previously declined to impose lengthy Guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases.'").

14

irrational on their face."). The Government's recommendation therefore fails to account for critical aspects of the offense such as whether Mr. Whitman was a remote tippee or an insider; whether he paid cold cash for stock tips or provided no benefits at all; or whether he knew about any benefits flowing to an insider. Such factors are crucial considerations in assessing an individual defendant's culpability for insider trading offenses under Section 3353(a).

There is no dispute that Mr. Whitman was a remote tippee who, according to the proof at trial, provided no benefits whatever to any insider. Nor did Mr. Whitman induce any insider to violate his or her fiduciary duties. Indeed, it is undisputed that Mr. Whitman had no contact with Marvell insiders Sam Miri and Bill Brennan, or Google insider Shammara Hussain. It is further undisputed that Mr. Whitman never received MNPI from Sunil Bhalla. Accordingly, subjecting Mr. Whitman to a Guidelines sentence without considering these factors would overstate the seriousness of the offenses in this case and fail to consider their relevant characteristics.

The Government's Sentencing Memorandum also fails to account for Mr. Whitman's personal history and characteristics. As set forth in Defendant's Sentencing Memorandum (at 3–19), Mr. Whitman has a history of good works, charitable contributions, and numerous acts of kindness toward his friends, neighbors, and even total strangers. He has suffered grievously since the outset of this case, losing his business, his ability to work for the rest of his life in the only industry he has ever known, his marriage and family, and much of his wealth. No lengthy prison sentence is necessary to further punish him.

CONCLUSION

For all of the foregoing reasons, the defense respectfully requests that the Court impose upon Doug Whitman a sentence within Zone A of the Sentencing Table.[5]

Dated: January 22, 2013
New York, New York

Respectfully submitted,

/s/ David M. Rody
_____

David L. Anderson
(dlanderson@sidley.com)
(Admitted *pro hac vice*)
SIDLEY AUSTIN LLP
555 California Street
San Francisco, California 94104
(415) 772-1200
(415) 772-7400 (fax)

David M. Rody
(drody@sidley.com)
Michael D. Mann
(mdmann@sidley.com)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Douglas F. Whitman*

---

[5] Defendant also notes two additional minor objections to the PSR. In paragraph 73 of the PSR, Mr. Whitman obtained his MBA from New York University in 1981, not 1991. In paragraph 85 of the PSR, Mr. Whitman worked part-time for IBM from 1979-80, not 1979-89.

16