UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,     :

       -v.-        :       12 Cr. 125 (JSR)

DOUG WHITMAN,     :

        Defendant.     :
-------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPPOSITION TO PETITIONER'S SECTION 2255 MOTION

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Christine I. Magdo
Assistant United States Attorney
- Of Counsel -

# **TABLE OF CONTENTS**

Preliminary Statement ............................................................................................. 1

Factual and Procedural Background ......................................................................... 3

     A.   Evidence Regarding Whitman's Knowledge of the Nature of the Benefits
          Received or Anticipated by Insiders in Exchange for MNPI ................................. 4

     B.   The Jury Instructions ................................................................................ 9

     C.   The Direct Appeal ................................................................................... 10

     D.   *United States* v. *Newman* .................................................................... 13

Argument .............................................................................................................. 14

    I.   Whitman Procedurally Defaulted His Newman Claim Regarding Proof of Friendship as a
       Sufficient Personal Benefit. ................................................................................ 14

     A.   Applicable Law ....................................................................................... 15

     B.   Discussion .............................................................................................. 18

          1. Whitman Did Not Raise His Current Argument on Direct Appeal .................. 18

          2. There Was No Cause for the Procedural Default............................................ 21

          3. Whitman Cannot Show Actual Innocence ...................................................... 22

    II.   Defense Counsel Was Not Constitutionally Ineffective for Failing to Raise the Nature of
       the Benefit Argument on Appeal. ....................................................................... 26

     A.   Applicable Law ....................................................................................... 26

     B.   Discussion .............................................................................................. 27

    III. Whitman's Challenge to the Sufficiency of the Indictment was Procedurally Defaulted, is
       Not Cognizable on Collateral Review, and is Meritless. ...................................... 29

Conclusion ............................................................................................................ 32

## Table of Authorities

**Cases**

Bailey v. United States,
  516 U.S. 137 (1995) .................................................................................................. 17

Bousley v. United States,
  523 U.S. 614 (1998) ................................................................................ 15, 16, 17, 22

Coleman v. Thompson,
  501 U.S. 722 (1991) .................................................................................................. 15

Dirks v. S.E.C.,
  463 U.S. 646 (1983) .................................................................................................. 18

Engle v. Isaac,
  456 U.S. 107 (1982) .................................................................................................. 16

Harrington v. Richter,
  562 U.S. 86 (2011) .................................................................................................... 15

Herrera v. Collins,
  506 U.S. 390 (1993) .................................................................................................. 16

Lopez v. Riley,
  865 F.2d 30 (2d Cir. 1989) ....................................................................................... 29

McCleskey v. Zant,
  499 U.S. 467 (1991) ...................................................................................... 15, 16, 21

McCoy v. United States,
  707 F.3d 184 (2d Cir. 2013) ..................................................................................... 27

Murray v. Carrier,
  477 U.S. 478 (1986) ...................................................................................... 15, 16, 21

Norton v. Sam's Club,
  145 F.3d 114 (2d Cir. 1998) ..................................................................................... 19

Paroutian v. United States,
  395 F.2d 673 (2d Cir. 1968) ..................................................................................... 30

Reed v. Ross,
  468 U.S. 1 (1984) ...................................................................................................... 15

Reyes-Requena v. United States,
  243 F.3d 893 (5th Cir. 2001) .................................................................................... 17

Rosario v. United States,
  164 F.3d 729 (2d Cir. 1999) ..................................................................................... 15

Ryan v. United States,
  645 F.3d 913 (7th Cir. 2011) ............................................................................... 22, 29

Sawyer v. Whitley,
  505 U.S. 333 (1992) .................................................................................................. 17

Schlup v. Delo,
  513 U.S. 298 (1995) .............................................................................................. 16, 17

Sellan v. Kuhlman,
  261 F.3d 303 (2d Cir. 2001) ..................................................................................... 26

Smith v. Murray,
    477 U.S. 527 (1986) ....................................................................................... 15
Strickland v. Washington,
    466 U.S. 668 (U.S. 1984) ............................................................................... 26
Underwood v. United States,
    166 F.3d 84 (2d Cir. 1999) ............................................................................ 17
United States v. Addonizio,
    442 U.S. 178 (1979) ....................................................................................... 15
United States v. Frady,
    456 U.S. 152 (1982) .................................................................................. 15, 21
United States v. Mechanik,
    475 U.S. 66 (1986) ......................................................................................... 29
United States v. Newman,
    773 F.3d 438 (2014) ...................................................................... 1, 13, 14, 23
United States v. Smith,
    407 F.2d 33 (2d Cir. 1969) ............................................................................ 30
United States v. Whitman,
    2013 WL 1739686 .................................................................................... 10, 11
United States v. Whitman,
    555 F. App'x 98 (2d Cir. 2014) ..................................................................... 12
United States v. Whitman,,
    135 S. Ct. 352 (2014) ..................................................................................... 12
Wainwright v. Sykes,
    433 U.S. 72 (1977) ......................................................................................... 15

**Statutes**

18 U.S.C. § 924(c)(1) ............................................................................................ 17
Title 15, United States Code, Sections 78j(b) ........................................................ 3
Title 18, United States Code, Section 2 .................................................................. 3
Title 18, United States Code, Section 371 .............................................................. 3
Title 28, United States Code, Section 2255 ....................................................... 1, 15

**Regulations**

Title 17, Code of Federal Regulations, Section 240.10b-5 ..................................... 3

iii

**Preliminary Statement**

Doug Whitman ("Whitman") was a savvy and experienced hedge fund manager who actively sought and then traded on inside information, reaping nearly a million dollars in illegal profits.  As the evidence at trial showed, the insiders who supplied the information on which Whitman traded did so in the expectation of receiving a benefit of a pecuniary nature.  Moreover, the evidence showed that Whitman was not a remote tippee—there was never more than one intermediary between Whitman and the insider from whom any illegal tip was obtained—and that he was either aware of the insiders' pecuniary expectations, or, deliberately turning a blind eye to the question, simply "assume[d]" that the insiders were expecting benefits such as (in his own words) "cash," "some really nice present," "a bunch of nice wine," "some dinners," "a beautiful purse," or "a trip to Hawaii."

Having been convicted at trial of two counts of conspiracy to commit securities fraud and two counts of substantive securities fraud, and having had that conviction affirmed on direct appeal, Whitman now seeks to set aside his conviction pursuant to Title 28, United States Code, Section 2255.  Relying on the Second Circuit's recent decision in *United States* v. *Newman*, 773 F.3d 438 (2014), which among other things appeared to alter what qualifies as a "personal benefit" for insider trading liability, Whitman argues that the jury at his trial might have impermissibly convicted him based on the conclusion that the only benefit expected by the tippers in his case was the tippees' friendship.

Whitman's petition is both procedurally and substantively invalid.  As a threshold matter, Whitman's failure to raise an argument about friendship as a qualifying personal benefit on direct appeal (despite raising a related point during the charge conference) means that the claim is procedurally defaulted.  That default, in turn, means that Whitman must either satisfy the strict

"cause and prejudice" standard to raise his claim for the first time on collateral review, or must demonstrate his "actual innocence."   Whitman cannot establish "cause" because nothing prevented him from challenging on direct appeal the then-prevailing notion of what constituted a sufficient benefit.   As *Newman* aptly demonstrates, such a challenge was not "futile."   Thus, Whitman must establish "actual innocence"—the showing that, in light of all the evidence adduced at trial, it is more likely than not that no reasonable juror would have convicted him—in order to prevail.   A review of the trial evidence, and in particular of Whitman's own "damning" words (as the Second Circuit characterized them), demonstrates that Whitman cannot make the requisite showing of actual innocence, inasmuch as he knew of, or deliberately blinded himself to, the pecuniary benefits expected by the insiders on whose tips he traded.

Whitman suggests that any default of his claim establishes, by definition, a claim of ineffective assistance of counsel.   However, the law is clear that failure to raise on appeal an argument later determined to be meritorious does not by itself render counsel constitutionally ineffective.   Counsel's decision not to raise this claim on direct appeal was a strategic one that clearly does not fall below an objective standard of reasonableness.   Whitman does not even endeavor to make a showing to the contrary.

Finally, Whitman's attempt to resurrect his challenge to the sufficiency of the Indictment fails, since he waived it by not raising it on direct appeal, it is not the type of claim that is cognizable on collateral review, and it is meritless in any event.

Because his claim is defaulted and, in any event, substantively without merit, Whitman's guilt endures even after the *Newman* decision, and his petition must be denied.

## Factual and Procedural Background

Indictment 12 Cr. 125 (JSR) (the "Indictment") was filed on February 8, 2012, in four counts. Counts One and Two each charged Whitman with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371. More specifically, Count One charged Whitman with participating in a conspiracy to commit insider trading in the stock of Marvell Technology Group, Ltd. from at least in or about 2007 through in or about 2009.  By way of a Bill of Particulars dated June 18, 2012,[1] the Government alleged that Whitman's co-conspirators in Count One included Wesley Wang, with whom Whitman shared material, non-public information ("MNPI") about Marvell in exchange for MNPI about other publicly-traded companies, including Cisco Systems, Inc.  Count Two charged Whitman with participating in a conspiracy to commit insider trading in the stock of Polycom and Google, Inc., from at least in or about 2006 through in or about 2007.  Counts Three and Four each charged Whitman with substantive counts of insider trading, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.  Count Three pertained to Whitman's trading in the securities of Polycom in 2006 and 2007, and Count Four pertained to Whitman's trading in the securities of Google on or about July 19, 2007.

Trial commenced on July 31, 2012, and ended on August 20, 2012, when the jury found Whitman guilty on all four counts of the Indictment.

The evidence at trial demonstrated that Whitman—the president and managing member of the hedge fund Whitman Capital, LLC ("Whitman Capital") and the principal portfolio

---

[1] A true and correct copy of the Bill of Particulars dated June 18, 2012 is attached hereto as Exhibit A.

manager of Whitman Partners L.P.—profited to the tune of nearly $1 million by obtaining material, nonpublic information about publicly traded technology companies through his participation in insider trading schemes. Whitman reaped illicit profits based on inside information that Roomy Khan—his neighbor and friend—provided him about Polycom and Google. Whitman also received and traded on inside information about Marvell that he obtained from his consultant, Karl Motey, and that he passed on to his friend, Wang, in exchange for still more inside information about Cisco.

### A. Evidence Regarding Whitman's Knowledge of the Nature of the Benefits Received or Anticipated by Insiders in Exchange for MNPI

Khan had a close relationship with Sunil Bhalla, a senior vice president and general manager of Polycom's Voice Communications Division. (Tr. 1019-27, 1603-04). In 2003, Khan invested $50,000 in a trading account of Bhalla's over which she had control and ended up losing that money through unprofitable securities trades. (Tr. 1024). Khan told Bhalla she would try to make it up to him; however, she was financially unable to repay him at the time. (*Id.*) Over time, Bhalla began sharing confidential information about Polycom's financial performance with Khan, including quarterly revenue information before it was publicly announced. (Tr. 1034-40, 1045-55, 1601-02, 1605-1619). Khan, in turn, shared this information with Whitman, who also knew Bhalla and repeatedly urged Khan to call Bhalla to obtain confidential information about Polycom's performance, telling her, for example, to "get[ ] a good call" on Polycom so that Whitman could "short it." (GX 22T-E2). When Khan resisted, expressing concern that she "could go to jail for doing that," Whitman urged Khan to "[u]se a skype phone number" so her call could not be traced to her, and when Khan continued to resist, Whitman mocked her by referring to her past impropriety: "Oh my God. Okay, miss, miss, uhh,

4

Google.  Don't even try that with me."  (*Id.*).  Whitman then told Khan, "What value are you if you're not a slime ball? . . . You're not gonna be a slime ball, what, what do I wanna talk to you for?"  (GX 22T-E2).  Throughout 2005 and into 2006, Bhalla provided Khan with inside information regarding Polycom's quarterly earnings, all of which information Khan then conveyed to Whitman. (Tr. 1035-40, 1043-48).  Whitman executed trades based on Bhalla's inside information, as did Khan.  (Tr. 1041).

At one point, Khan earned approximately $400,000 from her trades.  (Tr. 1051).  Aware of these profits, Bhalla asked Khan to put some of that money back into his account. (Tr. 1050-52).  Khan understood his request to be a *quid pro quo*; she testified that "his expectation was … he helped me make all this money, that I could recoup him the loss I made in his account."  (Tr. 1052).  There was a "hiatus of communication" between Khan and Bhalla from April 2006 through April 2007, "because now [Khan] understood that [Bhalla] expected the money and [Khan] still hadn't done that." (Tr. 1055).  Whitman was aware that Khan had "stopped calling [her] source" at Polycom, and noted that his current source was not as good as Khan's had been. (GX 21T-E). In the middle of 2007, Khan reconnected with Bhalla, because by that point, Khan "had the money to recoup his account, so [she] felt comfortable reaching out to him." (Tr. 1093). Khan made a few attempts to pay Bhalla back, but he never got around to opening the necessary account.  (*Id.*). Bhalla once again gave Khan inside information, which Khan then passed on to Whitman.  (Tr. 1094).

In the summer of 2007, Whitman obtained inside information about Google from Khan and traded upon that information.  (Tr. 1757-61; GX 53, 130-C).  Khan's acquaintance, a woman named Shammara Hussain, was working at the firm that handled investor relations for Google.

(Tr. 1060-67, 1069-73).  From the time they met in late 2006, Khan's relationship with Hussain focused almost exclusively on the exchange of inside information regarding various public companies.  (Tr. 1063-64).  For example, Hussain told Khan that she was working on Google's upcoming earnings announcement, and disclosed that Google's revenue and earnings per share ("EPS") numbers for the second quarter of 2007 would fall short of analysts' projections. (Tr. 866-67, 1060-73; GX 313).  At around the same time, Hussain told Khan that "she expect[ed] a lot of money in return" for the valuable information she had provided.  (Tr. 1074).  Khan could not recall whether the amount of money Hussain demanded was more than $100,000 or more than $200,000, but in any event, Khan objected to Hussain's demand, telling her it was more money than Khan could afford to pay her. (*Id*.).  Hussain responded by telling Khan to round up the money from others, and Khan told Hussain she would try. (Tr. 1074-75).  Khan subsequently collected $15,000 from another individual with whom she had shared Hussain's inside information, and attempted to give that money to Hussain, but was unable to connect with her. (Tr. 1092).  Khan also paid for a cell phone for Hussain and would pay for Hussain's meals when they went out to together. (Tr. 1075-76).

In December 2008, following his successful trading on Hussain's Google information, Whitman discussed his insider trading in Google during a wiretapped call with Wang, a friend with whom Whitman exchanged inside information about various stocks, including tips on Cisco that Wang got from his neighbor. (Tr. 1439-40, 1447-55, 1470-72). When Wang asked, "Are you, have you heard any on Google?  You don't, you don't do that stock, do you," Whitman immediately responded: "I did for a while.  Roomy [Khan] had a mole there for a while."  (GX 32T).

6

The following colloquy then ensued:

WANG:          And?

WHITMAN:    Uh she lost the mole.  The woman wanted her to take care of her for uh, giving her the information.

WANG:          And she just said fuck, fuck off?

WHITMAN:    Um, well, Roomy's view was that's illegal.  (Laughing).  I said Roomy, what you were getting from her was illegal to start with, so now you're getting ethical that you shouldn't give her any cash?  Or buy her some nice present?  I mean she didn't have enough sense to go out and buy her some really nice present.  Right?

                        *                              *                              *

WHITMAN:    I mean, let me ask you a question, I have to assume the guy that you talk to from Cisco, who's your buddy, that you give him a bunch of nice wine every once in a while, right?

WANG:          Not even.  Not even, Doug.  He's my neighbor.  He's my neighbor.

WHITMAN:    Okay, but, you know, so you have a thing.  But, I would assume you go across the street, something, you'll bring him over a nice bottle of wine every once in a while//

WANG:          //Yeah we hang out.  Whatever he wants I [stutters].

WHITMAN:    //Or buy him some dinners, or just something to thank him for the help, right?

WANG:          Yeah of course.

WHITMAN:    I mean she was, it was like, hey Roomy, did you ever think that you should just buy this woman a beautiful purse or something.

WANG:          She said no, of course.

WHITMAN:    Right? I mean you don't want to give her cash, right? But, you can, you could've bought her a nice present.  Send her on a trip to, to Hawaii.  I mean, you know.  So anyway.

WANG:          Wow.  That sucks.  It's kind of a dick.

7

| | | |
|---|---|---|
| WHITMAN: | Yeah.  Though actually when she did talk to me I told her you can't give her cash.  You'll go to jail, for that. | |

WHITMAN:    Yeah.  Though actually when she did talk to me I told her you can't give her cash.  You'll go to jail, for that.

WANG:          She wanted cash?

WHITMAN:    The woman wanted to be paid, yeah.

WANG:          Shit.  That's crazy dude.

WHITMAN:    Knowing Roomy she probably told Roomy in advance, "I'm going to give you information but if it's right you better pay me."

(GX 32T).

With respect to the information that Whitman obtained regarding Marvell through Karl Motey, Motey testified about his relationship with Sam Miri, who worked in sales for Marvell's Data Communications business and provided MNPI to Motey. (Tr. 706-07, 717-18).  While Motey considered Miri to be a friend, the trial evidence showed that a *quid pro quo* took place between Motey and Miri with respect to the MNPI that Miri provided about Marvell.  (Tr. 642-644).  Motey had loaned Miri three thousand dollars, at a time when Miri was "complaining about his financial position and hinting at a loan."  (Tr. 173).  The loan remained outstanding during the period when Miri was providing inside information about Marvell to Motey, who was passing it on to Whitman.  (Tr. 643).  Not only did Miri never repay the loan, but Motey never even asked him to.  (Tr. 173, 643).  Motey also received MNPI about Marvell from Bill Brennan, who was Vice-President of Sales for Marvell's Storage Business. (Tr. 195-203).  In exchange for that inside information, which Motey conveyed to Whitman, Motey provided Brennan with analyst reports and conference call transcripts about other companies, including competitors of Marvell. (Tr. 643-44).  Motey testified that he got those analyst reports from Whitman and others.  (Tr. 644).

8

### B.      The Jury Instructions

Before trial, Whitman filed a motion *in limine* arguing that the Government had to prove that the defendant knew that an insider disclosed confidential information for a personal benefit. The motion did not address what could constitute a personal benefit.  (Dkt. # 57).  It was only during the three-hour charge conference, in response to questioning by the Court, that Whitman argued in passing that a *pecuniary* benefit may be necessary in certain cases involving acquaintances:

> If the government is taking the position that friend per se is enough … our view is that … under *Dirks* reputation is invoked specifically in conjunction with the notion that it could translate into future earnings.  So it's not a vague, amorphous, sort of reputational benefit, but it's one that can actually be expected to redound a pecuniary benefit eventually.

(Tr. 2344).

However, Whitman then immediately conceded that, under controlling Supreme Court precedent, if the Government proved the defendant knew of the existence of a "close friendship" between the tipper and the immediate tippee, the Government would have met its burden of showing that the defendant had knowledge of a "personal benefit."

> [T]he friendship example that's used in *Dirks*, the analogy that the Supreme Court uses is trading oneself and then making a gift of the profits to the friend.  So that's plausible with certain kinds of relationships, like a close family relationship or close friendship.  But a mere acquaintanceship, it's quite implausible to believe that one would confer hundreds of thousands of dollars in trading profits.

(*Id.*)

The Court then gave an instruction that was essentially consistent with Whitman's position both with respect to the requirement that the defendant have knowledge of a personal benefit as well as with respect to the fact that maintaining or furthering a friendship could qualify as the tipper's personal benefit.  Consistent with Whitman's argument at the charge conference,

9

the Court did not include "mere acquaintanceship" as an example of a qualifying personal benefit.

> As to the personal benefit that the insider, whether Mr. Bhalla or Ms. Hussain, received or anticipated receiving from Roomy Khan in return for disclosing inside information, the benefit does not need to be financial or tangible in nature. It could include, for example, obtaining a useful networking contact, improving a witness' reputation or power within the company, obtaining future financial benefits or just maintaining or furthering a friendship. But the government must show that the insider is disclosing inside information to an outsider for some personal reason, rather than a company approved purpose, and is obtaining some personal benefit, however modest.

(Tr. 2952).

The Court also instructed the jury that the defendant had to know that the insider was receiving a benefit in exchange for the information. The Court instructed the jury that it could find the Government had satisfied its burden of proving Whitman's knowledge as follows:

> Also, the defendant's knowledge of such facts may be established by proof that the defendant was aware of a high probability that an insider was improperly disclosing inside information for personal benefit and, not actually believing otherwise, deliberately avoided learning the truth; in other words, not that he was merely negligent in finding out a fact, but rather, that he purposely blinded himself to obtaining actual knowledge of an obvious fact because he had a conscious purpose to avoid learning the truth.

(Tr. 2953).

### C.    The Direct Appeal

On April 15, 2013, Whitman appealed his conviction. On appeal, Whitman raised three categories of issues: (1) the district court erroneously excluded testimony of defense witnesses; (2) the district court instructed the jury erroneously on issues concerning scienter; and (3) the district court erroneously defined essential elements of the offense. *United States* v. *Whitman,* 2013 WL 1739686 (2d Cir.) (Brief of Defendant-Appellant (hereinafter "Whitman App. Br.")).

10

Only the second category, regarding the district court's jury instructions, is relevant to Whitman's current petition.[2]  Whitman appealed what he perceived as two errors in the jury instructions, namely, that it was impermissible to give the jury a conscious avoidance instruction because the facts did not support such a charge, and that the instruction was ambiguous and confusing with respect to whether the Government was required to prove that Whitman knew the insiders acted for personal benefit.  *Id.*  With respect to the second point, Whitman argued that the Court failed to "unambiguously direct[] the jurors [that they] must find that Whitman knew the insiders had received a personal benefit." *Id.* at 48.  Whitman further argued that the Court's attempt to clarify the first instruction with a follow-up instruction "confused" the jury; yet the only evidence of the jury's purported confusion to which Whitman pointed was "the fact that the jury returned a guilty verdict on counts for which evidence of personal benefit was clearly insufficient." *Id.* at 49.  In sum, Whitman's appellate argument regarding the personal benefit instruction focused entirely on whether the instruction clearly informed the jury of the requirement that they had to find that Whitman had *knowledge* of the fact that the insiders acted for personal benefit; he did not argue that this Court's instruction was incorrect in defining the *nature* of the personal benefit.  Significantly, Whitman did not raise the issue of whether "maintaining or furthering a friendship" was a legally sufficient "personal benefit" for the insider to receive or anticipate.  And Whitman nowhere raised any appellate challenge to the sufficiency of the Indictment, abandoning his pre-trial arguments on that subject.  (*See* Dkt. # 31 (motion to dismiss)).

---

[2] The third category, challenging this Court's definition of the essential elements of the offense, did not relate in any way to the present issue of what type of benefit the insider must receive in order for insider trading liability to lie.  Rather, it related to the unrelated questions of what law – state or federal – defined the duty that the insider must have breached, and what role the inside information was required to play in the defendant's decision to trade.  *Id*. at 51-59.

11

The Second Circuit affirmed Whitman's conviction on February 19, 2014.  *United States* v. *Whitman,* 555 F. App'x 98 (2d Cir. 2014).  In rejecting Whitman's argument that there were insufficient facts in the trial record to support the conscious avoidance instruction, the Second Circuit explained that:

> Whitman's own words were … damning, and provided ample factual basis for the conclusion that he could avoid positive knowledge that Khan and Motey used illegal channels to get confidential information only by deliberately closing his eyes to facts well known to him. Whitman called Khan "Ms. Google."  He told Wes Wang that Khan "had a mole there[, at Google,] for a while," whom she lost because "the [contact] wanted [Khan] to take care of her for ... giving her the information" and that Khan "didn't have enough sense to go out and buy [the contact] some really nice present." The jury could easily conclude that Whitman knew that Khan courted trouble, and yet rather than question Khan about whether she had crossed a line, he encouraged Khan to "buy this woman a beautiful purse or something." He was equally cavalier about Khan's connection to Bhalla, teasing Khan that she should "[u]se a[n untraceable] skype phone number" to "call [ ] Sunil and get[ ] a good call on Polycom." *In the face of substantial evidence that Khan had considered paying for information from an inside source, Whitman did not question Khan about whether she had done something illegal. Instead, the jury could reasonably have found, he advised her on how to continue pumping her sources.*

*Id.* at 105 (citations omitted) (emphasis supplied).

On July 8, 2014, Whitman petitioned the Supreme Court for a writ of certiorari; his petition was denied on November 10, 2014.  *United States* v. *Whitman*, 135 S. Ct. 352 (2014).

D.    *United States* v. *Newman*

On December 10, 2014, a panel of the Second Circuit decided *United States* v. *Newman*, 773 F.3d 438 (2014).   Todd Newman and Anthony Chiasson were hedge fund portfolio managers who traded securities with the assistance of a select number of analysts.   *Id.* at 443. Those analysts, in turn, belonged to a small group of friends who conspired to obtain material non-public information so that they and their bosses could benefit by trading on it.   *Id.*  The circle had particular success in developing sources inside public companies—sources that had access to periodic earnings numbers before they were released to the public.   *Id.*  At trial, the evidence proved that Newman and Chiasson obtained inside information concerning earnings at two public companies—Dell, Inc. and NVIDIA Corporation—that netted Newman and Chiasson $4 million and $68 million in profits, respectively, for their hedge funds.   *Id.*  Both defendants were convicted at trial of securities fraud.   *Id.* at 444.

On appeal, the primary question presented to the Second Circuit was whether the trial court improperly failed to instruct the jury that, in order to be held criminally liable, both defendants had to know that the insider-tippers' breaches were in exchange for a personal benefit.   *Id.* at 447.   One defendant, Newman, also argued that the Government failed to prove that the corporate insiders received a sufficiently meaningful personal benefit to support criminal liability.   *See* Brief for Appellant Todd Newman, *United States* v. *Newman*, 13-1837(L) at *49-51 (2d Cir. Aug. 15, 2013).

13

The *Newman* panel reversed Newman's and Chiasson's convictions and ordered the charges dismissed with prejudice.[3]  The panel offered two bases for reversal.  First, the panel seized on Newman's personal benefit argument and held that in order for a tippee to be guilty of insider trading, the insider who breached his duty must have done so in exchange either for pecuniary gain or as part of a "meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature."  *Newman*, 773 F.3d at 452.  Second, the panel concluded that a tippee must know of the tipper's personal benefit.  *Id.* at 450.  The panel ultimately found insufficient the Government's evidence that the insider-tippers obtained a legally cognizable personal benefit in exchange for providing material non-public information, and that Newman and Chiasson had the requisite knowledge of the insider-tippers' benefit.  *Id.* at 455.  In so holding, the panel noted that both defendants were "several steps removed from the corporate insiders[.]" *Id*. at 443.

## <u>Argument</u>

### I.   Whitman Procedurally Defaulted His Newman Claim Regarding Proof of Friendship as a Sufficient Personal Benefit.

Whitman's primary claim—that this Court committed prejudicial instructional error in its definition of personal benefit at trial (Pet'r Br. at 8)—has been procedurally defaulted because it was never advanced on direct appeal.  The falsity of Whitman's passing effort to suggest otherwise is apparent from even the briefest review of his appellate brief.  Accordingly, Whitman

---

[3] On April 3, 2015, the Second Circuit denied the Government's Petition for Rehearing and Rehearing *En Banc*.  The Government is in the process of determining whether to petition the United States Supreme Court for a writ of certiorari.

14

must either meet the cause-and-prejudice standard to be relieved from the consequences of the default, or he must show actual innocence.  He can do neither.

### A.  Applicable Law

It is well settled that Section 2255 is not designed as a substitute for a direct appeal, *see United States* v. *Frady*, 456 U.S. 152, 165 (1982); *United States* v. *Addonizio*, 442 U.S. 178, 184-85 (1979), and that a federal prisoner cannot use a Section 2255 petition to litigate questions that could have been raised on direct appeal but were not, *see Rosario* v. *United States*, 164 F.3d 729, 731 (2d Cir. 1999).   Society's interest in repose of criminal judgments animates these procedural rules and compels their vigorous enforcement.  *See, e.g.*, *Harrington* v. *Richter*, 562 U.S. 86, 103 (2011); *McCleskey* v. *Zant*, 499 U.S. 467, 490-91 (1991).  Thus, where a petitioner has procedurally defaulted a claim by failing to raise it on direct appeal, the claim may be raised in habeas only if the petitioner "can first demonstrate either 'cause' and 'actual prejudice,' or that he is 'actually innocent.'"  *Bousley* v. *United States*, 523 U.S. 614, 622 (1998) (quoting *Murray* v. *Carrier*, 477 U.S. 478, 485, 496 (1986); *Wainwright* v. *Sykes*, 433 U.S. 72, 87 (1977); and *Smith* v. *Murray*, 477 U.S. 527, 538 (1986)); *see also Rosario*, 164 F.3d at 732 (defendant must demonstrate "either (1) 'cause for failing to raise the issue, and prejudice resulting therefrom,' . . . or (2) 'actual innocence'" (citations omitted).)

The Supreme Court has made clear that "cause" is measured by a stringent standard of diligence.  *See, e.g.*, *Coleman* v. *Thompson*, 501 U.S. 722, 752 (1991) ("Cause" is "something external to the petitioner" which "cannot be fairly attributed to him").   "Cause" to excuse a procedural default may exist where a claim "is so novel that its legal basis [was] not reasonably available to counsel."  *Reed* v. *Ross*, 468 U.S. 1, 16 (1984).  A claim is "reasonably available," however, if at the time of the default, it was being raised by litigants and addressed by the courts.

15

*See Bousley*, 523 U.S. at 622-23 (claim not "novel" where judicial decisions in the reporters show that the legal basis for the claim was "reasonably available").

Critically, the Supreme Court has long made clear that a petitioner cannot demonstrate "cause" for failing to raise a claim simply because doing so would have been futile. It matters not that the claim may have been doomed under prevailing law; even when the law is against a contention, a litigant must make the argument to preserve it. As the Supreme Court stated in *Bousley*: "[F]utility cannot constitute cause if it means simply that a claim was unacceptable to the particular court at that particular time." 523 U.S at 623 (quoting *Engle* v. *Isaac*, 456 U.S. 107, 130 n.35 (1982)).

If a petitioner cannot demonstrate "cause" for his procedural default, he can attempt to obtain review for his claim by establishing "that a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey*, 499 U.S. at 494-95. The Supreme Court has repeatedly emphasized that by the term "fundamental miscarriage of justice," it means the "actual innocence" of the petitioner. *See Herrera* v. *Collins*, 506 U.S. 390, 404 (1993) (referring to rule requiring "proper showing of actual innocence" as the "fundamental miscarriage of justice exception" and explaining that the purpose of the exception is "to see that federal constitutional errors do not result in the incarceration of innocent persons"); *Murray*, 477 U.S. at 495-96 (explaining that the exception is reserved for those extraordinary cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent"). As the Court explained in *Schlup* v. *Delo*, 513 U.S. 298 (1995):

> To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.

*Id.* at 321.

Furthermore, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623 (citing *Sawyer* v. *Whitley*, 505 U.S. 333, 339 (1992)). This extremely narrow test is satisfied only if the petitioner can demonstrate that his acts "have been ruled not to constitute criminal conduct." *Underwood* v. *United States*, 166 F.3d 84, 88 (2d Cir. 1999); *see also Reyes-Requena* v. *United States*, 243 F.3d 893, 904 (5th Cir. 2001) (petitioner must establish that he or she "may have been convicted of a nonexistent offense"). For example, in *Bousley*, the Supreme Court remanded the case for a determination whether the petitioner had satisfied the "actual innocence" test. 523 U.S. at 624. There, the Court was considering whether the petitioner could obtain relief based on *Bailey* v. *United States*, 516 U.S. 137 (1995), in which the Court curtailed the reach of the version of 18 U.S.C. § 924(c)(1) in effect at the time of Bailey's conduct and held that the term "use" of a weapon in the statute required "active employment" of the weapon. *Id.* at 617. Petitioner Bousley had failed to raise any *Bailey*-type claim; *Bailey* itself had been handed down after his appeal was complete. *See* 523 U.S. at 622-23. The Supreme Court ruled that Bousley would be afforded the opportunity, on remand, to demonstrate "actual innocence"—that is, that he had not "used" a firearm within the meaning of the term adopted in *Bailey*—but that his claim would be procedurally barred absent such a demonstration. *See id.* at 624.

### B.  Discussion

### 1.  Whitman Did Not Raise His Current Argument on Direct Appeal

Whitman's primary argument in his petition is aptly summarized by him in two succinct sentences: "The instruction given at trial—which stated that just maintaining a friendship constitutes a personal benefit—is erroneous under *Newman*.  Because the Government relied heavily on a friendship theory of personal benefit at trial, that instruction cannot be deemed harmless." (Pet'r Br. at 8).  Whitman raised no claim even remotely like this on direct appeal, and the result is that Whitman's claim is procedurally barred unless he can show cause and prejudice or actual innocence.

In an attempt to avoid this heightened standard—with which he never engages—Whitman notes, with some support, that he did press the relevant issue during the charging conference at trial, but then argues, entirely contrary to fact, that when he failed to obtain the jury instruction he sought from this Court he continued to pursue the issue on direct appeal. (Pet'r Br. 18).  In support of this latter proposition, however, Whitman can muster only a single sentence, cobbling together out-of-context snippets from a single page of his appellate brief, asserting:

> Mr. Whitman reiterated these objections on appeal, arguing that the government's proof of friendship as a personal benefit conveyed to Motey's sources was not "in exchange for an actual 'personal gain'" ([Whitman App. Br.] at 50 (quoting *Dirks* v. *S.E.C.*, 463 U.S. 646, 662 (1983))), and that proof that Mr. Whitman knew of friendships between Khan and her sources did not constitute proof of a personal benefit either (*see*, *e.g.*, [Whitman App. Br.] at 50 and n.15 ("Although he was aware that Khan had a friendly relationship with Bhalla and requested that she contact him for information about Polycom, the record did not show that Mr. Whitman knew at the time of any benefit provided to or anticipated Bhalla.") (citations omitted)).

(Pet'r Br. at 18-19).

As an initial matter, the specific quotations from Whitman's appellate brief that Whitman now claims presented and preserved a specific claim of trial error are so obscure that it is hard to imagine how they could be deemed to preserve any claim on appeal, let alone the specific one that Whitman is now pressing in his Section 2255 motion.  One of the quoted passages from his appellate brief that Whitman now claims presented an issue to the court of appeals is no more than a parenthetical to a citation of *Dirks*, and the other is from a footnote. (Whitman App. Br. at 50 and n.15). *See also Norton* v. *Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("an argument made only in a footnote [i]s inadequately raised for appellate review").

In any event, even looking more broadly at the single paragraph and footnote of his appellate brief from which Whitman draws these snippets, it is plain that Whitman never asserted to the court of appeals anything like the claim he asserts now—that this Court committed instructional error by telling the jury that "just maintaining a friendship constitutes a personal benefit." (Pet'r Br. at 8).  To the contrary, having asserted the claim at trial, he abandoned it on appeal.

Whitman challenged only two aspects of the Court's jury instructions on appeal.  He asserted that the Court should not have given a conscious avoidance instruction (Whitman App. Br. at 43-46 ("It Was Impermissible To Instruct The Jury On Conscious Avoidance In The Absence Of The Necessary Factual Predicate.")), and he asserted that the Court failed to give a clear instruction that a defendant must *know* that the tipper received a benefit (Whitman App. Br. 46-51 ("The Instructions Erroneously Failed to Require Proof that Whitman Knew the Insiders Acted for Personal Benefit")).  The language that Whitman now relies on comes exclusively from the section on the latter claim. (Pet'r Br. at 18 (quoting Whitman App. Br. at 50)).

Specifically, in support of his claim that the Court's knowledge-of-the-benefit instruction was erroneous—and perhaps (although it is unclear) also in support of the claim of error concerning the conscious avoidance instruction—Whitman devoted a single paragraph and a footnote to the assertion that those two claimed instructional errors could not have been harmless because the Government's proof of the existence of any benefit was purportedly so weak that the jury's verdict could only be explained by the two claimed instructional errors. (Whitman App. Br. 50 ("The only way the jury could have found Whitman guilty on all counts, despite manifest deficiencies in the evidence concerning these and other counts, was the ambiguities and errors in the jury instructions.")).

Thus, in context, the very small section of his appellate brief to which Whitman points manifestly did not assert what Whitman now claims as the centerpiece of his Section 2255 Motion—that this Court committed instructional error by telling the jury that "just maintaining a friendship constitutes a personal benefit." (Pet'r Br. at 8).   Rather, it was a claim that two completely different purported instructional errors were not harmless.  Indeed, even in the more limited context of that argument—namely, that the supposed "insufficient evidence of any 'personal benefit'" demonstrated the requisite prejudice from those other two errors (Whitman App. Br. at 50)—Whitman never even offered in passing that he believed this Court had misdefined "personal benefit" to the jury or that he had suggested a different definition at the charging conference.   In other words, not only was the issue not pressed on appeal, it was not even mentioned in passing when the issue of "personal benefit" arose in this other context.

20

### 2.  There Was No Cause for the Procedural Default

Measured against the foregoing legal standard, Whitman's petition establishes neither "cause" nor "actual innocence."   However, because Whitman fails to acknowledge his procedural default, he does not directly address what possible "cause" prevented defense counsel[4] from raising this issue, other than making the largely irrelevant assertion that *Newman* created new substantive law.  The Supreme Court has repeatedly emphasized that "cause . . . requires a showing of some external impediment *preventing* counsel from constructing or raising the claim."  *McCleskey*, 499 U.S. at 497 (quoting *Murray*, 477 U.S. at 492) (emphasis in original).  There was no such external impediment that *prevented* Whitman from raising his claim on appeal, a point made clear by Whitman's objection to the benefit instruction during the charge conference, during which he argued that the benefit must be "one that can actually be expected to redound a pecuniary benefit eventually."  (Tr. 2343.)  By thereafter making a strategic decision not to present the claim to the Second Circuit—when it was clearly available to him—Whitman cannot show "cause" for his default.[5]

---

[4] The counsel that represented Whitman during trial also represented him on his direct appeal, but does not represent him for purposes of this habeas petition.  This prior counsel will be referred to as Whitman's "defense counsel."

[5] Even if Whitman were to demonstrate "cause" for his counsel's failure to raise the claim on appeal, he would not be able to prove prejudice.  Petitioner must "shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Frady*, 456 U.S. at 170.  For the same reasons that Whitman cannot show actual innocence (as explained later in this section), the abundant evidence of Whitman's knowledge of the pecuniary benefit expected by insiders would make it impossible for him to demonstrate prejudice of the magnitude required by *Frady*.

### 3. Whitman Cannot Show Actual Innocence

Whitman's unexcused default with respect to the nature of the benefit argument means that, to prevail, he must demonstrate that he is "actually innocent." The "actual innocence" standard is strict by design: Whitman must prove, based on the content of the entire trial record, that no reasonable juror would have convicted him. *See Bousley*, 523 U.S. at 623-24 (setting forth actual innocence standard); *Ryan v. United States*, 645 F.3d 913, 917 (7th Cir. 2011) ("*Bousley* afford[s] relief if a person is in prison for acts that the law does not make criminal. *That standard depends on the content of the trial record, not the content of the jury instructions*." (emphasis added)), vacated on other grounds, 132 S.Ct. 2099 (2012).

In this case, irrespective of whether the Court's jury instruction on the definition of personal benefit was broader than what might now be permissible under *Newman*, the content of the trial record provides ample evidence that Whitman was not "actually innocent" under the correct standard. To the contrary, the trial record was replete with proof that the insiders at issue acted in the expectation of a pecuniary benefit and that Whitman was well aware or consciously avoided knowledge of that fact.[6]

Indeed, on this subject, the facts developed during Whitman's trial differ significantly from the facts in *Newman*. Newman and Chiasson were found to be three and four levels removed, respectively, from one inside tipper, and four levels removed from another, and "were

---

[6] Whitman argues that the Government "relied heavily on a friendship theory as its core theory of guilt" at trial. (Pet'r Br. at 1). That is simply not true. For example, the recorded call between Whitman and Wang—which was the very first piece of evidence presented by the Government in its summation and which the Government characterized as "say[ing] it all"—had nothing to do with maintaining friendship in exchange for inside information. (Tr. 2799). Similarly, at the close of rebuttal, the Government again emphasized that recorded call as evidence of Whitman's knowledge that "when getting inside information, it is a *quid pro quo*" and of Whitman's understanding that Khan "is giving something to get this inside information, because that's how this works … insiders don't give this stuff for free." (*Id.* at 2931).

22

not aware of the source of the inside information." *Newman*, 773 F.3d at 443.  Whitman, by contrast, was separated from the insiders by only one intermediary—either Khan, Motey, or Wang—and had knowledge of who the insiders were, even if he did not know their names.

Moreover, the Government introduced direct evidence that Whitman had actual knowledge that insiders who provide MNPI in general—and, indeed, some of the specific insiders who provided the MNPI that made its way to him—expect a personal benefit that is "objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452.   Whitman's own recorded words, from a wiretapped conversation with Wang, are highly incriminating evidence that Whitman knew that the insiders who were providing the MNPI upon which Whitman traded were doing so with the expectation of a personal benefit of "some consequence" even if such benefit was not "*immediately* pecuniary." *Id.* at 453 (emphasis in original).  During the recorded call, Whitman betrayed not only his specific knowledge that Khan's "mole" at Google expected to be paid for the inside information she was providing, but also his awareness that this was the *normal practice* in such criminal arrangements.   Whitman clearly understood the rules of the illegal game he was playing.  Whitman told Wang that "I have to assume" that Wang also compensates his source with, for example "a bunch of nice wine," "some dinners," or "just something to thank him for his help," and Wang confirmed that he did provide some of this to his source.  Given the significance of this recorded call—recognized by the Second Circuit as particularly "damning" evidence—it is noteworthy and telling that Whitman does not address, or even mention, this recording in his Petition.  Whitman's own words are more than sufficient to defeat any claim of "actual innocence" with respect to all Counts in the Indictment, inasmuch as he was, at a

minimum, aware of the high probability of the fact that the insiders anticipated a *quid pro quo* and deliberately avoided confirming that fact.

Indeed, while Whitman's recorded statements are sufficient to prove that Whitman knew that the insiders with whom he was conspiring were anticipating a benefit that amounted to more than "maintaining or furthering a friendship," there was also proof that Whitman's understanding about expectations of pecuniary benefit were, in fact, correct.  With respect to Google, the insider, Hussain, had demanded a cash payment of over $100,000 in exchange for the MNPI she delivered.  Khan had made efforts to raise that money, including going so far as to collect $15,000 from one tippee.  When Khan failed to deliver on Hussain's demands, Hussain stopped providing inside information—and Whitman knew exactly that, as the jury learned from the Wang recording, in which Whitman said he lost his "mole" at Google because "the woman wanted to be paid" and Khan "didn't have enough sense to go out and buy her some really nice present."

Whitman's understanding also proved to be accurate with respect to the Polycom MNPI, in exchange for which Bhalla expected Khan to share her trading profits, and with respect to the Marvell MNPI, in exchange for which one insider received analyst reports and the other insider received forgiveness of a personal loan.  As with the Google insider, there was evidence that Whitman knew or consciously avoided knowing that the Polycom insider disclosed inside information in anticipation of a pecuniary benefit.  Khan testified that, not only did Whitman know that Bhalla was her source for inside information about Polycom, but also that Whitman repeatedly urged her to get such information from Bhalla.  For example, on one recorded call, Whitman is heard urging Khan to get a "good call" on Polycom so that Whitman could "short it."

When Khan expressed concern that she could "go to jail for doing that," Whitman suggested a means of communicating with her source that could not be traced back to her.  Khan testified that she and Bhalla stopped speaking for approximately a year, between April 2006 and April 2007, because Khan did not have the money that she had come to understand Bhalla expected in return for Marvell MNPI. Whitman knew that Bhalla had ceased giving Khan inside information.  And he also knew that after a year of no contact, Khan resumed receiving insider information from someone at Polycom.  Given Khan's willingness to discuss with Whitman the loss of Khan's insider at Google, due to Khan's unwillingness to pay cash in exchange for additional inside information, it is entirely reasonable for a jury to have inferred that Khan also told Whitman about the underlying financial reasons for the break in her communications with Bhalla.  Taking into consideration Whitman's recorded comments about how insiders could expect to receive remuneration such as cash, trips, wine, and expensive handbags in exchange for insider information, and that specifically the Google insider had those expectations, there is strong support for the inference that Whitman knew Bhalla expected a pecuniary benefit or that, at a minimum, Whitman deliberately avoided gaining such knowledge.[7]

In sum, in light of the content of the trial record, and in particular, the recorded call between Whitman and Wang, Whitman cannot establish his actual innocence, and therefore his claim is defaulted.

---

[7] In light of the strength of the Government's proof on the substantive counts, there can be no dispute that Whitman remains guilty of the conspiracy counts as well.

**II.     Defense Counsel Was Not Constitutionally Ineffective for Failing to Raise the Nature of the Benefit Argument on Appeal.**

In the last paragraph of his memorandum, Whitman asserts that if his counsel "could be reasonably expected to have more fully preserved Mr. Whitman's *Newman* claim, then it follows that they should have done so, and that failing on their part deprived their client of his Sixth Amendment right to the effective assistance of counsel." (Pet'r Br. at 20). However, Whitman's unsupported conclusion that his defense counsel's procedural default on appeal automatically establishes an ineffective assistance of counsel claim is directly contrary to recent Second Circuit case law.

### A.  Applicable Law

To prevail on an ineffective assistance of counsel claim, a habeas petitioner must demonstrate both that (1) his counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonability probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (U.S. 1984). "[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700.

"An attorney is not required to forecast changes or advances in the law" in order to provide effective assistance. *Sellan* v. *Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (internal quotation marks and citation omitted). Instead, "counsel's performance must be assessed … as of the time of counsel's conduct without the benefit of hindsight." *Id.* (internal quotation marks omitted).

The Second Circuit has explicitly rejected the argument that a district court places a defendant in an impermissible "Catch 22" in holding that "[the defendant's] claim did not overcome the 'cause' portion of the procedural default standard, while also concluding that counsel was not deficient because the argument was novel at the time" that counsel should have raised it. *McCoy* v. *United States*, 707 F.3d 184, 188 (2d Cir. 2013).  It is improper to consider these two standards to be interchangeable and thereby to "ignore[] the differences between determining whether cause exists to excuse a procedural default and whether counsel's performance was constitutionally deficient."  *Id.* (finding that defendant "failed to establishing cause for failing to raise the challenge below … because the argument was 'reasonably available'" to him and "nothing external prevented him from making it," while at the same time finding that his counsel was not ineffective in failing to raise the challenge "given the defense bar's long-held position" about the categorical qualification of state narcotics convictions for purposes of repeat offender notice).

### B.  Discussion

By "ignoring the differences between determining whether cause exists to excuse a procedural default and whether counsel's performance was constitutionally deficient," Whitman does precisely what is expressly prohibited by *McCoy*.  Moreover, aside from this erroneous conflation of the two standards, Whitman makes no effort to explain how the representation provided by his defense counsel falls below an objective standard of reasonableness.  And in fact, it does not.

Put simply, the *Strickland* test is a two-pronged test, requiring both an objectively unreasonable decision and prejudice.  Whitman's argument collapses it into a single factor—prejudice—inviting the Court to find that ineffective assistance of counsel is established simply

because a decision, reasonable or not, is claimed with the benefit of hindsight to have worked out to the defendant's detriment.  The practice of law, which inherently requires strategic decision-making, is not subject to any such standard of strict liability.

Furthermore, in this case, the Court went out of its way to praise the "exceptional" and "excellent" performance of defense counsel:

> I thought this was an exceptionally well tried case by counsel on both sides. I have had a number of important trials recently. In none was the uniform level of the lawyering as good as it was in this trial. It was really exceptional, and I commend all counsel for their excellent work.

(Tr. 2935).

Because Whitman has not shown that the performance of defense counsel was objectively unreasonable, the Court need not reach the prejudice prong of the ineffective assistance of counsel standard.   However, even if the Court were to determine that counsel was constitutionally ineffective and were to reach the prejudice prong, Whitman could not prevail. Even if Whitman's defense counsel had appealed the nature-of-the-benefit instruction, and even if the Second Circuit had issued a *Newman*-type decision on that appeal, this would not have resulted in the reversal of Whitman's conviction.  As explained in Section I, *supra*, the evidence offered against Whitman at trial was more than sufficient to sustain his conviction, even under a heightened *Newman* standard.   In other words, the result of the criminal proceedings against Whitman would not have been different, as there was overwhelming proof that Whitman knew that the insiders were not acting solely for the purpose of "maintaining or furthering a friendship."   Again, even if the jury considered only the recorded call that captured Whitman's own words about the pecuniary nature of the benefit he assumed the insiders were expecting, in conjunction with this Court's conscious avoidance instruction, the jury would easily have

28

concluded that Whitman knew that casual friendship was not the currency of exchange for illegally-procured inside information.

Therefore, Whitman's claim that his defense counsel was ineffective should be rejected by this Court.

## III.   Whitman's Challenge to the Sufficiency of the Indictment was Procedurally Defaulted, is Not Cognizable on Collateral Review, and is Meritless.

Finally, separate and apart from his claims of trial error, Whitman asserts that the Indictment itself was deficient because it did not allege that the tippers received an objective and consequential benefit, and that Whitman was aware of such a benefit. (Pet'r Br. at 15).  This claim can be swiftly rejected for at least three reasons.

*First*, Whitman did not raise any such claim on direct appeal, nor does he claim now that he did.  There having been no cause for this procedural default—for the reasons already discussed—the argument is procedurally barred.  And Whitman cannot show actual innocence as a result of supposed pleading deficiencies in the Indictment.  Rather, whether Whitman is in prison for a crime of which he is actually innocent (and he is not) "depends on the content of the trial record." *Ryan*, 645 F.3d at 917.  Indeed, even were this direct appeal, Whitman's challenge to the charging language of the Indictment would be beside the point in light of the subsequent trial and guilty verdict.  *See generally United States* v. *Mechanik*, 475 U.S. 66, 70 (1986) ("Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt."); *Lopez* v. *Riley*, 865 F.2d 30, 32 (2d Cir. 1989) ("federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury").

29

*Second*, and largely for the same reason, even if preserved, challenges to supposed defects in an Indictment are almost categorically not the type of claim that is cognizable on collateral review. *See*, *e.g.*, *Paroutian* v. *United States*, 395 F.2d 673, 675 (2d Cir. 1968) ("It is settled that an indictment cannot be collaterally attacked under section 2255 except for lack of jurisdiction or infringement of constitutional rights."); *United States* v. *Smith*, 407 F.2d 33, 34-35 (2d Cir. 1969) ("Since it does not appear on the face of the indictment that no federal offense had been committed, the indictment is not presently subject to collateral attack by motion under Section 2255.").

*Third*, in any event, there was no defect in the Indictment.  Federal Rule of Criminal Procedure 7(c) requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged."  To be legally sufficient, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (citations omitted); *United States* v. *Al Kassar*, 582 F. Supp. 2d 488, 496 (S.D.N.Y. 2008); *United States* v. *Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (citations omitted).  "In short, 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States* v. *LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (quoting *Hamling* v. *United States*, 418 U.S. 87, 117 (1974)).  An indictment also "'must be read to include facts which are necessarily implied by the specific allegations made.'"  *Stavroulakis*, 952 F.2d at 693 (quoting *United States* v. *Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)).

In this case, the Indictment was valid on its face, irrespective of the heightened benefit requirement in *Newman*, given that each of the elements of insider trading liability had been sufficiently pled.   The Indictment alleged that Whitman knew that the inside information was "obtained in violation of duties of trust and confidence that the [inside sources] owed to [the company] and [its] shareholders."   This allegation—when "read to include facts which are necessarily implied by [it]"—is plainly sufficient to meet the pleading requirement that "the tippee knew of the tipper's breach, that is, he knew the information was confidential and divulged for personal benefit." *Newman*, 773 F.3d at 450.   Put differently, "the exchange of confidential information for personal benefit is not separate from an insider's fiduciary breach; it *is* the fiduciary breach," *Newman*, 773 F.3d at 447-48 (emphasis in original), and so if the Indictment charged that Whitman was aware of the insider's breach (as it did), it necessarily charged that Whitman was aware of a sufficient personal benefit to the insider to constitute that breach.   This Court reached the same conclusion in denying Whitman's pre-trial motion to dismiss the Indictment, *see* June 21, 2012 Oral Argument Tr. at 3, 24, as have other federal district courts in this Circuit.   *See United States* v. *Rajaratnam*, 2014 WL 1554078, *2 (S.D.N.Y. April 17, 2014) (Buchwald, J.) ("charging knowledge of a breach of fiduciary duty as was done here necessarily charges knowledge of a personal benefit, thus making the Indictment sufficient");   *United States* v. *Santoro*, 647 F. Supp. 153, 170 (E.D.N.Y.1986), *aff'd mem.* 880 F.2d 1319 (2d Cir.1989) (indictment not facially deficient for alleging only knowledge of a breach of fiduciary duty).

## Conclusion

For the reasons set forth above, the Court should deny Whitman's Section 2255 petition.

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York


By: _____/s/_____
    Christine I. Magdo
    Assistant United States Attorney

Dated: New York, New York
       April 15, 2015

32